TENNESSEE:

UNITED STATES DEPARTMENT OF JUSTICE

UNITED STATES ATTORNEY'S OFFICE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA,

       PLAINTIFF,

VS.                    CASE NO. 23-MJ-02033

JOSIAH ERNESTO GARCIA,

       DEFENDANT.

_____

AUDIO TRANSCRIPTION OF HEARING
BEFORE THE HONORABLE
JEFFREY S. FRENSLEY

TUESDAY, APRIL 18, 2023

FRED D. THOMPSON FEDERAL BUILDING AND COURTHOUSE
719 CHURCH STREET
NASHVILLE, TENNESSEE 37203

TOLL-FREE 800.262.8777   LOCAL 540.667.0600   FAX 540.667.6562

County COURT REPORTERS, Inc.
Videography   Litigation Technology™

```
 1              APPEARANCES

 2  ON BEHALF OF THE PLAINTIFF,

 3  UNITED STATES OF AMERICA:

 4  BROOKE K. SCHIFERLE,

 5  ASSISTANT UNITED STATES ATTORNEY

 6  UNITED STATES ATTORNEY'S OFFICE

 7  719 CHURCH STREET, SUITE 3300

 8  NASHVILLE, TENNESSEE 37203

 9  TELEPHONE: 615.736.5151

10  FASCIMILE: 615.401.6626

11

12  ON BEHALF OF THE DEFENDANT,

13  JOSIAH ERNESTO GARCIA:

14  DAVID FLETCHER, FEDERAL PUBLIC DEFENDER

15  OFFICE OF THE PUBLIC DEFENDER

16  810 BROADWAY

17  SUITE 200

18  NASHVILLE, TENNESSEE 37203

19

20

21

22

23

24

25
```

County
COURT REPORTERS, Inc.
Videography    Litigation Technology

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 2 of 131 PageID #: 45
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1                    **APPEARANCES**

2    **ON BEHALF OF THE DEFENDANT,**

3    **JOSIAH ERNESTO GARCIA:**

4    CARYLL S. ALPERT,

5    ASSISTANT FEDERAL PUBLIC DEFENDER

6    **OFFICE OF THE PUBLIC DEFENDER**

7    810 BROADWAY

8    SUITE 200

9    NASHVILLE, TENNESSEE 37203

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX

 2                                        Page

 3   FBI SPECIAL AGENT STEPHEN HUNTER:

 4   DIRECT EXAMINATION BY MS. SCHIFERLE    8

 5   CROSS EXAMINATION BY MR. FLETCHER      60

 6   REDIRECT EXAMINATION BY MS. SCHIFERLE  77

 7

 8   PATRICIA GARCIA:

 9   DIRECT EXAMINATION BY MR. FLETCHER     82

10   CROSS EXAMINATION BY MS. SCHIFERLE     86

11

12

13                     EXHIBITS

14   Exhibit                              Page

15

16                RETAINED BY COUNSEL

17

18     1        Exhibit 1                 15

19

20     2        Exhibit 2                 18

21

22     3        Exhibit 3                 20

23

24     4        Exhibit 4                 23

25
```

```
 1     5      Exhibit 5                    25

 2

 3     7      Exhibit 7                    26

 4

 5     8      Exhibit 8                    26

 6

 7     6      Exhibit 6                    27

 8

 9     9      Exhibit 9                    31

10

11    10      Exhibit 10                   38

12

13    11      Exhibit 11                   47

14

15    12      Exhibit 12                   47

16

17

18

19

20

21

22

23

24

25
```

County
**COURT** **REPORTERS**, Inc.
Videography          Litigation Technology

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 5 of 131 PageID #: 48
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1                **AUDIO TRANSCRIPTION OF HEARING**

2                  **BEFORE THE HONORABLE**

3                  **JEFFREY S. FRENSLEY**

4                **TUESDAY, APRIL 18, 2023**

5                **THE COURT:**  Good afternoon.

6  Welcome, everyone.  We're here this afternoon the

7  matter of the United States of America v. Josiah

8  Garcia.  It's case number 323MJ2033.  Mr. Garcia

9  is present in court this afternoon, along with

10  Mr. Fletcher and Ms. Alpert's here.  Ms.

11  Schiferle is here for the United States.  We'd

12  set the matter today for a detention hearing in

13  this matter.  The Court's in receipt of the

14  pretrial services report, which I've reviewed.

15  I've assume you've each received a copy of the

16  report as well, and you can keep your copy at the

17  completion of the proceedings today.

18                Ms. Schiferle, is Government ready

19  and do you have any announcements before we get

20  started?

21                **MS. SCHIFERLE::**  No, we're ready,

22  Your Honor.

23                **THE COURT:**  All right.  Very good.

24  Thank you.

25                Mr. Fletcher, any announcements?

County
**CourtReporters**, Inc.
Videography          Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 6 of 131 PageID #: 49
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  Are you ready?

2              **MR. FLETCHER:**  Ready, Your Honor.

3              **THE COURT:**  All right, very good.

4  Thank you.  Ms. Schiferle, how would you like to

5  proceed?

6              **MS. SCHIFERLE::**  Your Honor, I'd

7  like to call to the stand FBI Special Agent

8  Stephen Hunter.

9              **THE COURT:**  All right, if you'd

10  step up, sir, and be sworn.

11              **COURT CLERK:**  Do you solemnly

12  swear or affirm that the testimony given this

13  case is the truth, the whole truth, and nothing

14  but the truth?

15              **MR. HUNTER:**  Yes.  I do.

16              **COURT CLERK:**  Could you please

17  state your name for the record and spell your

18  last name?

19              **MR. HUNTER:**  Stephen Hunter.  H-U-

20  N-T-E-R.

21              **COURT CLERK:**  Thank you so much.

22  Have a seat.

23  **FBI SPECIAL AGENT STEPHEN HUNTER,** having been

24  duly sworn by the CLERK, was examined and

25  testified as follows:

1  DIRECT EXAMINATION

2  BY MS. SCHIFERLE::

3       Q.   Good afternoon, Agent Hunter.

4       A.   Good afternoon.

5       Q.   Could you just please tell the Court

6  briefly about your history as a law enforcement

7  officer or agent?

8       A.   Yes, I've been an FBI agent for

9  approximately 14 years.  I spent, after Quantico,

10  I spent my first six years working gangs and

11  drugs and violent crime on a task force in

12  Baltimore, Maryland on the edge of D.C., and then

13  spent three years on our FBI Director's

14  protection detail before coming to Nashville in

15  the last four years, working violent crime here

16  in Nashville.

17       Q.   So you've been investigating violent

18  crime as an FBI agent for let's call it a total

19  of ten years, approximately, out of that, almost

20  14?

21       A.   Yes, that'd be accurate.

22       Q.   Okay, and before this case, have you

23  ever investigated a murder-for-hire case?

24       A.   I have not.

25       Q.   So since it was your first one, did you

1  confer with any other FBI agents who had

2  experience investigating this type of case?

3      A.   Yes, a colleague in my office worked a

4  complex murder-for-hire case in the last couple

5  of years.  I consulted with him, and then the

6  undercover is experienced in murder-for-hire

7  cases, consulted with them as well.

8      Q.   Okay.  And we're going to get more into

9  the undercover who was involved in this case in a

10  little bit.  But you said he has significant

11  experience participating in murder-for-hire

12  investigations?

13      A.   Yes.

14      Q.   And so can you describe a little bit

15  how your relationship with the undercover was

16  structured in this investigation?

17      A.   Yes.  So the way it works with our

18  agency is once a case looks like it's going

19  towards where an undercover would be used, we, we

20  have an undercover coordinator in our office work

21  with that person, who then chooses, or helps

22  choose who's going to come in and work the case.

23  And then I work with that undercover, giving

24  direction on the case, but then taking guidance

25  from them based on their experience as well.

County
COURT REPORTERS, Inc.
Videography        Litigation Technology

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 9 of 131 PageID #: 52
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1      Q.   Okay, and so is that how it worked

2  here?  You were essentially directing the

3  undercover or giving him guidance, but he was, I

4  don't want to put the words in your mouth.

5      A.   Yes.

6      Q.   Can you say it again?

7      A.   Yeah, that's right.  Yes.  So he

8  doesn't know the case at first, so I give him

9  direction on, on the case and how we're trying to

10 get things to work, but then he also gives me

11 guidance based on his experience and the best way

12 to do things based on what he's done in the past.

13     Q.   Okay, great.  So before we get into the

14 nitty gritty, can you give the Court a really big

15 overview of essentially what happened in this

16 investigation?

17     A.   Yes.  So Air Force OSI reached out to

18 our office with some information regarding this

19 case that was then passed on to me.  Being that I

20 work on the Violent Crime Task Force.  There was

21 a website that's out there that Mr. Garcia had

22 reached out to called rentahitman.com and had

23 sent some information to, seeking, looking, what

24 it looked like to seek employment as a hitman.

25 As we got that information, Mr. Garcia followed

County
COURT REPORTERS, Inc.
Videography      Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 10 of 131 PageID #: 53
800.262.8777 TOLL-FREE      540.667.0600 LOCAL      540.667.6562 FAX    CountyCourtReporters.com

 1  up a few times, and then I got involved, started

 2  working the case, directed the UC.  As we started

 3  to get that involved, then there was some text

 4  messages, phone call, an initial meeting, and

 5  then a, a meeting where there was an exchange of

 6  funds and a target package where Mr. Garcia was

 7  arrested.

 8      Q.   Okay.  So when you initially got that

 9  tip from the Air Force, did you then reach out to

10  rentahitman.com to get some information directly

11  from them?

12      A.   Yes.  When the information was passed

13  on, the website owner's contact information was

14  also passed on, and I reached out to him and

15  spoke with him.

16      Q.   Okay.  And so did you obtain copies of

17  all that communication that occurred between the

18  defendant and that website?

19      A.   Yes, I did.

20      Q.   Okay.  Why was it that it went to the

21  Air Force before it went to the FBI, if you know?

22      A.   Mr. Garcia is employed by the Air

23  National Guard.

24      Q.   And so the website administrator

25  essentially informed them first?

 1      A.   Yes.  He reached out to Air Force OSI,

 2   Office of Special Investigation, who then reached

 3   out to us based on jurisdiction.

 4      Q.   Okay.  And you're the lead case agent,

 5   right?

 6      A.   I am.

 7      Q.   So when the undercover officer made

 8   contact with the defendant via text or phone

 9   call, were you present when those happened?

10      A.   I was not present.

11      Q.   The UC just gave you the information,

12   right?

13      A.   Yeah.  We spoke about it beforehand and

14   how that would work and then worked together on

15   that, and then he would send messages or make a

16   phone call.

17      Q.   And then when the deal occurred on

18   April 12th, were you present for that?

19      A.   I was not with the undercover, but I

20   was there present, yes.

21      Q.   At the location?

22      A.   Yes.  At the location.

23      Q.   And actually you were present with the

24   defendant when he was arrested, right?

25      A.   Yes.

1    Q.    Okay.  All right.  You are also the

2  affiant of the criminal complaint in this case,

3  correct?

4    A.    I am.

5    Q.    All right.  Do you adopt the full

6  contents of that criminal complaint as part of

7  your testimony here today?

8    A.    Yes, I do.

9    Q.    All right.  So let's talk about really

10 briefly.  Can you tell the Court what you know

11 about rentahitman.com?

12   A.    Yes.  So as a part of the case, I

13 learned the website from the website owner, who

14 explained to me as well that the, the website

15 began as, you know, around 2005 or so.  He and

16 some other people were trying to get an IT

17 company, computer company, cyber type company,

18 started.  Had the, started the website for that

19 reason with a catchy name, and their business was

20 not successful.  But they started getting so many

21 inquiries on people trying to hire a hitman that

22 they turned the website into a sort of a parody

23 where it looks, it appeared to be, you know,

24 where you would hire, where you would find

25 someone, you know, to hire a hitman.  And over

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 13 of 131 PageID #: 56
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  the years, there have been multiple arrests.

2      Q.   Okay.  And those arrests, to your

3  knowledge, well, first of all, they occurred

4  because someone at the website referred the

5  information to a law enforcement agency, correct?

6      A.   Correct.  He would refer to whatever

7  agency's jurisdiction.

8      Q.   Okay.  And to your knowledge, have all

9  of those arrests up until now been for people who

10 are looking to hire a hitman?

11     A.   Yes, according to the website owner.

12 Yeah.

13     Q.   Okay.  And is this in fact the first

14 case in this country that you're aware of where

15 someone was arrested for trying to be a hitman?

16     A.   Yes, from that website.

17     Q.   Okay.

18     A.   That's how he described it.

19     Q.   And did the website owner tell you

20 whether or not other people have ever sent sort

21 of initial employment inquiries to the website?

22     A.   To be a hitman?

23     Q.   Correct.

24     A.   What he said was this was the first

25 time he had had this specific situation.

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 14 of 131 PageID #: 57
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    County Court Reporters.com

1        Q.    Meaning that the person was following

2    up, giving a resume, and the requested documents,

3    right?

4        A.    Correct.  Yes.  Someone, as opposed to

5    hiring someone to, to murder someone else, this

6    is the first time someone had contacted the

7    website to be a hitman and then submitted the

8    resume and everything.

9        Q.    All right, I am going to pass you what

10    is pre-marked as Government Exhibit-1.  Defense

11    and the Court have a copy.

12    (WHEREUPON, the WITNESS examined Government

13    Exhibit-1 for identification.)

14        Q.    Do you recognize that?

15        A.    Yes, I do.

16        Q.    What do you recognize it to be?

17        A.    It appears to be the initial, the first

18    inquiry that Mr. Garcia made to the website.

19        Q.    Okay.  And how do you recognize it?

20    What on that page tells you that that's what it

21    is.

22        A.    So it says general inquiries and

23    comments, employment inquiry.  And then I

24    recognize this as the first one, the first

25    contact.

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 15 of 131 PageID #: 58
800.262.8777 TOLL-FREE • 540.667.0600 LOCAL • 540.667.6562 FAX • CountyCourtReporters.com

```
 1        Q.    What's the date on it?

 2        A.    It is February 16th, 2023.

 3              MS. SCHIFERLE:  I'm offering

 4   Government's Exhibit-1 into evidence.

 5   THE COURT:  It'll be admitted.

 6   (WHEREUPON, Government's Exhibit-1 was admitted

 7   into evidence.)

 8   CONTINUATION OF DIRECT EXAMINATION

 9   BY MS. SCHIFERLE:

10        Q.    All right.  Now, does it have actually

11   the defendant's name on that document?

12        A.    Yes, it does.

13        Q.    And does it have an email address?

14        A.    It does.

15        Q.    What's the email address?

16        A.    Garcia.Numch1@gmail.com

17        Q.    does it have a phone number?

18        A.    Yes.

19        Q.    What is that?

20        A.    615-609-6559.

21        Q.    Is that the same phone number that the

22   undercover ended up having communications with

23   the defendant on?

24        A.    Yes.

25        Q.    All right, and then there's a section
```

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 16 of 131 PageID #: 59
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  where you can put questions or comments, right?

2      A.   Correct.

3      Q.   All right, and can you read for the

4  Court what is written in there?

5      A.   Yes, it says, "Hello, I'm looking for a

6  job much like this one, to be exact.  I have

7  military experience and rifle expertise, so

8  perhaps this is the place I could find that job.

9  However, before I go further, I have a couple of

10 questions.  Is this legit, and can I get an in-

11 depth job description, please?  Looking forward

12 to hearing from you."

13     Q.   All right.  And that was on February 16

14 of this year, correct?

15     A.   Yes.

16            MS. SCHIFERLE:  Do you want me to

17 pass these up or wait?

18            THE COURT:  You can just hold them

19 in case he needs to refer back to them, and then

20 you can put them all up at once.  Just make sure

21 we get them all.

22            MS. SCHIFERLE:  Will do.

23            THE COURT:  Thank you.

24 CONTINUATION OF DIRECT EXAMINATION

25 BY MS. SCHIFERLE:

1    Q.    All right, now, did the defendant in

2  fact reach out again to the Rent A Hitman website

3  that following day on February 17th ?

4    A.    Yes.

5    Q.    What was the substance of that

6  communication?

7    A.    They're having website issues.

8  Possibly having some website issues.

9    Q.    Okay.  And so he was conveying to the

10  website that he was having trouble using the

11  website?

12    A.    Yes.

13    Q.    All right.  And then I'm going to show

14  you what is pre-marked as Government's Exhibit-2.

15  (WHEREUPON, the WITNESS examined Government's

16  Exhibit-2 for identification.)

17    Q.    Do you recognize that?

18    A.    Yes.

19    Q.    What do you recognize it to be?

20    A.    This is an email from the website to

21  Mr. Garcia.

22    Q.    Okay.  And do you recognize that

23  because it has the website information and Mr.

24  Garcia's email address on it?

25    A.    Correct.  In the "to" sections.

1    Q.    And what is the date on that?

2    A.    It is February 18th, 2023.

3              MS. SCHIFERLE:   I'm offering

4    Government's Exhibit-2 into evidence.

5              THE COURT:   That'll be admitted.

6    (WHEREUPON, Government's Exhibit-2 was admitted

7    into evidence.)

8    CONTINUATION OF DIRECT EXAMINATION

9    BY MS. SCHIFERLE:

10    Q.    All right, so the "to" section, what

11    does it actually say the name is of the person?

12    I'm sorry, the from, who is the email being sent

13    from?

14    A.    It says

15    GuidofanelliContact@rentahitman.com.

16    Q.    All right.  Who's Guido Fanelli?

17    A.    That is the website owner's, what

18    fictional name he uses.

19    Q.    Okay.  And it's being sent to the

20    defendant.  And can you go ahead and read the

21    substance of the email, please?

22    A.    Yes.  "Josiah, thank you for letting us

23    know about the web form for employment.  We will

24    let our IT staff know so they can correct the

25    problem as far as employment is concerned.  If

1  you would like to send in a resume, headshot, and

2  an image of your ID, we can begin our interview

3  and onboarding process.  Best regards, Guido

4  Fanelli."

5      Q.   And then there's an email signature on

6  there, right?

7      A.   Oh, yeah.

8      A.   CEO of Rent A Hitman.  Your point click

9  solution.  Www.rentahitman.com.  100 percent

10  HIPAA compliant Hitman Information Privacy and

11  Protection Act of '64.

12      Q.   All right.  Did the defendant respond

13  to that request for documentation?

14      A.   Yes.

15      Q.   Showing you what's pre-marked as

16  Government's Exhibit-3.

17  (WHEREUPON, the WITNESS examined Government

18  Exhibit-3 for identification.)

19      Q.   It's a two-page document.  Do you

20  recognize those items?

21      A.   Yes, I do.

22      Q.   What do you recognize them to be?

23      A.   The driver's license for Josiah Garcia

24  and a selfie, self-taken photograph, and then a

25  resume of Mr. Garcia.

County
**COURT REPORTERS, Inc.**
Videography    Litigation Technology

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 20 of 131 PageID #: 63
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1          **MS. SCHIFERLE:**  I'm offering

2    Government's Exhibit-3 into evidence.

3          **THE COURT:**  It will be admitted.

4    **(WHEREUPON, Government's Exhibit-3 was admitted**

5    **into evidence.)**

6    **CONTINUATION OF DIRECT EXAMINATION**

7    **BY MS. SCHIFERLE:**

8        Q.   All right.  So the email that we just

9    read a minute ago asked for headshots, resume,

10   and an image of your ID.  Is that essentially

11   what we have here?

12       A.   Yes.

13       Q.   All right.  And what is the full name

14   on the ID?

15       A.   It is Josiah Ernesto Garcia.

16       Q.   And is the person in that headshot

17   appears to be the person who you arrested, who is

18   also the person who is here in court today?

19       A.   Yes.

20       Q.   All right.  Let's take a look at the

21   resume.  On the top of the resume, does it have

22   the same name, email address, and phone number

23   that we saw on the previous communications?

24       A.   Yes, it does.

25       Q.   Okay.  And what information is provided

 1  under work experience?

 2      A.   Security Forces, Air National Guard,

 3  Nashville, Tennessee, July 2021 to present.

 4      Q.   Okay.  And then there's some high

 5  school information.  And what about skills?

 6      A.   Entrepreneurship, military leadership,

 7  and surveillance.

 8      Q.   All right.  And then there's a section

 9  on military service?

10      A.   Yes.  It says branch, Air National

11  Guard; service country United States; rank E3;

12  July 2021 to present.

13      Q.   Have you done any investigation into

14  what the defendant's action position is in the

15  Air National Guard?

16      A.   Yes.

17      Q.   And what is it?

18      A.   Security Forces, which is like guarding

19  the gates or protection of a base.

20      Q.   And he holds that job here in Middle

21  Tennessee?

22      A.   Yes.

23      Q.   All right.  Under awards, what does it

24  say?

25      A.   Marksman expert, awarded for not

County
CourtReporters, Inc.
Videography    Litigation Technology

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 22 of 131 PageID #: 65
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1  missing a single bullseye on all the targets and

2  for shooting expert with two or more weapons.

3  And then it says, "Nicknamed, in quotations,

4  "Reaper, earned from military experience and

5  marksmanship."

6      Q.   All right, and then there's the last

7  section, certifications and licenses?

8      A.   Yeah.  It says expert in marksmanship,

9  certified expert in marksmanship;  Never miss the

10 bullseye.

11     Q.   All right.  And those documents were

12 sent to the Rent A Hitman on February 19th; is

13 that right?

14     A.   Yes.

15     Q.   Okay, I'm going to show you what's been

16 pre-marked as Government's Exhibit-4.

17 (WHEREUPON, the WITNESS examined Government

18 Exhibit-4 for identification.)

19     Q.   All right.  Do you recognize this

20 document?

21     A.   Yes.

22     Q.   What do you recognize it to be?

23     A.   It's an email from Mr. Garcia's email

24 to the Rent A Hitman website

25          MS. SCHIFERLE:  Offering

County
**COURT REPORTERS, Inc.**
Videography    Litigation Technology™

 1  Government's Exhibit-4 into evidence.

 2             **THE COURT:**  It'll be admitted.

 3  **(WHEREUPON, Government's Exhibit-4 was admitted**

 4  **into evidence.)**

 5  **CONTINUATION OF DIRECT EXAMINATION**

 6  **BY MS. SCHIFERLE:**

 7       **Q.   And what is the date and time that this**

 8  **email was sent?**

 9       A.   February 20th, 2023.  10:07 a.m.

10       **Q.   Okay.  And go ahead and please read the**

11  **email content for the Court.**

12       **Q.   Please read the email content for the.**

13       A.   Okay.  It says, "Hello, sir.  I hope

14  you're doing well.  I sent an email with the

15  requested documents for employment.  I haven't

16  heard back, so I'm sending this follow up email

17  as well.  Hope to hear from you soon.  Thank

18  you."

19           And then the next paragraph is, "Why I

20  want this job?  I'm looking for a job that pays

21  well related to my military experience."  And

22  then in parentheses, "Shooting and killing the

23  marked target so I can support my kid on the way.

24  What can I say?  I enjoy doing what I do.  So if

25  I can find a job that is similar to it," and then

County
COURT REPORTERS, Inc.
Videography   Litigation Technology

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 24 of 131 PageID #: 67
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1 parentheses, "such as this one, put me in, Coach.

2 Signed, Josiah G."

3       Q.    As part of your investigation, did you

4 also look into the defendant's social media, and

5 in particular, his Facebook account?

6       A.    Yes.

7       Q.    Did you find a Facebook account

8 belonging to him that had a public profile?

9       A.    I did.

10       Q.    Right.  I'm going to show you what's

11 going to be marked as Government's Exhibit-5.

12 (WHEREUPON, the WITNESS examined Government

13 Exhibit-5 for identification.)

14       Q.    Do you recognize this?

15       A.    Yes.

16       Q.    And what do you recognize it to be?

17       A.    A photo from the Facebook page.  His

18 Facebook page.

19       Q.    And you know what?  To expedite this

20 for the Court, why don't I show you also what's

21 been pre-marked as Government's 6, 7, and 8.  And

22 tell me, are those all images taken directly from

23 the defendant's public profile of the Facebook

24 account?

25       A.    Yes, it is.

1    Q.    Okay.

2                MS. SCHIFERLE:  I'm offering

3    Government Exhibit 5, 6, 7, and 8 into evidence.

4                THE COURT:  All right.  They'll be

5    admitted.

6    **(WHEREUPON, Government's Exhibit-5, Exhibit-6,**

7    **Exhibit-7, and Exhibit-8 were admitted into**

8    **evidence.)**

9    **CONTINUATION OF DIRECT EXAMINATION**

10   **BY MS. SCHIFERLE:**

11       **Q.    All right.  Starting with No. 5.  What**

12   **is it a picture of?**

13       A.    So it's a picture of Mr. Garcia, what

14   appears to be the Air Force beret, a t-shirt that

15   says Air National Guard, and then an AR style

16   like training weapon that's like a paint gun

17   style weapon.

18       **Q.    When you say it's a training weapon and**

19   **then you say it's a paint gun style weapon, what**

20   **do you mean?**

21       A.    Well, later, later on, I saw this

22   weapon in person, and it appears to be not a live

23   firearm, but a firearm that is used, possibly

24   used for training, that would take paintball or

25   you'd shoot paint.

County
COURT REPORTERS, Inc.
Videography    Litigation Technology

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 26 of 131 PageID #: 69
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1    **Q.    Okay.  So I don't want to put words in**
2    **your mouth, so you tell me if this is correct, if**
3    **I correctly understand you or not.  It's a gun**
4    **that can be used to shoot paintballs and is, but**
5    **it could also be used for training, for shooting**
6    **other targets.  Is that what you mean?**

7    A.    Yes.  You could, you could, you
8    wouldn't have to go to a firearms range to shoot
9    that gun because it doesn't, it would not harm
10   someone significantly if it hit them.  You could
11   shoot it at a wall, and it wouldn't go through
12   the wall.

13   **Q.    All right.  Exhibit-6.  Tell me about**
14   **that one.**

15   **(WHEREUPON, the WITNESS examined Government**
16   **Exhibit-6 for identification.)**

17   A.    So a photo of the same weapon, the Air
18   Force beret, and then maybe a small bag or a
19   piece of fabric that says Tennessee Air National
20   Guard.  And then below it, it says, "Josiah
21   Garcia, June 5th, 2022.  Now I can start off base
22   practicing at home, LOL."

23   **Q.    And the one that we just looked at a**
24   **minute ago, Exhibit 5, also posted that same**
25   **date, right?  June 5th, 2022?**

County
**COURT REPORTERS, Inc.**
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 27 of 131 PageID #: 70
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1      A.    Correct.

2      **Q.    All right.  Take a look at No. 7,**

3  **please.**

4  **(WHEREUPON, the WITNESS examined Government**

5  **Exhibit-7 for identification.)**

6      A.    All right.  Picture from the Facebook

7  page.  Mr. Garcia in an Air Force uniform with a

8  beret on, dated just says January 9th.  Josiah

9  Garcia.  And then, "Officially got that blue

10  beret," with an American flag, smiley face, and

11  thumbs up.

12      **Q.    Okay.  And tell me about Exhibit-8.**

13  **(WHEREUPON, the WITNESS examined Government**

14  **Exhibit-8 for identification.)**

15      A.    A photo from the Facebook profile as

16  well.  Josiah Garcia, February 20th.  It says,

17  "She's beautiful."  And the photo is of an AR-15

18  or it's an M4A1 rifle and a magazine.

19      **Q.    So that we're clear, the firearm in**

20  **this picture is not a paintball gun?**

21      A.    No.  This, I also saw this in person as

22  well.  It is, it is, in fact, a firearm.

23      **Q.    And what was the date this was posted?**

24      A.    February 20th.

25      **Q.    What is the comment written by the**

County
**COURT  REPORTERS**, Inc.
Videography        Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 28 of 131 PageID #: 71
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1  defendant?

2      A.    "She's beautiful."

3      Q.    Does the date February 20th mean

4  anything to you in the context of this case?

5      A.    Yes, it was the, the date of one of the

6  contact emails to the website.

7      Q.    I'm going to pass Government Exhibit-4

8  that's in evidence back to you.  What is the date

9  of that?

10     A.    February 20th, 2023.

11     Q.    And just so that the record is cleared

12 for the Court, which contact is that?

13     A.    This is from Mr. Garcia to the website,

14 following up on sending the requested documents,

15 which are the driver's license and headshot along

16 with the resume and in the section of why I want

17 this job.

18     Q.    Okay.  And so that's the email where he

19 says, "Put me in, Coach"?

20     A.    Yes.

21     Q.    All right.  And so that's the same day

22 that he posted that AR-style rifle on his

23 Facebook page?

24     A.    Correct.

25     Q.    All right.  All right.  So you received

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 29 of 131 PageID #: 72
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  all of this proof of contact with the website.

2  You did some research into his Facebook account,

3  and then what did you decide to do next?

4      A.   So I directed the owner of the website

5  to send a communication to Mr. Garcia that a

6  field coordinator would be in touch in the near

7  future based on clients.

8      Q.   Okay.

9      A.   And that would remove the website owner

10 from the situation.

11     Q.   Okay.  And what did you do after that?

12 Is that when you engaged the undercover officer?

13     A.   Yes.

14     Q.   Okay.  And so what were the first steps

15 that the undercover took in this case?

16     A.   He reached out via text to Mr. Garcia.

17     Q.   Okay.

18     A.   And too, he reached out via text to, to

19 arrange a telephone call.

20     Q.   And I'm not going to show you pictures

21 of those texts unless you need them to refresh

22 your recollection.  But in general, what did the

23 UC say in his introductory text message to the

24 defendant?

25     A.   That, you know, he was reaching out to,

County
CourtReporters, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 30 of 131 PageID #: 73
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  to see if Mr. Garcia were still interested and

2  then, you know they would have an in-person

3  meeting as, like, an initial interview.  And then

4  if that went well, I'm sorry, a phone call.  The

5  phone call for the initial interview.  And then

6  if that went well, you'd have an in-person

7  meeting.

8      Q.    And did he, in those text messages,

9  actually introduce himself as being a field

10  representative from rentahitman.com?

11      A.    Yes.

12      Q.    And I'm not asking you for verbatim,

13  but generally, how did the defendant respond?

14      A.    That he, he did agree and wanted to

15  speak on the phone.

16      Q.    Okay, so did they then set up a

17  telephone call?

18      A.    Yes.

19      Q.    Okay.  Was that telephone call on April

20  5th , 2023?

21      A.    Yes, it was.

22      Q.    I'm going to show you what has been

23  pre-marked as Government's Exhibit-9.  This is a

24  disk.  Have you reviewed this before?

25  (WHEREUPON, the WITNESS examined Government

1  Exhibit-9 for identification.)

2      A.    I have.

3      Q.    And how do you know it's the one that

4  you have viewed?

5      A.    Because I put my initials and today's

6  date on it.

7      Q.    All right.  And what are generally the

8  contents of this disc?

9      A.    Audio recordings of the phone call, the

10  first in-person meeting, and then the second

11  meeting where Mr. Garcia was subsequently

12  arrested.

13          MS. SCHIFERLE:  Offering

14  Government's Exhibit-9 into evidence.

15          THE COURT:  All right.  It'll be

16  admitted.

17  (WHEREUPON, Government's Exhibit-9 was admitted

18  into evidence.)

19  CONTINUATION OF DIRECT EXAMINATION

20  BY MS. SCHIFERLE:

21      Q.    All right.  Before we listen to these,

22  tell me about how each of them was recorded.  So

23  first, the call on April 5th, 2023, how was that

24  recorded?

25      A.    Yes.  So we, basically, we use an audio

1  recording device that can be used with a phone

2  where you can hear both sides of the

3  conversation.

4      Q.   And then after that, on April 5th, then

5  there was an in-person meeting on April 6th,

6  correct?

7      A.   Correct.

8      Q.   All right.  And how was that meeting

9  recorded?

10     A.   We use specific recording devices that

11  are hidden so that the person that we're meeting

12  with can't see them.  And then one had audio and

13  video.  And one had audio.

14     Q.   Okay.  So we're just going to listen to

15  audio today, but there does exist also some video

16  recording of that meeting, correct?

17     A.   Correct.

18     Q.   All right.  And then for the subsequent

19  meeting on April 12th, how was that recorded?

20     A.   The same way as the initial meeting.

21  With, along again, two devices that were one was

22  audio/video, and one was audio.

23     Q.   All right.

24     A.   Both also hidden, of course, from the

25  person that we're meeting with.

1      Q.   And again, we're just going to listen

2   to audio today, but there is some videos of that

3   meeting?

4      A.   Correct.

5           MS. SCHIFERLE:  All right.  So

6   with the Court's permission, I will play these

7   clips.

8           THE COURT:  You may.  Make sure

9   we're all set up to hear it.

10           MS. SCHIFERLE:  We should be.  We

11   did a test.

12           THE COURT:  Oh, great.  Thank you.

13   (WHEREUPON, an audio recording was played.)

14   CONTINUATION OF DIRECT EXAMINATION

15   BY MS. SCHIFERLE:

16      Q.   I just have one follow-up question for

17   you.  So all of those clips that we've just heard

18   were from the phone call that occurred on April

19   5th, right?

20      A.   Correct.

21      Q.   And you heard there was a section where

22   they discussed whether the defendant was

23   comfortable with torture or taking trophies?

24      A.   Yes.

25      Q.   Okay.  As part of that conversation, he

County
COURT REPORTERS, Inc.
Videography    Litigation Technology

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 34 of 131 PageID #: 77
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1  was also asked if he'd be comfortable with sexual

2  assault.  Is that right?

3      A.    Correct.

4      Q.    And what was his answer to that?

5      A.    No, he is not, he is not comfortable

6  with that.

7      Q.    So he's fine with torture and taking

8  trophies, but drew the line at sexual assault,

9  right?

10     A.    That's true.

11     Q.    Okay.  Now, after that phone call, they

12  then had an in-person meeting the next day,

13  right?

14     A.    Yes.

15     Q.    So how was that location coordinated

16  between the UC and the defendant?

17     A.    Via text message.

18     Q.    Okay.  So at some point in advance of

19  the meeting time, the UC chose a location and

20  gave that information to the defendant?

21     A.    Yes.

22     Q.    Okay.  What was that location?

23     A.    It was a cigar bar in Nashville,

24  Tennessee.

25     Q.    And I'm not going to play some clips

County
CourtREPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 35 of 131 PageID #: 78
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  **from this in-person meeting.**

2  **(WHEREUPON, an audio recording was played.)**

3                   **MR. FLETCHER:** Excuse me.  Your

4  Honor, I just want to make note right now because

5  I don't want to have to go back through all

6  these.  A lot of them are cut off.  I've listened

7  to them myself, and a lot of them are incomplete.

8  So I don't think they are complete conversations

9  or that we have complete conversations in them.

10  I don't know what's cut off on the other ends of

11  them, but I just wanted to make note of it now

12  instead of having to go back and replay them

13  again.

14                   **THE COURT:**  Okay.  So you've got

15  the complete conversations?

16                   **MR. FLETCHER:**  No.  I have what

17  she's playing right now, but I already noted

18  that, as you can hear, that it cuts off ...

19                   **THE COURT:**  Right.

20                   **MR. FLETCHER:**  ... at many

21  different portions of the clips.  And so we don't

22  hear, I don't know what's on the other end of the

23  parts that we don't hear.

24                   **MS. SCHIFERLE:**  That's correct.  I

25  made clips to try to expedite the proceeding.  If

County
**CourtReporters, Inc.**
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 36 of 131 PageID #: 79
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1 we play the whole conversation, which I'm happy

2 to do if the Court wants that, I don't have that

3 on the disk, but I have it on my computer. It's

4 a little over an hour. So I did make clips just

5 to expedite it, and that is what has been

6 provided to defense. The full copy will be

7 provided in discovery.

8                    THE COURT: Okay.

9                    MR. FLETCHER: And that's fine,

10 Your Honor. We can get it then. I just wanted

11 to make note of it now because I didn't want to

12 go and replay it when I got up there.

13                    THE COURT: Sure. Thank you.

14 Appreciate you bringing it to my attention. It's

15 noted for the record. You can continue, Ms.

16 Schiferle.

17 **(WHEREUPON, an audio recording was played.)**

18 **CONTINUATION OF DIRECT EXAMINATION**

19 **BY MS. SCHIFERLE:**

20     **Q.    All right.  So before I play the next**

21 **one, could you hear that last clip, Agent Hunter?**

22     A.    Yes.

23     **Q.    Okay.  What were they talking about?**

24     A.    The tattoo that Mr. Garcia has.

25     **Q.    And have you also viewed the video of**

1  this conversation?

2       A.   Yes.

3       Q.   All right.  Do you recognize what has

4  been pre-marked as Government's Exhibit-10?

5  (WHEREUPON, the WITNESS examined Government

6  Exhibit-10 for identification.)

7       A.   Yes.

8       Q.   What is it?

9       A.   It is a screenshot of the video where

10 Mr. Garcia is holding up his shirt, appears to be

11 his right shoulder with a tattoo.  It says

12 "Reaper."  And then underneath that is a skull

13 with a beret, blue beret on it.

14      Q.   Okay.

15            MS. SCHIFERLE:  I'd like to offer

16 Exhibit-10 into evidence.

17            THE COURT:  All right.  It'll be

18 admitted.

19 (WHEREUPON, Government's Exhibit-10 was admitted

20 into evidence.)

21 CONTINUATION OF DIRECT EXAMINATION

22 BY MS. SCHIFERLE:

23      Q.   And before I forget, were you also

24 informed by the UC about the clothing that the

25 defendant was wearing during this meeting?

1    A.    Yes.

2        Q.    **Was there anything of note?**

3    A.    Yeah.  If I remember correctly, the hat

4  also had the same skull.  It's called Punisher.

5        Q.    **Okay.  What's Punisher, if you know.**

6    A.    It's, it's from the military, and

7  military units use it and other, other people and

8  things have picked it up over the years.

9        Q.    **Okay.  And so, it's a commonly used**

10  **logo, is that ...**

11    A.    Yeah.  In military-type settings or,

12  yeah.

13        Q.    **Okay.  And so the tattoo is that, plus**

14  **the word Reaper?**

15    A.    Yes.

16        Q.    **Okay.**

17  **(WHEREUPON, an audio recording was played.)**

18  **CONTINUATION OF DIRECT EXAMINATION**

19  **BY MS. SCHIFERLE:**

20        Q.    **That one was a little difficult to**

21  **hear.  Were you able to hear it, Agent Hunter?**

22    A.    Yes, most of it.  And just as a note, I

23  think each recording you go to, you have to get

24  the green volume all the way.  You have to do

25  that each time.

1      Q.    oh, you're right.  Thank you.  Thank

2   you for reminding me.

3      A.    But yes, I could hear.  I could hear

4   that.

5      Q.    Could you just briefly summarize what

6   that last clip was?

7      A.    The UC was confirming that Mr. Garcia

8   preferred to shoot from long distances, and Mr.

9   Garcia agreed, yes, and then was asked, you know,

10  what distance.  And, and Mr. Garcia said up to

11  300 meters is what he was comfortable with.

12     Q.    And then he asked him, I think, correct

13  me if this isn't what I heard, but if he gave him

14  an order to kill a man in his house, would he be

15  fine with that?

16     A.    Yes.  If he needed to, you know, shoot

17  him in the chest coming out of the house, that he

18  would be, he could do that or be good with that,

19  and he said yes.

20     Q.    Okay.

21  (WHEREUPON, an audio recording was played.)

22  CONTINUATION OF DIRECT EXAMINATION

23  BY MS. SCHIFERLE:

24     Q.    I forgot to turn off the volume full

25  until nearly the end of that one.  So one of the

1  things that he said near the end, the UC asked

2  him, "You've weighed the psychological

3  consequences of killing somebody," right?  And

4  how did the defendant respond?

5      A.   That he has and he's okay with it.

6      Q.   And now we've heard Reaper a couple of

7  times.  He has Reaper on his shoulder and the UC

8  actually just started calling him Reaper.  Can

9  you explain what you know about that?

10     A.   Yes, a nickname that, that Mr. Garcia,

11 when I spoke with him post-arrest that he gave

12 himself.  Initially what I knew about it was from

13 the, the resume that said it was from military

14 experience and marksmanship.  After talking to

15 Mr. Garcia, it sounds like it was maybe more of a

16 username used on video games.

17     Q.   Regardless, it's his nickname?

18     A.   Yes.

19     Q.   Right?  That's what he goes by, so

20 that's presumably why he has that on his

21 shoulder?

22     A.   Yes.

23 (WHEREUPON, an audio recording was played.)

24 CONTINUATION OF DIRECT EXAMINATION

25 BY MS. SCHIFERLE:

1    Q.   All right.  That was clip nine.  I

2   think the beginning was a little hard to hear.

3   Can you sum that up for the Court?  He was

4   talking about a girlfriend, right?

5        A.   Yes.  So Mr. Garcia sounds like from

6   the, the recording, was, he has a girlfriend who

7   may be dating someone else.  That person was

8   abusive and called and told Mr. Garcia about

9   that.  And then Mr. Garcia said everything inside

10  him wanted to go shoot him, you know, but, but he

11  did not.  And the UC said that it was not a good

12  idea, don't do that.

13       Q.   I'm sorry.  I started playing.  Go

14  ahead.  You can finish what you were saying.

15       A.   Yeah.  Just the UC advised, you know,

16  don't, don't do that.  Contact me.  You know,

17  talk to me before you anything like that.

18  (WHEREUPON, an audio recording was played.)

19  CONTINUATION OF DIRECT EXAMINATION

20  BY MS. SCHIFERLE:

21       Q.   All right.  Again, I'd like you to

22  recap that one because there's little muffled and

23  they were talking quickly.  So the UC was talking

24  about the numbers of people he might kill, right?

25       A.   Yeah.  So that conversation, that

1  portion of the conversation was regarding how

2  much money, you know, Mr. Garcia would make.  And

3  the UC was explaining was more based on volume.

4  So the, the more people that, that are killed,

5  the more money Mr. Garcia would make.  And he

6  said 100 at first and said, you know, that, that

7  would be high, but maybe 50.  And then Mr. Garcia

8  said 50 is rookie numbers for the Reaper.

9  **(WHEREUPON, an audio recording was played.)**

10 **CONTINUATION OF DIRECT EXAMINATION**

11 **BY MS. SCHIFERLE:**

12     **Q.    All right.  That's my last bit from**

13 **this meeting, but before we move on, there's**

14 **something that I inadvertently omitted, so I want**

15 **to see if you remember it in your listening.  Do**

16 **you recall a conversation at that same in-person**

17 **meeting between the UC and the defendant about**

18 **what the defendant thought his parents might**

19 **think of the sort?**

20     A.    Yeah.  He said that, Mr. Garcia said

21 that his, you know, parents support him in

22 whatever he does.

23     **Q.    And so the defendant indicated to the**

24 **UC that he thought that his parents would support**

25 **him in being a hitman?**

1    A.    It's what it sounded like.

2    **Q.    That was his belief anyway?**

3    A.    Yeah.

4    **Q.    Okay.  All right.  So that was on April**

5  **6th.  And we're going to talk about the deal that**

6  **happened on April 12th, but tell me what happened**

7  **in between April 6th and April 12th.  Was there**

8  **some additional conversation between the**

9  **defendant and the UC?**

10    A.    Yes.  The UC reached out via text to

11  arrange the meeting for April 12th.

12    **Q.    Okay.  And do you remember ...**

13    A.    The dates?

14    **Q.    Yes.  Was it April 9th?**

15    A.    Yes.

16    **Q.    And so on April 9th, the UC reached out**

17  **to the defendant.  How did he reach out?**

18    A.    Text message.

19    **Q.    Okay.  And at that time, did the**

20  **defendant respond?**

21    A.    Yes.

22    **Q.    And what was his general response?  Was**

23  **he in agreement?**

24    A.    Yes.  Willing to meet and just working

25  out the times.

1    **Q.    And then did the UC have any follow-up**

2    **communication with the defendant after that?**

3    A.    He did.   More specific follow up on, on

4    timing and where, where the meeting would take

5    place.

6    **Q.    Did that occur on April 11th?**

7    A.    Yes.

8    **Q.    Okay.   And on April 11th, did the**

9    **defendant again seem interested in meeting up?**

10    A.    Yes.

11    **Q.    All right.   Let's talk about April**

12    **12th.   You want to just tell the Court about, now**

13    **you were actually involved in that operation?**

14    A.    Yes.   I was.

15    **Q.    So go ahead and tell the Court where**

16    **the meeting location was and what was the plan?**

17    A.    Yes.   So the, the UC, we arranged the

18    meeting to occur at a, at a park in

19    Hendersonville, Tennessee.   At that meeting, Mr.

20    Garcia would be provided with a target package

21    with which consisted of some photos of a person,

22    a fictional person, and fictional identifiers,

23    name, height, weight, address, vehicle tag, all

24    that stuff.   And then payment.   So the down

25    payment half upfront, which was $2,500 upfront.

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 45 of 131 PageID #: 88
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1    Q.   Okay.  And so the UC went to the park

2  to meet with the defendant, and then were you

3  also at that park in a different location?

4    A.   Yes.

5         MS. SCHIFERLE:   Let's go ahead

6  and play this meeting clip.  And just for the

7  record, the phone call and the previous meeting

8  were just clips.  This is the entirety of the in-

9  person conversation between the UC and the

10  defendant.

11  (WHEREUPON, an audio recording was played.)

12  CONTINUATION OF DIRECT EXAMINATION

13  BY MS. SCHIFERLE:

14    Q.   All right.  When that interaction

15  ended, could you then see the defendant walking

16  away from the meeting with the target package and

17  the money?

18    A.   We had agents that could.

19    Q.   Before I move onto what happened next,

20  there was some discussion on there about a

21  laptop, and the app.  Could you tell the Court

22  about what that was all about?

23    A.   Yeah.  The UC, in an earlier

24  conversation, had said that he would provide Mr.

25  Garcia with a laptop that would and they would

1 communicate through that later on once that was

2 provided.

3     **Q.**  **And so the laptop wasn't something that**

4 **he needed to commit this deal, right?**

5     A.  right.

6     **Q.**  **Okay.  But it's something that they**

7 **discussed that would be a way for them to**

8 **communicate in the future about other deals?**

9     A.  Yes.  The, the UC describes laptop as,

10 like, an encrypted laptop that they could

11 communicate as, as he became an employee of the

12 company for future, future operations or hits.

13     **Q.**  **And I'm going to show you what been**

14 **pre-marked as Government's 11 and 12.  Do you**

15 **recognize those?**

16 **(WHEREUPON, the WITNESS examined Government**

17 **Exhibit-11 and Exhibit-12 for identification.)**

18     A.  Yes.

19     **Q.**  **What are they?**

20     A.  This is a target package that I put

21 together that was in in the envelope there that

22 you see.

23           **MS. SCHIFERLE:**  Ask that 11 and 12

24 be introduced into evidence, be entered into

25 evidence.

1                    **THE COURT:**  All right.  It will be

2  admitted.

3  **(WHEREUPON, Government's Exhibits 11 and 12 were**

4  **admitted into evidence.)**

5  **CONTINUATION OF DIRECT EXAMINATION**

6  **BY MS. SCHIFERLE:**

7        **Q.   All right.  So the one sheet paper has**

8  **some sort of demographic information, right?**

9        A.   Correct.

10        **Q.   Okay.  And so what does it say about**

11  **the target?**

12        A.   It says name, Peter Mitchell.  Age, 44

13  years old.  Height, 6'2".  Weight, 250 pound.

14  Address, 100 Laurel Drive, Russellville,

15  Kentucky, 42276.  Vehicle, Black Chevrolet

16  Silverado Kentucky tag, A4EF14.  Employment,

17  truck driver for Truckmasters.

18        **Q.   Right.  And that's Exhibit-10, correct?**

19        A.   No.  That one's 11.

20        **Q.   That was 11.  All right.  The other one**

21  **is 12, right?**

22        A.   Correct.

23        **Q.   All right.  What's in 12?**

24        A.   12 is a photo that would appear to be

25  like a self-taken photo, a selfie, and then, and

1  then a photo of the same person walking through a

2  parking lot with a cell phone.  That's a sideview

3  photo.  And then the same person walking in a

4  parking lot with the same clothes on, but walking

5  at a different direction from the back.

6      Q.   Now, obviously those pictures are of a

7  real person who exists, right?

8      A.   Yes.

9      Q.   But his name is not Peter Mitchell,

10 right?

11     A.   Correct.

12     Q.   And all that information on Exhibit-11

13 is fictional?

14     A.   Yes.

15     Q.   Okay.  But this person who's described

16 herein the person that the defendant agreed to

17 shoot and kill, right?

18     A.   Yes.

19     Q.   All right,  So now tell us about you

20 said there were agents in place who could see the

21 defendant walk away from the exchange with the

22 UC?

23     A.   Correct.

24     Q.   All right.  So what happens next?

25     A.   So the, Mr. Garcia, you know, when he

1 got up and walked away from the meeting, had to

2 walk a little distance across the park,

3 approximately 150 yards to get to his car.  And

4 prior to him getting to his car, he was arrested.

5     Q.   Were you present at his arrest?

6     A.   Yes.

7     Q.   Did you have an opportunity to speak

8 with him?

9     A.   Yes.

10     Q.   All right.  Was he given his Miranda

11 warnings?

12     A.   He was.

13     Q.   Okay.  Did he request a lawyer or ask

14 to stop speaking with you at any time?

15     A.   He did not.

16     Q.   All right.  Please tell the Court

17 generally what he had to say.

18     A.   So myself and another agent, once,

19 once, Mr. Garcia was secured and, and searched

20 briefly, myself and another agent, we sat in a

21 vehicle with Mr. Garcia, read him Miranda rights

22 that he signed the consent form, and then we

23 spoke.  He advised that he was coming to the park

24 that day to tell the UC that he had changed his

25 mind and did not want to move forward with this

County
COURT REPORTERS, Inc.
Videography      Litigation Technology

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 50 of 131 PageID #: 93
800.262.8777 TOLL-FREE   •   540.667.0600 LOCAL   •   540.667.6562 FAX   •   CountyCourtReporters.com

1  employment.  And he was going to, you know, when

2  he walked away with the package and the $2,500,

3  he was going to get to his vehicle, call the UC,

4  tell them that he didn't want, you know, changed

5  his mind, didn't want to do it, and was going to

6  leave the packet with the money on the curb for

7  the UC to pick up.

8      **Q.   Did that story make any sense to you?**

9      A.   It did not.

10     **Q.   Why not?**

11     A.   Based on the coordination through the

12 text messages and the distance to drive to get up

13 to the park, and then Mr. Garcia, you know,

14 meeting the UC, asking details of, you know, is a

15 photo needed, you know, taking the money, being

16 kind of excited about how the money felt and

17 agreeing to move forward and then walking away

18 with the UC's money.  Also, in an interview, he

19 advised he was scared of the UC, what the UC may

20 do to him.  That didn't make sense to me because

21 taking, taking the money, I think, would be a

22 little more scary.

23     **Q.   When he was physically apprehended, did**

24 **he have the target package and the money on him?**

25     A.   Yes, he did in his hands.

County
COURT REPORTERS, Inc.
Videography      Litigation Technology

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 51 of 131 PageID #: 94
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1      Q.   Did he also say anything about his

2  current employment status?

3      A.   He did.  He, the Air National Guard was

4  one weekend a month, and he had recently been

5  hired by Vanderbilt Medical.  I believe it was

6  like a certified nurse's assistant or something

7  of that nature, caregiver, Friday, April 7th, and

8  was start, started training that job on Monday,

9  April 10th.

10     Q.   So he said he got the job offer on

11 April 7th and started on April 10th?

12     A.   Yes, for the initial training.

13     Q.   And what was the significance about

14 getting that job and his participation with the

15 UC?

16     A.   Yes.  So he said once he got that job,

17 that was part of his decision, that he didn't

18 need the money as much anymore, and that was part

19 of the reason why he was going to change his mind

20 and not do it.

21     Q.   Okay.  You said he said that the job on

22 April 7th, right?  And I think earlier you

23 testified that he had some text conversations

24 with the UC on April 9th?

25     A.   Correct.  Sunday, April 9th.

1    **Q.    And then he told you if he started the**
2  **job on April 10th?**
3    A.    Yes.
4    **Q.    Okay.   And then I think you previously**
5  **testified that he had some text communication**
6  **with the UC on April 11th?**
7    A.    Correct.
8    **Q.    Right.**
9    A.    And that was arranging the meeting.
10    **Q.    And so with those text messages, and in**
11  **fact, actually, was there some text or phone**
12  **communication between the defendant and the UC on**
13  **April 12th before the meeting?**
14    A.    Yes, there was.
15    **Q.    And so at any of those times, to your**
16  **knowledge, did he express any interest in**
17  **canceling the meeting?**
18    A.    He did not.
19    **Q.    All right.   After you spoke with the**
20  **defendant, did you also go to his home?**
21    A.    Yes.   Later that evening, we went to
22  the address where he lived with his mother,
23  father, and brother.
24    **Q.    Why did you do that?**
25    A.    During the interview with Mr. Garcia in

1  the back of, of the car, we also signed a consent

2  form for, for the rifle, just to search his room

3  in that residence for the rifle or electronic

4  devices that could be related to this case.

5       Q.   And he signed that consent?

6       A.   He did.

7       Q.   In your interview with him, did the

8  defendant say anything about anything he might

9  have told his mother or his parents before he

10  went to meet the UC?

11       A.   Yes.  He said he told his mother and

12  father that he was going to meet this person to

13  change his mind and wasn't going to do the work.

14       Q.   Did he tell you what kind of work he

15  had told his parents it was?

16       A.   So during his interview, he said he had

17  told his parents that had something to do with,

18  like, contract work, had something to do with

19  shooting, and not specifically what it was of the

20  hitman, but he thought that his parents knew the

21  gist of it, knew what it was.

22       Q.   So did you in part go to the house also

23  to interview the parents about veracity of those

24  statements?

25       A.   Yes.

1      Q.    Okay.  All right.  So tell us about

2  what happened when he got to the home.

3      A.    So yeah, myself and two other agents, a

4  male and a female agent, arrived at the address,

5  and Ms. Garcia answered the door.  She was there

6  by herself at the time.  She was very upset, but

7  we talked to her for a while and, you know,

8  explained what we could and that we were there

9  to, you know, at some point, take a look at the

10  room.

11         But when I spoke with her, she said

12  that Mr. Garcia had said before he left that he

13  was going to meet with somebody, some kind of

14  contractor, to not take the job.  He changed his

15  mind.  She said he'd never been in trouble

16  before, never had any violent tendencies or

17  anything like that or any kind of violent

18  activity.

19         And as we talked more and more about

20  this particular situation, she, she said that she

21  took it because of his military experience and

22  what he was doing in the military, which was

23  classified and he couldn't talk about that, that

24  this contract job was something with high-level

25  secret government contract work where people are

County
COURT REPORTERS, Inc.
Videography    Litigation Technology

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 55 of 131 PageID #: 98
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1 eliminated, and he could make up to hundreds of

2 thousands of dollars.  And a judge was mentioned

3 as a possible target being at the top end of that

4 money.  So it, as we talked to her more, it

5 sounded like that, that he had told her that it

6 was something in the realm of, of killing people.

7     Q.    And did there come a time when someone

8 else from the family participated in the

9 interview?

10    A.    Yes, the 19-year-old brother arrived

11 while we were there.

12    Q.    And what did he say about what he knew

13 about this situation?

14    A.    Yeah, it was similar in that his, that

15 Mr. Garcia had spoken with him about it and that,

16 and that same type scenario of kind of classified

17 contract work where you eliminate people.  His

18 brother and his mother both told him that, you

19 know, they advised against it, but Mr. Garcia

20 said that, you know, he could make possibly

21 millions of dollars doing this type of work.

22         Ms. Garcia also advised, you know, that

23 the family was struggling financially and that

24 Mr. Garcia's portion of the rent was, was part of

25 that, et cetera.  And then the brother seemed to

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 56 of 131 PageID #: 99
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1 know that about this situation.  Not that they

2 were never told it was a hitman, but it was, you

3 know, contract government work, super-secret.

4 They were very worried about his safety, thinking

5 that because he went there and was going to turn

6 the job down, that, that the reason he hadn't

7 shown up was that, you know, whoever these people

8 were may have harmed him.

9     **Q.   Did she get any feeling or did Ms.**

10 **Garcia say anything about her feelings about the**

11 **government or law enforcement?**

12     A.   her specific feelings?  No, just that

13 she had seen movies and, and, you know, seen how

14 this stuff can happen, possibly, that there are,

15 there are some kind of black op contract killers

16 out there.

17     **Q.   Did she feel comfortable having you in**

18 **her home?**

19     A.   At first, she was leery because she was

20 worried that whoever's people were had killed her

21 son.  She used the term, you know, that he was in

22 the ditch.  And we showed our credentials and

23 badges and, and spoke with her.  And she became

24 comfortable and allowed.  Yeah, we walked in the

25 home with her, and then we talked with her there,

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 57 of 131 PageID #: 100
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  and we had forms and everything that we filled

2  out, and then it was, it was a totally

3  comfortable conversation.

4      **Q.   Okay.  And did she consent to the**

5  **search of the home, meaning the specific limited**

6  **search of the defendant's bedroom?**

7      A.   Yes.  And she, so we, we had her walk

8  in point and show which bedroom was him.

9      **Q.   She also signed a consent form?**

10     A.   And signed the consent form.

11     **Q.   All right.  So what did you find of an**

12 **evidentiary nature in the defendant's bedroom?**

13     A.   The AR-15 style rifle that's pictured

14 there in the case, and then a laptop computer

15 that Mr. Garcia had described in an interview.

16 And we saw the, also the tan, black and tan

17 training paintball weapon as well, but we did not

18 seize that.

19     **Q.   Okay.  And the firearm that you seized,**

20 **that appears to be the same firearm that we saw**

21 **in that February 20th Facebook post, right?**

22     A.   Yes.

23     **Q.   And the laptop, we haven't yet gotten a**

24 **search warrant for that, right?**

25     A.   Have not.

County
**COURT REPORTERS, Inc.**
Videography   Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 58 of 131 PageID #: 101
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1    **Q.    But what is the believed nexus?  What**

2    **do we believe happened on that laptop that**

3    **connects to this case?**

4        A.    So Mr. Garcia advised that the initial,

5    his initial research and contact to the Rent A

6    Hitman website came from the laptop.

7        **Q.    Is there anything I've forgotten to ask**

8    **you that's relevant to this defendant's**

9    **dangerousness?**

10        A.    The only detail I can think of is that

11    he also had a cell phone on him when, when we

12    arrested him, and, and we did seize that phone as

13    well, and that we will get a search warrant at

14    some point for that.

15                **MS. SCHIFERLE:**  Nothing further at

16    this time, Your Honor.

17                **THE COURT:**  All right.  Mr.

18    Fletcher, do you have questions of this witness?

19                **MR. FLETCHER:**  Yes, sir.

20                **MS. SCHIFERLE:**  Do you want me to

21    pass these up now?

22                **THE COURT:**  Sure.  That'd be

23    great.  Thank you.

24                **MR. FLETCHER:**  May I proceed, Your

25    Honor?

1              **THE COURT:**  You may.  If you want

2  to, you can pivot that podium so you can face the

3  witness, or you stand like that.  Whatever you

4  want to do is fine.  But ...

5              **MR. FLETCHER:**  Oh, it's fancy.

6  All right.

7              **THE COURT:**  There's a different

8  one that you have to latch in to make it stay in

9  place.  Maybe on the left, one side or the other.

10              **MR. FLETCHER:**  I think I'll just

11  do it like this, not to make a further fool of

12  myself.

13              **THE COURT:**  No worries.

14  **CROSS EXAMINATION**

15  **BY MR. FLETCHER:**

16      **Q.   All right.  Detective Hunter, how are**

17  **you doing?  Or Special Agent Hunter?  Is how I**

18  **should ...**

19      A.   Yes, sir.  Special Agent.

20      **Q.   Okay.  So I'll ask you a few questions.**

21  **I won't try to hold you too long.  So when did**

22  **you start speaking to Mr. Garcia?**

23      A.   When did I speak to him?

24      **Q.   Yes.**

25      A.   When he was arrested and searched and

1  then approximately five minutes.  We were,

2  several minutes, we were in the back of the car

3  talking.

4      **Q.  So your personal interactions with him**

5  **all took place after this investigation was**

6  **complete?**

7      A.  Well, not the investigation, but just

8  the arrest.

9      **Q.  Okay.  But you didn't talk to him until**

10 **after the arrest?**

11     A.  Correct.

12     **Q.  Okay.  And you had no further personal**

13 **communications with him before he was arrested,**

14 **right?**

15     A.  That's correct.

16     **Q.  Okay.  And have you ever received any**

17 **other or made any other arrest to your knowledge**

18 **or any other agents in relation to the site that**

19 **contacted the Air Force base in relation to Mr.**

20 **Garcia?**

21     A.  So I have not, but the owner of the

22 website gave me some other agents' names ATF

23 Agent, FBI, just different jurisdictions, and

24 then I read some articles of other arrests that

25 occurred through the site.

1    Q.   Okay.  You had in your report that Mr.

2  Garcia said that he was a skilled marksman,

3  right?

4    A.   Yes.

5    Q.   And were you able to corroborate that?

6    A.   No.

7    Q.   Okay.  And he also told you that he

8  preferred, well, I don't think he told you that,

9  but in your report, this was from one of the

10  interviews that we just listened to, one of the

11  clips, that he preferred distance versus close

12  range setups, right?

13    A.   Correct.  And I've requested his

14  military records from the Air Force.  So as far

15  as the marksman grading, they could be in there.

16    Q.   But of your current knowledge right

17  now, what is your current knowledge of what his

18  job was as an Air National Guardsman?

19    A.   As security forces, like military

20  police, but it's not investigative, it's more of

21  a, like, a ...

22    Q.   But again, you don't know that he's an

23  actual skilled marksman?

24    A.   Not other than his, his own ...

25    Q.   And what was on his resume?

County
CourtReporters, Inc.
Videography  Litigation Technology

1      A.   Yes, correct.

2      Q.   **Okay.  And based on what he told you**

3  **about his skills as a shooter, did you**

4  **corroborate any of that?**

5      A.   His skillset ...

6      Q.   **His skills as a shooter, yes.**

7      A.   No.

8      Q.   **Okay.  So you don't know whether he was**

9  **capable of actually doing anything violent, do**

10  **you?**

11     A.   Not other than, than what he had

12  portrayed during the meetings and, and phone

13  calls.

14     Q.   **Okay.  Now Mr. Garcia also told you**

15  **that, well, actually, let me take a step back.**

16  **Let's talk about Facebook.  So I saw we have in**

17  **evidence some of the Facebook photos, and so I**

18  **assume that you went through his Facebook page,**

19  **correct?**

20     A.   I did see it, yeah.

21     Q.   **And were those the only pictures that**

22  **you pulled from his Facebook page?**

23     A.   That I pulled, or were there others?

24     Q.   **Were there others?**

25     A.   Yeah, there are other pictures.

1    Q.    Could you describe the other photos?

2 Just some of them

3    A.    Yes.

4    Q.    And could you describe them?

5    A.    Oh, describe some of the others?

6    Q.    Yes.

7    A.    Yeah.  I mean, there were family

8 photos, vehicle photos of maybe a truck that he

9 owned.

10    Q.    Now, would I be correct in stating that

11 most of, if you go to his Facebook page, most of

12 the posts on his Facebook page are in reference

13 to God?

14    A.    Yeah.  They were Christian posts and

15 things.  Yeah.

16    Q.    And they were kind of motivational

17 posts, correct?

18    A.    Correct.

19    Q.    And you can scroll down for a number of

20 minutes, and most of his posts were motivational

21 posts to people referencing God.  Would that be

22 correct, or would that be an inaccurate depiction

23 of what his general Facebook posts was?

24    A.    Well, so photos and posts, I think, are

25 different.  So photos, you know, I saw the family

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 64 of 131 PageID #: 107
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  and different photos like that.  And then posts,

2  yeah, there were a lot of, yeah, there were

3  patriotic posts and Christian posts and things

4  like that.  Friends' posts.  It's like general

5  activities, yeah.

6      Q.   Would you say, just going on his

7  Facebook page, that it was full of guns or more

8  full of motivational posts?

9      A.   More full of posts not related to guns.

10     Q.   Okay.  All right.  So he told you that

11  he had gotten a job at Vandy as a care partner,

12  correct?

13     A.   Correct.

14     Q.   Did you corroborate that?

15     A.   No.

16     Q.   Okay.  And he also had previously well,

17  I don't know if he told you this, it's in your

18  report, but he previously told one of the other

19  agents that he had been looking for work, right?

20     A.   He had told another agent that?

21     Q.   Yes.  At the beginning.  This was on

22  one of the clips that he had been looking for

23  work.

24     A.   Okay.

25     Q.   At the very beginning, he said he had

1  been looking for work; is that correct?

2      A.   Okay.  Yeah, that's in the recording,

3  yeah.

4      Q.   Okay.  And did you corroborate that he

5  had been looking for any other work at all other

6  than what he had told you guys he was looking

7  for?

8      A.   No.

9      Q.   Okay.  And so it is very possible that

10 during this time that he was talking to the

11 undercover agent that he had been applying to

12 Vanderbilt, correct?

13     A.   Yeah, it's possible.  And the other,

14 the only other work that Mr. Garcia mentioned

15 looking for was that he had spoken with a

16 colleague in the Air National Guard about

17 contract security work, contract mercenary work,

18 and then he was looking for, in his words,

19 contract mercenary work or security work.

20     Q.   Correct.  But that was an answer to the

21 question that the agent asked him, why do you

22 want to do this work, correct?  So the answer

23 that you just gave about the only other answer

24 that he gave about what type of work he was

25 doing, contract mercenary work, that was an

County
COURT REPORTERS, Inc.
Videography        Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 66 of 131 PageID #: 109
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    County CourtReporters.com

1  answer to a question that the agent asked him

2  regarding why he wanted to do this job, correct?

3      A.  Yeah.  So yeah.  I asked him, "How did

4  you, how did you, yeah, how did you find this,"

5  or, "What led you to this?"  Yeah, down that path

6  of questioning.  Yeah.

7      Q.  And so there was no other conversation

8  about any other type of work that he had been

9  applying to, right?

10      A.  Correct.

11      Q.  Okay.  And so let's talk about the

12  interview.  When you interviewed him, isn't it

13  true that he told you he had never been arrested

14  before, correct?

15      A.  Correct.

16      Q.  And he also told you that he needed

17  money to help his family?

18      A.  Yes.

19      Q.  He told you that he had second thoughts

20  and that he had wanted to change his mind,

21  correct?

22      A.  Correct.

23      Q.  Okay.  And you said that Mr. Garcia, he

24  took the $2,500 from the agent?

25      A.  Yes.

1    Q.   Okay.  And he was subsequently

2  arrested?

3    A.   Yes, on the way back to his car.

4    Q.   And would you say it was about between

5  two to five minutes?

6    A.   Correct.

7    Q.   Okay.  And if he wanted to change his

8  mind, would you say that he would have had the

9  chance at the opportunity to change his mind?

10  And I'm asking you this because you said his

11  story didn't sound correct, but from what you

12  just said was that he was arrested, and about two

13  to five minutes later, I mean he got the money

14  and about two to five minutes later, he was

15  arrested, correct?

16    A.   Correct.

17    Q.   So with his story that he wanted to

18  leave the money on the curb, he wouldn't have had

19  the opportunity at that point if he was arrested

20  two to five minutes after he took the money,

21  correct?

22    A.   Well, I think the first part of your

23  question is that, you know, he wanted to change

24  his mind, and I think he had the opportunity if

25  he had already changed his mind that he didn't

1  need to come to the meeting.  But if you're

2  saying, yes, he changed his mind, but did not

3  have the opportunity to set it on the curb and do

4  that, then, yes, he did not have that chance.

5       Q.   No, what I'm asking and I'll be clear,

6  I'm asking you stated on direct that you didn't

7  believe the story that when he said, when I

8  changed my mind, I wanted to change my mind, I

9  was going to walk back to the car, place the

10 money on the sidewalk.  That was what he told

11 you.  And I understand that it's your belief that

12 you don't believe that to be true.  But based on

13 when he was arrested, from between the time you

14 said that he took the money, two to five minutes

15 later he was arrested, he would not have had the

16 opportunity to leave the money on the side of the

17 curb, correct?

18      A.   Well, in my interview with him, he said

19 he changed his mind before he got there.  I think

20 the way I understand your question is he changed

21 his mind, like, after he got the money, then he

22 would not have had an opportunity to, to do that

23 scenario of leaving it on the curb.

24      Q.   Well, no.  So you can believe that

25 that's what happened, but you don't believe that

1  he could change his mind even before the

2  interview, and then his plan to leave the money

3  on the curb, you don't believe that to be true?

4      A.   I don't believe it as, I don't, I don't

5  believe it as if he were scared or didn't want to

6  do it.  Taking the money from someone you're

7  scared of doesn't make sense to me.

8      Q.   But with what he said, though, with

9  what he told you, that he changed his mind and

10  his plan was to leave the money on the curb, he

11  would not have had the opportunity because he was

12  arrested two to five minutes after taking the

13  money, correct?

14      A.   That's correct.  Yeah.  He was arrested

15  prior to him getting to his vehicle.

16      Q.   Okay.  So he also told you that you

17  just stated that he was afraid that the

18  undercover agent, he was afraid to go back

19  because the undercover agent might be angry and

20  harm him, correct?

21      A.   Correct.

22      Q.   And you said on direct that you don't

23  believe that to be true?

24      A.   Well, yeah, I mean, I believe, I, I, I

25  cannot judge, you know, or say whether I believe

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 70 of 131 PageID #: 113
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  he was scared or not, but I just, it doesn't make

2  sense to me is what I was saying, that, that if

3  you are afraid of this person that you would, and

4  you already decided you're going to change your

5  mind, that you would come there and then take the

6  money from that person.    Because then now you

7  have their money.  And to me, that's scarier, you

8  know, now that you have that.

9       **Q.    Okay.  Well, let's talk about the**

10  **actual arrest.  So when Mr. Garcia, he allegedly**

11  **took the money, and then two to five minutes**

12  **later, he was arrested because he was walking**

13  **back to his car, did he try to flee when he was**

14  **arrested?**

15       A.    No.

16       **Q.    Did he try to resist the arrest?**

17       A.    No, he was compliant.

18       **Q.    And isn't it true that the very first**

19  **question that he asked when he met with the agent**

20  **was, "Do I have to accept it?"**

21       A.    When he met with the UC?

22       **Q.    Yes, when he met with the UC, that was**

23  **his first question was, "Do I have to accept it?"**

24  **Correct?**

25       A.    That's correct.

County
COURT REPORTERS, Inc.
Videography        Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 71 of 131 PageID #: 114
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX  •  County CourtReporters.com

1        Q.    Okay.  And so let's talk about after

2    the arrest then.  Did Mr. Garcia willingly talk

3    to you after the arrest?

4        A.    He did.

5        Q.    And isn't it true that he also provided

6    you with his access to his phone and his

7    computer?

8        A.    He provided ...

9        Q.    His passwords to his phone and his

10   computer?

11       A.    Yes, he gave passwords.

12       Q.    And more importantly, didn't he direct

13   you to the location of his rifle?

14       A.    He did.

15       Q.    Did he also signed a consent form for

16   you to search his room?

17       A.    Yes, he did.

18       Q.    And his car?

19       A.    Yes, he did.

20       Q.    And in conducting your investigation,

21   at any point, did Mr. Garcia impede your

22   investigation, lie to you, or try to mislead you?

23       A.    Not that I can, not impede and lying, I

24   can't tell.  But no, I don't, I don't, he, he was

25   cooperative.

1      Q.    Okay.  And you also stated that you

2   spoke with his family, right?

3      A.    Yes.

4      Q.    And they all complied with your

5   investigation, didn't they?

6      A.    Yes.  From what I could tell

7      Q.    And I think it came up on direct that

8   you spoke with his mother about the things that

9   he told his mother.  Did he ever tell his mother

10   that he was applying to be a hitman?

11      A.    His mother you said, or brother?

12      Q.    His mother.  Nothing about his brother

13   appears in your report.  Your conversation with

14   his brother, that didn't appear in your report.

15      A.    Yes.  So I'm sorry.  I thought you

16   said, I couldn't tell you if you said brother or

17   mother.  But no, yeah.  From what I understand,

18   he did not say the words hitman, he was applying

19   for a hitman job to his mother.

20      Q.    And so when you say specialist

21   assassin, doesn't that relate to or doesn't it

22   seem that his mother would believe that that

23   relates to his current job in the military?  Or

24   isn't it plausible that his mother could believe

25   what he told her related to his job in the

County
COURT REPORTERS, Inc.
Videography   Litigation Technology™

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 73 of 131 PageID #: 116
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX   CountyCourtReporters.com

1 **military?**

2     A.   That the work that he had gone to meet

3 the UC was regarding his work that he already was

4 ...

5     **Q.   At least what he was telling his mother**

6 **he was doing, isn't it plausible to believe that**

7 **that work could be related to his job in the**

8 **military?**

9     A.   From what she said to me, I took it as

10 yes, that could have been somehow connected, but

11 because of his, you know, classified access and

12 military training and military employment, that

13 this job was related to, that she's portraying

14 this to me from what he portrayed to her.  I took

15 it as her saying she said the word secret

16 government contract work where, you know, they,

17 they eliminate people.  You know, so it could be

18 related, but it was, it was still under the

19 premise of killing people.

20     **Q.   Okay, so we heard clips of the**

21 **interviews.  Is every portion of those every**

22 **interview when he spoke with the undercover**

23 **agent, is every portion of it recorded?**

24     A.   Every portion of when he spoke with the

25 undercover agent?

County
COURT REPORTERS, Inc.
Videography      Litigation Technology™

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 74 of 131 PageID #: 117
800.262.8777 TOLL-FREE   540.667.0600 LOCAL   540.667.6562 FAX   CountyCourtReporters.com

1      Q.    Yes.

2      A.    Every, yes.

3      **Q.    So there aren't any portions that are**

4  **not recorded?**

5      A.    So you have, you have an audio, you

6  have a phone call, you have two in-person

7  meetings that were recorded.

8      Q.    **Right.**

9      A.    The second in-person meeting where he

10  was arrested, there is a phone call while the

11  audio devices is working.  And that phone call

12  was also recorded by, one side of it was recorded

13  by that and then text messages, of course,

14  screenshots, and we have that phone.

15      **Q.    But just to be clear, the clips that we**

16  **just heard, some of them are incomplete?**

17      A.    The, yes.  So the clips you just heard

18  are clips from an hour-long meeting that

19  occurred.

20      Q.    **Okay.**

21      A.    Or a phone call.  You know, I think

22  some of those were cut out as well.

23      **Q.    Okay.  Did you or any other Government**

24  **agent, to your knowledge, research any of Mr.**

25  **Garcia's criminal history?**

1    A.   Yes, we ran his criminal history.

2    Q.   And did you find anything?

3    A.   No criminal history.

4    Q.   Okay.  So you don't know if Mr. Garcia

5  had ever committed any violent acts prior to that

6  meeting?

7    A.   No.

8    Q.   And he wasn't violent at the meeting,

9  was he?

10   A.   No.

11   Q.   Okay.  I think I only have a few more

12 questions.  The Punisher logo that came up.  So

13 did you ever ask Mr. Garcia why he had that logo?

14   A.   I did not.

15   Q.   And did you know that that logo was a

16 unit tattoo?

17   A.   Military units.  I know it's, it's

18 attached to military units.

19   Q.   Okay.  And did you know for him that

20 that meant just simply defenders of the force?

21   A.   No, I did not ask him that.

22   Q.   Okay.  And that logo, you don't know if

23 it had anything to do with Mr. Garcia being

24 violent?

25   A.   No.

County
COURT REPORTERS, Inc.
Videography    Litigation Technology

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 76 of 131 PageID #: 119
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX • CountyCourtReporters.com

1       Q.    Okay.  All right.

2                   MR. FLETCHER:  I think that's all

3   I have, Your Honor.

4                   THE COURT:  Any redirect?

5                   MS. SCHIFERLE:  Very brief.

6   REDIRECT EXAMINATION

7   BY MS. SCHIFERLE:

8       Q.    Just two points I want to clarify.  For

9   your testimony on cross-examination, you were

10  asked the question just now about whether the

11  defendant ever impeded your investigation or told

12  a lie.  Do you remember being asked that

13  question?

14      A.    Yes, I do.

15      Q.    Okay.  Post-arrest, when the defendant

16  told you that he planned to get into his vehicle,

17  call the UC, and cancel and leave the money on

18  the curb, did you, as a law enforcement agent,

19  based on your training and experience and

20  familiarity with this investigation, did you

21  believe that to be the truth or a lie?

22      A.    I believe that to be a lie.

23      Q.    And so I just wanted to clarify that

24  because I think the answer that you gave on

25  cross-examination was no when you said he was

1  cooperative.

2        A.    Correct.

3        Q.    So he was generally cooperative, right?

4        A.    Yes.

5        Q.    Okay.  But there was that one statement

6  he made that you believed to be a lie?

7        A.    Yes.  And I can't, you know, I can't

8  always, when you interview somebody, I don't

9  always know what is a lie and what isn't.  So I,

10  you know, I did not believe in general that he

11  was, you know, some people say, you know, the

12  exact, something so blatantly obvious it's a lie.

13  But other than, you know, the scenario of putting

14  the money the curb, which I, I asked him about

15  that, does it make any sense.  I don't believe

16  anything else to be, you know, blatantly a lie.

17        Q.    Okay.  One other question.  When you

18  were interviewing his mother, so you were asked

19  the question on cross-examination about whether

20  the mom could have thought that this contract

21  work was part of his military work.  Do you

22  remember being asked that question?

23        A.    Yes.

24        Q.    I'm going to ask you to maybe answer

25  that question again just so that it's really

1  clear.  **What did his mother say to you about the**

2  **job that she believed he was considering**

3  **accepting?**

4      A.   Yes.  It's always hard to say what

5  someone else ...

6      Q.   **Of course.**

7      A.   ... is thinking.  But what she said to

8  me, she believed that the job that, that he was

9  meeting a contractor for was some kind of secret,

10  you know, black ops.  You know, she's seen a lot

11  of movies.  She knows how this stuff works,

12  where, where he was applying.  And she was

13  worried he didn't maybe have all the skillset for

14  it based on his, his military career.  But it

15  sounds like he had been portraying to her that he

16  worked in classified type of operations, but that

17  he was applying for a job where people were

18  eliminated.  And she mentioned, you know, that a

19  judge was mentioned, and that was the highest, a

20  higher level of payment.  So to me, as we spoke

21  and talked and more was coming out, it seemed

22  clear that she knew that the employment that he

23  was seeking was, even if it was related to

24  government work, was to, to kill people.

25      Q.   **Thank you.  And I think you testified**

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 79 of 131 PageID #: 122
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

 1  earlier today that his actual job that he holds

 2  for the Air Force National Guard is guarding a

 3  gate?

 4        A.   Yes, it's called security forces, and

 5  it's, it's, it's military-style police, but

 6  they're not conducting investigations.  From my

 7  understanding, it's, it's more of a base

 8  protection, guarding gates, checking IDs.

 9        Q.   And you're not in the Air Force, right?

10        A.   I'm not.

11        Q.   But you've been an FBI agent for almost

12  14 years?

13        A.   Yes.

14        Q.   Have you ever heard of any Air Force

15  related position that would involve eliminating

16  people such as federal judges?

17        A.   No, especially not in the Air National

18  Guard.

19              MS. SCHIFERLE:  Nothing further.

20  I have two exhibits that I failed to give.

21              THE COURT:  All right.  Thank you.

22  All right.  Thank you, Special Agent Hunter.  You

23  can step down.  I appreciate your testimony

24  today.

25              Do you have any other proof, Ms.

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 80 of 131 PageID #: 123
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  Schiferle?

2                    **MS. SCHIFERLE:** No, Your Honor.

3                    **THE COURT:** All right. Very good.

4                    Mr. Fletcher, do you have any

5  proof you want to put on?

6                    **MR. FLETCHER:** Your Honor, I have,

7  well, first, if I may, I just wanted to introduce

8  Mr. Garcia's family is here. His mom, Patricia.

9  His father is here. His brother, sister, and his

10  grandma Patsy are here.

11                    **THE COURT:** Okay. All right.

12                    **MR. FLETCHER:** His mother and

13  father have agreed to, and I'll apprise the Court

14  of this in my detailed, in my final argument, but

15  they've agreed to be third-party custodians. If

16  the Court would like to hear some testimony from

17  them or one of them, I can bring them up about

18  third-party custodian. But otherwise though, I

19  don't have any questions for them.

20                    **THE COURT:** Well, it's your case,

21  and you're the one who wants me to do that. If

22  you think I ought to hear from them, I'm glad to

23  hear from them. We've heard a little bit about

24  some interactions. Maybe it'd be a good idea for

25  you to try to explain that a little bit.

County
**COURT REPORTERS, Inc.**
Videography        Litigation Technology

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 81 of 131 PageID #: 124
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX   CountyCourtReporters.com

1           **MR. FLETCHER:**  Yes, Your Honor.

2  In that case, I'll call his mom, Patricia Garcia,

3  to the stand.

4           **THE COURT:**  All right.  Ma'am, if

5  you'd step up please and be sworn.

6           **COURT CLERK:**  Do you solemnly

7  swear or affirm that the testimony you give in

8  this case is the truth, the whole truth, and

9  nothing but the truth?

10          **WITNESS:**  Yes, ma'am.

11          **COURT CLERK:**  Could you please

12  state your name for the record?

13          **WITNESS:**  Patricia Garcia.

14          **COURT CLERK:**  Thank you.  You can

15  go sit over there.

16          **THE COURT:**  Watch your step,

17  ma'am.

18          **COURT CLERK:**  There's a weird

19  raise.

20  **PATRICIA GARCIA,** having been duly sworn by the

21  CLERK, was examined and testified as follows:

22  **DIRECT EXAMINATION**

23  **BY MR. FLETCHER:**

24      Q.   Good afternoon, Ms. Garcia.

25          **MR. FLETCHER:**  And just to let the

1 Court know, when she walked over here, her shoe

2 broke, which is why that is happening right now.

3 **CONTINUATION OF DIRECT EXAMINATION**

4 **BY MR. FLETCHER:**

5     **Q.**   **But could you tell me your full name?**

6     A.   Patricia Garcia.

7     **Q.**   **And how are you related to Mr. Garcia?**

8     A.   He's my son.

9     **Q.**   **Where do you live?**

10     A.   Hermitage.  1213 Travelers Place,

11 Hermitage, Tennessee.

12     **Q.**   **Does Mr. Garcia live with you?**

13     A.   Yes, sir.

14     **Q.**   **And does anyone else live in the home?**

15     A.   My husband and my son Jacob.

16     **Q.**   **Do you have any other children?**

17     A.   No, sir.

18     **Q.**   **Okay.  And let's talk about Josiah.  Do**

19 **you know where he was working before this instant**

20 **case?**

21     A.   Yes, sir, at the Vanderbilt University

22 Medical Center.

23     **Q.**   **And what was he doing before that?**

24     A.   Before that, he was supposed to be full

25 time on base, but the job that he had, it just,

1 they, it cancelled out.  Something happened, and

2 he wasn't getting paid, and he was, yeah, he kept

3 applying at different places.

4     Q.    Okay.  And to your knowledge, has he

5 ever been violent?

6     A.    No, sir.  He's been respectful his

7 whole life.  Anyone that knows him, he's always

8 been an honorable young man.  Patriot, loves the

9 Lord.

10     Q.    And did you fully know about his

11 involvement with what has been going on today and

12 what you heard?

13     A.    I wouldn't say I fully knew.  He came,

14 he told us, mentioned something about somebody on

15 base gave him info.  And we, and I was explaining

16 that to the agent.  I've seen enough movies to

17 know that stuff is really scary.  You don't get

18 involved in that kind of stuff because it

19 automatically makes you think killing.  That's

20 the way I was explaining it to the agent, that,

21 yeah, that stuff is serious.  And we thought, you

22 know, high, like, classified intel.  And there

23 was, I guess when he had met with the person,

24 there was examples about corrupt judges given to

25 him and just, like, human traffickers, like bad

1  people, like really bad people.  And we just, so

2  that's, you don't need to get involved in that.

3  That's, that's not who you are.

4      Q.    But is it fair to say that you were

5  more concerned about your son's safety?

6      A.    Yes, sir.  Yes, sir.

7      Q.    Okay.  Now, you agreed to be a third-

8  party custodian for your son, correct?

9      A.    Yes, sir.

10      Q.    And you and I have discussed the

11  particulars of that, right?

12      A.    Yes.

13      Q.    And so do you know that means that you

14  will be responsible for assisting him in

15  complying with the conditions that the Court may

16  impose if he is released?

17      A.    Yes, sir.

18      Q.    Do you know that this may also mean

19  that you would have to contact probation, you

20  would have to contact me, you'd have to contact

21  the authorities if Mr. Garcia is found not to

22  comply with conditions that the Court could

23  impose?

24      A.    Yes, sir.

25      Q.    And you know that or do you know that

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 85 of 131 PageID #: 128
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  if you make this call that that could ultimately

2  land him in jail?

3        A.   Yes, sir.

4        Q.   And would you be willing to contact the

5  police authorities, myself, probation, if your

6  son was to violate any conditions that the court

7  could impose?

8        A.   Yes.  I would.  Yes.  I would.

9               MR. FLETCHER:  Okay.  Your Honor,

10 I think that's all I have for now.

11              THE COURT:  All right.  Ms.

12 Schiferle, any cross-examination of this witness?

13 CROSS EXAMINATION

14 BY MS. SCHIFERLE:

15       Q.   Good afternoon, Ms. Garcia.

16       A.   Good afternoon.

17       Q.   My name is Brooke Schiferle.  I'm the

18 prosecutor in this case.  I know that you're not

19 in a fun position today, so I will try to keep my

20 questions brief.

21       A.   Yes, ma'am.

22       Q.   I was a little confused on direct

23 examination when you said you thought he was

24 working full time at the base, but then something

25 happened.  What happened there?

 1      A.   He applied for a position on the base,

 2 and he was supposed to be full time.  And then

 3 something happened with that job, and his

 4 paychecks was getting all crazy.  They weren't

 5 paying the way they were supposed to, and he

 6 started applying different areas.  His sergeant

 7 was actually helped him apply for the police

 8 academy, and something happened to that.  His

 9 sergeant said, "I dare them not take a, you know,

10 guardsman."  He's always been about upholding the

11 law.  That's, you know, can't wrap on the head

12 around this.

13      **Q.   I don't know if it was easy for you or**

14 **difficult for you to hear some of the recordings**

15 **that I played earlier.**

16      A.   I, to be honest, ma'am, it's, I did

17 hear some of it.  I just plugged my ears, to be

18 honest.

19      **Q.   That's understandable.**

20      A.   because the son we raised, and I know,

21 my heart goes to all of the, it goes out to all

22 the mothers that have been through this and who

23 are going through it.  I will never defend wrong,

24 and our sons, all of our children have been

25 raised to uphold the law.  And like I said, he's

1  always been respectful.  Anyone that knows him.

2  He's never committed crime.  Never drank.  Never

3  did drugs.  We can't wrap our heads around why he

4  basically entertained this.  He would, he would

5  never go through with something like that.  And I

6  know y'all are doing your jobs.  Thank God we got

7  FBI.

8      **Q.    Were you able to hear the part where he**

9  **said he had thought about traditional law**

10 **enforcement but decided that wasn't for him and**

11 **he wanted something more exciting?**

12     A.   He did mention that to us, but it's

13 because he wanted to be FBI.  He applied at FBI.

14 He wanted to be, like, profiler, like,

15 investigator.  We used to watch crime shows

16 together and stuff.

17     **Q.    Okay.**

18     A.   Yeah.

19     **Q.    So when he came to you and said, "Oh, I**

20 **have this job opportunity, and somebody on the**

21 **base told me about it," what did he tell you that**

22 **this job opportunity was?**

23     A.   He didn't, he didn't really say much

24 about it.  All I know is my thoughts were because

25 we did know someone long time ago that was in the

County
COURT REPORTERS, Inc.
Videography  Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 88 of 131 PageID #: 131
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1 Air Force, that was offered, like, CIA, like,

2 things like that.  It was a long time ago.  And

3 that was my thought.  It scared me.  So he's not

4 anybody that knows Josiah knows he doesn't have a

5 mean bone in his body.  And that's what I said.

6 I don't know why he entertained it.  I don't

7 understand it.  He would never harm anyone.

8 Anyone that knows him knows this.  He's just a

9 kind, loving soul.

10     **Q.   But when you said earlier that he said**

11 **something about corrupt judges and human**

12 **traffickers?**

13     A.   That's what was told to him, that that

14 would be, like, the target.

15     **Q.   The target of?**

16     A.   Like, I guess, his job.

17     **Q.   So, your understanding of what this job**

18 **was ...**

19     A.   But that was, but that was not recent.

20 That's, like, that was just like, that's not what

21 he first told us about the person giving him,

22 yeah.

23     **Q.   Okay.  So first he told you about**

24 **someone gave him some info?**

25     A.   Yes.

County
COURT REPORTERS, Inc.
Videography        Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 89 of 131 PageID #: 132
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1     Q.    And you weren't sure what that was

2  about?

3     A.    No.

4     Q.    Okay.  So then when did this other

5  stuff come up about judges?

6     A.    That was just, I would say two days

7  before that.  And he said that he would, we told

8  him, we said, "Son, you do not get involved with

9  that stuff.  This is not who you are.  You," and

10  I quoted the Scripture.  The Word of God says

11  vengeance is mine.  I will repay said the Lord.

12  And he knows this.  He can, he can try to pose

13  tough.

14        There was an incident that happened to

15  him, and I know he's probably embarrassed and

16  don't want me to talk about it.  But it happened

17  to him when he was in tech school, in basic in-

18  tech.  And he felt powerless.  And I don't know

19  if he just felt like he had to prove something,

20  trying to be tough.  I don't know.  But like I

21  said, anyone that knows him would know, they

22  would know he would never harm anyone.  But I

23  understand, like I said, y'all are doing your

24  job.  And to y'all, to anyone, he looks, you

25  know, so.

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 90 of 131 PageID #: 133
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1    Q.    Well, you heard the recordings.

2    A.    Yes.

3    Q.    You agree ...

4    A.    I'm just like what ...

5    Q.    ... that's what it sounds like?

6    A.    I just can't wrap my head around it.

7    Q.    What did he tell you about the kind of

8 money he was going to make doing this job?

9    A.    When he mentioned the judge, the

10 corrupt judge, and the human traffickers, he

11 mentioned like, $100,000.  And we said, "No

12 amount of money is worth your life.  No amount of

13 money is putting your life in danger."  Yeah.

14    Q.    So really you were concerned about your

15 son's safety?

16    A.    Yes.

17    Q.    Not so much a concern ...

18    A.    No.

19    Q.    ... about these bad people being

20 killed?

21    A.    No.  More his safety.

22    Q.    I just have a couple more questions.

23    A.    Okay.

24    Q.    I think in your interview with the FBI,

25 you mentioned that you rely on your son

County
**COURT REPORTERS**, Inc.
Videography   Litigation Technology™

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 91 of 131 PageID #: 134
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1  **financially?**

2        A.    When we, yes.   There was an incident

3  where we moved home to Florida.  I stayed sick,

4  sick here a lot, and my husband was supposed to

5  change of operations.  We moved home to Florida,

6  happy because we got to go to my cousin's Lynn's

7  church and he was working with him and stuff.

8  Anyway, there was mold in my home.  I got deathly

9  sick.  Josie didn't know anything about it

10  because he was in boot camp and stuff, and we

11  could not give him any details on stuff.  They

12  always said motivate.

13            Anyway, I had to come back up here and

14  live in a travel trailer.  But yeah, we did, we

15  agreed when we moved into the home we're in now,

16  we sat his brother down and him.  Said we all got

17  to work together.  Because his daddy makes really

18  good, he makes good money, but we're kind of in

19  over our heads right now.  So we said we got to

20  work together on this, guys.  We all got to pay

21  our portions, you know, until we can get back,

22  you know, because of the move and everything.  We

23  had to go to Florida, get our stuff, and we was

24  just getting resituated again.  Yeah.

25        **Q.    So it's going to be a financial**

1 **hardship for you if he stays in jail for a while?**

2      A.   That's an understatement.

3      **Q.   Just one more question.   You remember**

4 **when you spoke to the probation officer, they did**

5 **an interview with you, maybe it was on the phone.**

6 **They did a check of your criminal history and it**

7 **came up that you have an arrest a long time ago**

8 **from 2000 for obstruction of justice?**

9      A.   Yes, ma'am.

10      **Q.   Can you tell me about that?**

11      A.   Yes.  It had to do with my daughters,

12 and I was told not to talk to my daughter, and I

13 was pregnant.  And just my nerves, and, you know,

14 you get all just, because I was pregnant, and I

15 got in trouble for talking to my daughter, which

16 I shouldn't have did.  And so I got arrested.

17 Never been in trouble in my life.  And went to

18 jail, and it was the most humiliating experience

19 I've ever had in my life.

20      **Q.   What happened with the case?  Do you**

21 **remember?**

22      A.   It was, it got, it got, well, my

23 daughters were brought home, and thank God, and

24 my, I mean, it got dropped.  I mean, I was

25 released.  Yeah, everything.

County
COURT REPORTERS, Inc.
Videography    Litigation Technology

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 93 of 131 PageID #: 136
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1      Q.   Okay.

2      A.   Yeah.

3           MS. SCHIFERLE:  I have nothing

4 further, Your Honor.

5           MR. FLETCHER:  That's all my

6 proof, Your Honor.

7           THE COURT:  I'm sorry?

8           MR. FLETCHER:  That's all my

9 proof, Your Honor.

10          THE COURT:  All right.  Thank you,

11 Ms. Garcia.  You can step down.  I really

12 appreciate you being here today.  Thank you for

13 your testimony.  Watch your step when you come

14 around the corner there.

15          All right.  So you don't have any

16 more proof?

17          MR. FLETCHER:  That's all, Your

18 Honor.

19          THE COURT:  All right.  Very good.

20 Thank you.

21          Ms. Schiferle, does the Government

22 have any rebuttal proof?

23          MS. SCHIFERLE:  No, Your Honor.

24          THE COURT:  All right.  If the

25 lawyers could just bear with me for a minute.  I

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 94 of 131 PageID #: 137
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  have another matter that I need to take up.  I'm

2  going to do an initial appearance real quick.

3  We're going to do it by video.  You're welcome to

4  stay in your seats if you want to, or you can

5  step out in the hallway, whatever you're

6  comfortable doing.  If you need a comfort break,

7  now would be a good time to do that if you want.

8  And we'll go ahead and adjourn for just a moment.

9  Let me take this, and then when everybody's

10  ready, we'll come back out and I'll hear

11  argument, and we'll go from there.

12  **(WHEREUPON, the Court took a brief recess.)**

13             **THE COURT:**  All right.  Thank you

14  all.  I appreciate everyone accommodating me to

15  handle some other matters.  We're back on the

16  record after a short recess.

17             Before I hear from the lawyers for

18  argument, I wanted to raise an issue.  Mr.

19  Fletcher, so I've heard the proof in this case,

20  and I'm a little bit concerned about the proposed

21  third party situation that we've got here.  I've

22  heard the proof, and there seems to be a whole

23  lot of naivete about some situations.  Obviously,

24  the charges the defendant faces in this case are

25  significant and serious charges.  There are some

1 mitigating circumstances in my mind with regard

2 to the charges themselves.  Obviously, Mr. Garcia

3 doesn't have any sort of a prior criminal record,

4 but it appears from the proof that I've heard

5 that his family was aware generally of his

6 potential involvement in some sort of a contract

7 killing situation.  Whether it was under the

8 auspices of some Governmental entity or agency or

9 some other type of arrangement appears to be

10 somewhat in dispute.

11            But the idea that Mr. Garcia was

12 talking to somebody about being engaged in

13 murdering people, no matter what the

14 circumstances, and that didn't lead to anything

15 more than what happened in this case.  In terms

16 of a response from the proposed third-party

17 custodian, I'm just not sure that that's the best

18 situation, and I'm not really comfortable with

19 that kind of a release plan in this particular

20 case.  I haven't ruled yet on release, but I

21 wanted to raise the issue with you at this stage

22 of the proceedings in the event that you wanted

23 to make a motion and perhaps look at proceeding

24 in some different fashion with regard to the

25 proof in this case.

County
CourtREPORTERS, Inc.
Videography        Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 96 of 131 PageID #: 139
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1          **MR. FLETCHER:**  Your Honor, we have

2  actually a few third-party custodian options that

3  we could present to the Court, one being another

4  sister that I've spoken with Mr. Garcia about.

5  She doesn't live here.  She lives in Ohio.  We

6  could have got her on the phone.  I believe

7  probation has already spoken to her already, and

8  I think there's another possible third-party

9  custodian that we could get.  I just don't know

10  if it could happen today.  If the Court would

11  like us to try to set those up, we could pretty

12  quickly this week.

13          **THE COURT:**  Well, again, as I said

14  earlier, it's your case, but I think it's fair to

15  you to let you know sort of where I am in light

16  of what I've heard.  And if you want the

17  opportunity to put some additional proof on, I'm

18  willing to continue the matter and let you put

19  something else on if you want to, or if you want

20  to proceed in some different fashion, or if you

21  want to proceed as things are, then it's your

22  decision to make.

23          **MR. FLETCHER:**  Your Honor, if you

24  could give me two days, Your Honor, and just

25  mostly just to kind of iron things out with my

1 client, just to make sure everything's good with

2 him.  If we could do that, and if opposing

3 counsel could be here in two days, we could have

4 it set up.

5           THE COURT:  Ok.  All right.  Let's

6 see what our availability is, and Ms. Schiferle,

7 what the Government's availability is.

8           MS. SCHIFERLE:  If we're talking

9 about Thursday when we say two days, I have a

10 sentencing that I expect to take most of the day.

11 It starts at 9 a.m.

12           THE COURT:  Okay.  Could we look

13 at Friday?

14           MS. SCHIFERLE:  All right.  Just

15 confirm with the agent.  He has to be in Memphis

16 on Friday morning.  He can make an attempt to be

17 back here Friday afternoon.  It might be that I

18 wouldn't need him

19           THE COURT:  Right.

20           MS. SCHIFERLE:  But that would

21 partly depend on if I had the full information

22 about people who are going to testify in advance,

23 I might want to put some rebuttal proof on.

24           THE COURT:  Yes, right.

25           MR. FLETCHER:  Does tomorrow

1  afternoon work?

2          **MS. SCHIFERLE:**  Does what?

3          **MR. FLETCHER:**  Tomorrow afternoon

4  work?

5          **THE COURT:**  We could do 1:00

6  tomorrow.  Do you think that'll be enough time?

7  Because I would like for you to, as I said at the

8  initial appearance, if you're going to propose

9  any sort of release plan, I think it's helpful to

10 be able to disclose that information to the

11 Government and also, more importantly, from my

12 standpoint, to pretrial services so that we can

13 have an opportunity to work through that.

14          **MR. FLETCHER:**  I have, Your Honor.

15 The proposal has already been submitted to

16 pretrial.  They've already spoken to her, too.

17          **THE COURT:**  Okay.

18          **MR. FLETCHER:**  This was just the

19 first plan that we were choosing to go to.  If

20 the Court's not comfortable with that, we can go

21 with our second plan.  I just wanted enough time

22 to probably try to get her.

23          **THE COURT:**  Okay.  Can you do 1:00

24 tomorrow?

25          **MS. SCHIFERLE:**  I can.  I think

1 that the sister who was proposed lives in Ohio.

2 Do you expect her to be in person here by that

3 time?

4         **MR. FLETCHER:**  She's assured me

5 that she can try to get here.  If she can't, Your

6 Honor, we could get her on the phone for sure.

7         **THE COURT:**  What about by video?

8         **MR. FLETCHER:**  We could do that

9 also.

10         **THE COURT:**  Can we do it by video?

11 Let's do it by video.  Why don't we do it by

12 video that way she doesn't have to travel down

13 for that.  And that'll give everybody a chance

14 to sort of run some traps and determine what

15 that's going to look like.  So that's what we'll

16 do.  We'll continue this till tomorrow.  I'll let

17 you put on your additional proof, and then I'll

18 hear argument and I'll make a decision at that

19 point about what to do here.

20         **MS. SCHIFERLE:**  May I ask?  So the

21 probation interviewed Patricia Garcia and Heather

22 Diaz.  And by I just heard Counsel mention that

23 there's another potential person.  Is that person

24 going to be offered to probation for an

25 interview, or will we be given that person's name

1  in advance?

2                    **MR. FLETCHER:**  Yeah, we can.

3                    **THE COURT:**  All right.  Very good.

4  All right.  Thank you all very much.  We will

5  adjourn matters until tomorrow at 1:00.  Thank

6  you.

7                    **MR. FLETCHER:**  Thank you, Your

8  Honor.

9  **(WHEREUPON, the HEARING was adjourned.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

County
**COURT REPORTERS,** Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 101 of 131 PageID #: 144
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1                                CAPTION

2

3  The foregoing matter was taken on the date, and at

4  the time and place set out on the title page hereof.

5

6  It was requested that the matter be transcribed from

7  an audio recording and that the same be reduced to

8  typewritten form.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF TRANSCRIBER AND SECURE ENCRYPTED

2         SIGNATURE AND DELIVERY OF CERTIFIED TRANSCRIPT

3         I, **KATHRYN REED**, do hereby certify that the

4    forgoing matter was transcribed verbatim from an

5    audio recording provided to me, that the transcript

6    prepared by me or under my direction, is a true and

7    accurate record of same to the best of my knowledge

8    and ability; that there is no relation nor employment

9    by any attorney or counsel employed by the parties

10   hereto, nor financial or otherwise interest in the

11   action filed or its outcome.

12        This transcript and certificate have been

13   digitally signed and securely delivered through our

14   encryption server.

15        IN WITNESS HEREOF, I have here unto set my hand

16    this 22ND day of APRIL, 2023.

17

18

19   *Kathryn J. Reed*

20

21   /s/ KATHRYN REED

22   TRANSCRIBER

23

24

25

**$**

**$100,000** 91:11

**$2,500** 45:25 51:2 67:24

**1**

**1:00** 99:5 99:23 101:5

**10:07** 24:9

**100** 20:9 43:6 48:14

**10th** 52:9 52:11 53:2

**11** 47:14 47:23 48:3 48:19 48:20

**11th** 45:6 45:8 53:6

**12** 47:14 47:23 48:3 48:21 48:23 48:24

**1213** 83:10

**12th** 12:18 33:19 44:6 44:7 44:11 45:12 53:13

**14** 8:9 8:20 80:12

**150** 50:3

**16** 17:13

**16th** 16:2

**17th** 18:3

**18** 6:4

**18th** 19:2

**19th** 23:12

**19-year-old** 56:10

**2**

**2000** 93:8

**2005** 13:15

**2021** 22:3 22:12

**2022** 27:21 27:25

**2023** 6:4 16:2 19:2 24:9 29:10 31:20 32:23

**20th** 24:9 28:16 28:24 29:3 29:10 58:21

**250** 48:13

**3**

**300** 40:11

**323MJ2033** 6:8

**4**

**42276** 48:15

**44** 48:12

**5**

**5** 26:3 26:11 27:24

**50** 43:7 43:8

**5th** 27:21 27:25 31:20 32:23 33:4 34:19

**6**

**6** 25:21 26:3

**615-609-6559** 16:20

**6'2** 48:13

**64** 20:11

**6th** 33:5 44:5 44:7

**7**

**7** 25:21 26:3 28:2

**7th** 52:7 52:11 52:22

**8**

**8** 25:21 26:3

**9**

**9** 98:11

**9th** 28:8 44:14 44:16 52:24 52:25

**A**

**a.m** 24:9 98:11

**A4EF14** 48:16

**able** 39:21 62:5 88:8

99:10

**abusive** 42:8

**academy** 87:8

**accept** 71:20 71:23

**accepting** 79:3

**access** 72:6 74:11

**accommodatin g** 95:14

**according** 14:11

**account** 25:5 25:7 25:24 30:2

**accurate** 8:21

**across** 50:2

**Act** 20:11

**action** 22:14

**activities** 65:5

**activity** 55:18

**acts** 76:5

**actual** 62:23 71:10 80:1

**actually** 12:23 16:10 19:11 31:9 41:8 45:13 53:11 63:9 63:15 87:7



County
**COURT REPORTERS**, Inc.
Videography   Litigation Technology™
800.262.8777 TOLL-FREE • 540.667.0600 LOCAL • 540.667.6562 FAX   CountyCourtReporters.com

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 104 of 131 PageID #: 147

97:2

**additional**
44:8 97:17
100:17

**address**
16:13 16:15
18:24 21:22
45:23 48:14
53:22 55:4

**adjourn** 95:8
101:5

**adjourned**
101:9

**administrato
r** 11:24

**admitted**
16:5 16:6
19:5 19:6
21:3 21:4
24:2 24:3
26:5 26:7
32:16 32:17
38:18 38:19
48:2 48:4

**adopt** 13:5

**advance**
35:18 98:22
101:1

**advised**
42:15 50:23
51:19 56:19
56:22 59:4

**affiant** 13:2

**affirm** 7:12
82:7

**afraid** 70:17

70:18 71:3

**afternoon**
6:5 6:6 6:9
8:3 8:4
82:24 86:15
86:16 98:17
99:1 99:3

**against**
56:19

**Age** 48:12

**agency** 9:18
14:5 96:8

**agency's**
14:7

**agent** 7:7
7:23 8:3
8:7 8:8
8:18 12:4
37:21 39:21
50:18 50:20
55:4 60:17
60:19 61:23
65:20 66:11
66:21 67:1
67:24 70:18
70:19 71:19
74:23 74:25
75:24 77:18
80:11 80:22
84:16 84:20
98:15

**agents** 9:1
46:18 49:20
55:3 61:18
61:22 65:19

**ago** 21:9
27:24 88:25

89:2 93:7

**agreed** 40:9
49:16 81:13
81:15 85:7
92:15

**agreeing**
51:17

**agreement**
44:23

**ahead** 19:20
24:10 42:14
45:15 46:5
95:8

**Air** 10:17
11:9 11:21
11:22 12:1
22:2 22:10
22:15 26:14
26:15 27:17
27:19 28:7
52:3 61:19
62:14 62:18
66:16 80:2
80:9 80:14
80:17 89:1

**allegedly**
71:10

**allowed**
57:24

**Alpert's**
6:10

**already**
36:17 68:25
71:4 74:3
97:7 97:7
99:15 99:16

**am** 12:6 13:4

15:9 97:15

**America** 6:7

**American**
28:10

**amount** 91:12
91:12

**angry** 70:19

**announcement
s** 6:19 6:25

**answer** 35:4
66:20 66:22
66:23 67:1
77:24 78:24

**answered**
55:5

**anybody** 89:4

**anymore**
52:18

**anyone** 83:14
84:7 88:1
89:7 89:8
90:21 90:22
90:24

**anything**
29:4 39:2
42:17 52:1
54:8 54:8
55:17 57:10
59:7 63:9
76:2 76:23
78:16 92:9
96:14

**anyway** 44:2
92:8 92:13

**app** 46:21

County
**COURT REPORTERS**, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 105 of 131 PageID #: 148
800.262.8777 TOLL-FREE • 540.667.0600 LOCAL • 540.667.6562 FAX    CountyCourtReporters.com

appear 48:24
73:14

appearance
95:2 99:8

appeared
13:23

appears
15:17 21:17
26:14 26:22
38:10 58:20
73:13 96:4
96:9

applied 87:1
88:13

apply 87:7

applying
66:11 67:9
73:10 73:18
79:12 79:17
84:3 87:6

appreciate
37:14 80:23
94:12 95:14

apprehended
51:23

apprise
81:13

approximatel
y 8:9 8:19
50:3 61:1

April 6:4
12:18 31:19
32:23 33:4
33:5 33:19
34:18 44:4
44:6 44:7

44:7 44:11
44:14 44:16
45:6 45:8
45:11 52:7
52:9 52:11
52:11 52:22
52:24 52:25
53:2 53:6
53:13

AR 26:15

AR-15 28:17
58:13

areas 87:6

aren't 75:3

argument
81:14 95:11
95:18
100:18

arrange
30:19 44:11

arranged
45:17

arrangement
96:9

arranging
53:9

arrest 50:5
61:8 61:10
61:17 71:10
71:16 72:2
72:3 93:7

arrested
11:7 12:24
14:15 21:17
32:12 50:4
59:12 60:25

61:13 67:13
68:2 68:12
68:15 68:19
69:13 69:15
70:12 70:14
71:12 71:14
75:10 93:16

arrests 14:1
14:2 14:9
61:24

arrived 55:4
56:10

AR-style
29:22

articles
61:24

assassin
73:21

assault 35:2
35:8

assistant
52:6

assisting
85:14

assume 6:15
63:18

assured
100:4

ATF 61:22

attached
76:18

attempt
98:16

attention
37:14

audio 6:1
32:9 32:25
33:12 33:13
33:15 33:22
34:2 34:13
36:2 37:17
39:17 40:21
41:23 42:18
43:9 46:11
75:5 75:11

audio/video
33:22

auspices
96:8

authorities
85:21 86:5

automaticall
y 84:19

availability
98:6 98:7

awarded
22:25

awards 22:23

aware 14:14
96:5

away 46:16
49:21 50:1
51:2 51:17

---
B
---
bad 84:25
85:1 91:19

badges 57:23

bag 27:18

Baltimore

County
COURT REPORTERS, Inc.
Videography   Litigation Technology™

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 106 of 131 PageID #: 149
800.262.8777 TOLL-FREE • 540.667.0600 LOCAL • 540.667.6562 FAX   CountyCourtReporters.com

8:12

**bar** 35:23

**base** 22:19
27:21 61:19
80:7 83:25
84:15 86:24
87:1 88:21

**based** 9:25
10:11 10:12
12:3 30:7
43:3 51:11
63:2 69:12
77:19 79:14

**basic** 90:17

**basically**
32:25 88:4

**bear** 94:25

**beautiful**
28:17 29:2

**became** 47:11
57:23

**bedroom** 58:6
58:8 58:12

**beforehand**
12:13

**begin** 20:2

**beginning**
42:2 65:21
65:25

**belief** 44:2
69:11

**believe** 52:5
59:2 69:7
69:12 69:24
69:25 70:3

70:4 70:5
70:23 70:24
70:25 73:22
73:24 74:6
77:21 77:22
78:10 78:15
97:6

**believed**
59:1 78:6
79:2 79:8

**belonging**
25:8

**beret** 26:14
27:18 28:8
28:10 38:13
38:13

**best** 10:11
20:3 96:17

**bit** 9:10
9:14 43:12
81:23 81:25
95:20

**black** 48:15
57:15 58:16
79:10

**blatantly**
78:12 78:16

**blue** 28:9
38:13

**body** 89:5

**bone** 89:5

**boot** 92:10

**branch** 22:10

**break** 95:6

**brief** 77:5

86:20 95:12

**briefly** 8:6
13:10 40:5
50:20

**bring** 81:17

**bringing**
37:14

**broke** 83:2

**Brooke** 86:17

**brother**
53:23 56:10
56:18 56:25
73:11 73:12
73:14 73:16
81:9 92:16

**brought**
93:23

**bullseye**
23:1 23:10

**business**
13:19

———————
C
———————

**camp** 92:10

**cancel** 77:17

**canceling**
53:17

**cancelled**
84:1

**capable** 63:9

**car** 50:3
50:4 54:1
61:2 68:3
69:9 71:13
72:18

**care** 65:11

**career** 79:14

**caregiver**
52:7

**case** 6:8
7:13 8:22
8:23 9:2
9:4 9:9
9:18 9:22
9:24 10:8
10:9 10:19
11:2 12:4
13:2 13:12
14:14 17:19
29:4 30:15
54:4 58:14
59:3 81:20
82:2 82:8
83:20 86:18
93:20 95:19
95:24 96:15
96:20 96:25
97:14

**cases** 9:7

**catchy** 13:19

**cell** 49:2
59:11

**Center** 83:22

**CEO** 20:8

**certificatio
ns** 23:7

**certified**
23:9 52:6

**cetera** 56:25

**chance** 68:9
69:4 100:13

change 52:19
54:13 67:20
68:7 68:9
68:23 69:8
70:1 71:4
92:5

changed
50:24 51:4
55:14 68:25
69:2 69:8
69:19 69:20
70:9

charges
95:24 95:25
96:2

check 93:6

checking
80:8

chest 40:17

Chevrolet
48:15

children
83:16 87:24

choose 9:22

chooses 9:21

choosing
99:19

chose 35:19

Christian
64:14 65:3

church 92:7

CIA 89:1

cigar 35:23

circumstance

s 96:1
96:14

clarify 77:8
77:23

classified
55:23 56:16
74:11 79:16
84:22

clear 28:19
69:5 75:15
79:1 79:22

cleared
29:11

CLERK 7:11
7:16 7:21
7:24 82:6
82:11 82:14
82:18 82:21

click 20:8

client 98:1

clients 30:7

clip 37:21
40:6 42:1
46:6

clips 34:7
34:17 35:25
36:21 36:25
37:4 46:8
62:11 65:22
74:20 75:15
75:17 75:18

close 62:11

clothes 49:4

clothing
38:24

Coach 25:1
29:19

colleague
9:3 66:16

comfort 95:6

comfortable
34:23 35:1
35:5 40:11
57:17 57:24
58:3 95:6
96:18 99:20

coming 8:14
40:17 50:23
79:21

comment
28:25

comments
15:23 17:1

commit 47:4

committed
76:5 88:2

commonly
39:9

communicate
47:1 47:8
47:11

communicatio
n 11:17
18:6 30:5
45:2 53:5
53:12

communicatio
ns 16:22
21:23 61:13

company

13:17 13:17
13:17 47:12

complaint
13:2 13:6

complete
36:8 36:9
36:15 61:6

completion
6:17

complex 9:4

compliant
20:10 71:17

complied
73:4

comply 85:22

complying
85:15

computer
13:17 37:3
58:14 72:7
72:10

concern
91:17

concerned
19:25 85:5
91:14 95:20

conditions
85:15 85:22
86:6

conducting
72:20 80:6

confer 9:1

confirm
98:15

confirming

40:7

**confused**
86:22

**connected**
74:10

**connects**
59:3

**consent**
50:22 54:1
54:5 58:4
58:9 58:10
72:15

**consequences**
41:3

**considering**
79:2

**consisted**
45:21

**consulted**
9:5 9:7

**contact**
11:13 12:8
15:25 29:6
29:12 30:1
42:16 59:5
85:19 85:20
85:20 86:4

**contacted**
15:6 61:19

**content**
24:11 24:12

**contents**
13:6 32:8

**context** 29:4

**CONTINUATION**

16:8 17:24
19:8 21:6
24:5 26:9
32:19 34:14
37:18 38:21
39:18 40:22
41:24 42:19
43:10 46:12
48:5 83:3

**continue**
37:15 97:18
100:16

**contract**
54:18 55:24
55:25 56:17
57:3 57:15
66:17 66:17
66:19 66:25
74:16 78:20
96:6

**contractor**
55:14 79:9

**conversation**
33:3 34:25
37:1 38:1
42:25 43:1
43:16 44:8
46:9 46:24
58:3 67:7
73:13

**conversation
s** 36:8 36:9
36:15 52:23

**conveying**
18:9

**cooperative**
72:25 78:1

78:3

**coordinated**
35:15

**coordination**
51:11

**coordinator**
9:20 30:6

**copies** 11:16

**copy** 6:15
6:16 15:11
37:6

**corner** 94:14

**correct** 13:3
14:5 14:6
14:23 15:4
17:2 17:14
18:25 19:24
27:2 28:1
29:24 33:6
33:7 33:16
33:17 34:4
34:20 35:3
36:24 40:12
48:9 48:18
48:22 49:11
49:23 52:25
53:7 61:11
61:15 62:13
63:1 63:19
64:10 64:17
64:18 64:22
65:12 65:13
66:1 66:12
66:20 66:22
67:2 67:10
67:14 67:15
67:21 67:22
68:6 68:11

68:15 68:16
68:21 69:17
70:13 70:14
70:20 70:21
71:24 71:25
78:2 85:8

**correctly**
27:3 39:3

**corroborate**
62:5 63:4
65:14 66:4

**corrupt**
84:24 89:11
91:10

**counsel** 98:3
100:22

**country**
14:14 22:11

**couple** 9:4
17:9 41:6
91:22

**course** 33:24
75:13 79:6

**court** 6:5
6:9 6:23
7:3 7:9
7:11 7:16
7:21 8:5
10:14 13:10
15:11 16:5
17:4 17:18
17:23 19:5
21:3 21:18
24:2 24:11
25:20 26:4
29:12 32:15
34:8 34:12

36:14 36:19
37:2 37:8
37:13 38:17
42:3 45:12
45:15 46:21
48:1 50:16
59:17 59:22
60:1 60:7
60:13 77:4
80:21 81:3
81:11 81:13
81:16 81:20
82:4 82:6
82:11 82:14
82:16 82:18
83:1 85:15
85:22 86:6
86:11 94:7
94:10 94:19
94:24 95:12
95:13 97:3
97:10 97:13
98:5 98:12
98:19 98:24
99:5 99:17
99:23 100:7
100:10
101:3

**Court's** 6:13
34:6 99:20

**cousin's**
92:6

**crazy** 87:4

**credentials**
57:22

**crime** 8:11
8:15 8:18
10:20 88:2

88:15

**criminal**
13:2 13:6
75:25 76:1
76:3 93:6
96:3

**CROSS** 60:14
86:13

**cross-**
**examination**
77:9 77:25
78:19 86:12

**curb** 51:6
68:18 69:3
69:17 69:23
70:3 70:10
77:18 78:14

**current** 52:2
62:16 62:17
73:23

**custodian**
81:18 85:8
96:17 97:2
97:9

**custodians**
81:15

**cut** 36:6
36:10 75:22

**cuts** 36:18

**cyber** 13:17

---

D

---

**D.C** 8:12

**daddy** 92:17

**danger** 91:13

**dangerousnes**
**s** 59:9

**dare** 87:9

**date** 16:1
19:1 24:7
27:25 28:23
29:3 29:5
29:8 32:6

**dated** 28:8

**dates** 44:13

**dating** 42:7

**daughter**
93:12 93:15

**daughters**
93:11 93:23

**day** 18:3
29:21 35:12
50:24 98:10

**days** 90:6
97:24 98:3
98:9

**deal** 12:17
44:5 47:4

**deals** 47:8

**deathly** 92:8

**decide** 30:3

**decided** 71:4
88:10

**decision**
52:17 97:22
100:18

**defend** 87:23

**defendant**
11:18 12:8

12:24 16:23
18:1 19:20
20:12 29:1
30:24 31:13
34:22 35:16
35:20 38:25
41:4 43:17
43:18 43:23
44:9 44:17
44:20 45:2
45:9 46:2
46:10 46:15
49:16 49:21
53:12 53:20
54:8 77:11
77:15 95:24

**defendant's**
16:11 22:14
25:4 25:23
58:6 58:12
59:8

**defenders**
76:20

**defense**
15:10 37:6

**demographic**
48:8

**depend** 98:21

**depiction**
64:22

**depth** 17:11

**describe**
9:14 64:1
64:4 64:5

**described**
14:18 49:15
58:15

describes
47:9

description
17:11

detail 8:14
59:10

detailed
81:14

details
51:14 92:11

Detective
60:16

detention
6:12

determine
100:14

device 33:1

devices
33:10 33:21
54:4 75:11

Diaz 100:22

different
36:21 46:3
49:5 60:7
61:23 64:25
65:1 84:3
87:6 96:24
97:20

difficult
39:20 87:14

direct 8:1
16:8 17:24
19:8 21:6
24:5 26:9
32:19 34:14
37:18 38:21

39:18 40:22
41:24 42:19
43:10 46:12
48:5 69:6
70:22 72:12
73:7 82:22
83:3 86:22

directed
11:2 30:4

directing
10:2

direction
9:24 10:9
49:5

directly
11:10 25:22

Director's
8:13

disc 32:8

disclose
99:10

discovery
37:7

discussed
34:22 47:7
85:10

discussion
46:20

disk 31:24
37:3

dispute
96:10

distance
40:10 50:2
51:12 62:11

distances
40:8

ditch 57:22

document
16:11 20:19
23:20

documentatio
n 20:13

documents
15:2 23:11
24:15 29:14

dollars 56:2
56:21

done 10:12
22:13

door 55:5

drank 88:2

drew 35:8

drive 48:14
51:12

driver 48:17

driver's
20:23 29:15

dropped
93:24

drugs 8:11
88:3

duly 7:24
82:20

during 38:25
53:25 54:16
63:12 66:10

—————————
E
—————————

E3 22:11

earlier
46:23 52:22
80:1 87:15
89:10 97:14

earned 23:4

ears 87:17

easy 87:13

edge 8:12

electronic
54:3

eliminate
56:17 74:17

eliminated
56:1 79:18

eliminating
80:15

else 15:5
42:7 56:8
78:16 79:5
83:14 97:19

email 16:13
16:15 18:20
18:24 19:12
19:21 20:5
21:8 21:22
23:23 23:23
24:8 24:11
24:12 24:14
24:16 29:18

emails 29:6

embarrassed
90:15

employed
11:22

**employee**
47:11

**employment**
10:24 14:21
15:23 19:23
19:25 24:15
48:16 51:1
52:2 74:12
79:22

**encrypted**
47:10

**enforcement**
8:6 14:5
57:11 77:18
88:10

**engaged**
30:12 96:12

**enjoy** 24:24

**entered**
47:24

**entertained**
88:4 89:6

**entirety**
46:8

**entity** 96:8

**Entrepreneur
ship** 22:6

**envelope**
47:21

**Ernesto**
21:15

**especially**
80:17

**essentially**
10:2 10:15

**11:25 21:10**

**et** 56:25

**evening**
53:21

**event** 96:22

**everybody**
100:13

**everybody's**
95:9

**everyone** 6:6
95:14

**everything**
15:8 42:9
58:1 92:22
93:25

**everything's**
98:1

**evidence**
16:4 16:7
19:4 19:7
21:2 21:5
24:1 24:4
26:3 26:8
29:8 32:14
32:18 38:16
38:20 47:24
47:25 48:4
63:17

**evidentiary**
58:12

**exact** 17:6
78:12

**examination**
8:1 16:8
17:24 19:8
21:6 24:5

26:9 32:19
34:14 37:18
38:21 39:18
40:22 41:24
42:19 43:10
46:12 48:5
60:14 77:6
82:22 83:3
86:13 86:23

**examined**
7:24 15:12
18:15 20:17
23:17 25:12
27:15 28:4
28:13 31:25
38:5 47:16
82:21

**examples**
84:24

**exchange**
11:5 49:21

**excited**
51:16

**exciting**
88:11

**Excuse** 36:3

**Exhibit** 26:3
27:24

**Exhibit-1**
15:10 15:13
16:4 16:6

**Exhibit-10**
38:4 38:6
38:16 38:19
48:18

**Exhibit-11**

47:17 49:12

**Exhibit-12**
47:17

**Exhibit-2**
18:14 18:16
19:4 19:6

**Exhibit-3**
20:16 20:18
21:2 21:4

**Exhibit-4**
23:16 23:18
24:1 24:3
29:7

**Exhibit-5**
25:11 25:13
26:6

**Exhibit-6**
26:6 27:13
27:16

**Exhibit-7**
26:7 28:5

**Exhibit-8**
26:7 28:12
28:14

**Exhibit-9**
31:23 32:1
32:14 32:17

**exhibits**
48:3 80:20

**exist** 33:15

**exists** 49:7

**expect** 98:10
100:2

**expedite**
25:19 36:25

37:5

**experience**
9:2  9:11
9:25  10:11
17:7  22:1
23:4  24:21
41:14  55:21
77:19  93:18

**experienced**
9:6

**expert** 22:25
23:2  23:8
23:9

**expertise**
17:7

**explain** 41:9
81:25

**explained**
13:14  55:8

**explaining**
43:3  84:15
84:20

**express**
53:16

---

F

**fabric** 27:19

**face** 28:10
60:2

**Facebook**
25:5  25:7
25:17  25:18
25:23  28:6
28:15  29:23
30:2  58:21
63:16  63:17

63:18  63:22
64:11  64:12
64:23  65:7

**faces** 95:24

**fact** 14:13
18:2  28:22
53:11

**failed** 80:20

**fair** 85:4
97:14

**familiarity**
77:20

**family** 56:8
56:23  64:7
64:25  67:17
73:2  81:8
96:5

**fancy** 60:5

**Fanelli**
19:16  20:4

**fashion**
96:24  97:20

**father** 53:23
54:12  81:9
81:13

**FBI** 7:7  7:23
8:8  8:13
8:18  9:1
11:21  61:23
80:11  88:7
88:13  88:13
91:24

**February**
16:2  17:13
18:3  19:2
23:12  24:9

28:16  28:24
29:3  29:10
58:21

**federal**
80:16

**feel** 57:17

**feeling** 57:9

**feelings**
57:10  57:12

**felt** 51:16
90:18  90:19

**female** 55:4

**fictional**
19:18  45:22
45:22  49:13

**field** 30:6
31:9

**filled** 58:1

**final** 81:14

**financial**
92:25

**financially**
56:23  92:1

**fine** 35:7
37:9  40:15
60:4

**finish** 42:14

**firearm**
26:23  26:23
28:19  28:22
58:19  58:20

**firearms**
27:8

**first** 8:10

8:25  10:8
11:25  14:3
14:13  14:24
15:6  15:17
15:24  15:24
30:14  32:10
32:23  43:6
57:19  68:22
71:18  71:23
81:7  89:21
89:23  99:19

**five** 61:1
68:5  68:13
68:14  68:20
69:14  70:12
71:11

**flag** 28:10

**flee** 71:13

**Fletcher**
6:10  6:25
7:2  36:3
36:16  36:20
37:9  59:18
59:19  59:24
60:5  60:10
60:15  77:2
81:4  81:6
81:12  82:1
82:23  82:25
83:4  86:9
94:5  94:8
94:17  95:19
97:1  97:23
98:25  99:3
99:14  99:18
100:4  100:8
101:2  101:7

**Florida** 92:3

92:5 92:23

**follow-up**
34:16 45:1

**fool** 60:11

**force** 8:11
10:17 10:20
11:9 11:21
12:1 26:14
27:18 28:7
61:19 62:14
76:20 80:2
80:9 80:14
89:1

**forces** 22:2
22:18 62:19
80:4

**forget** 38:23

**forgot** 40:24

**forgotten**
59:7

**form** 19:23
50:22 54:2
58:9 58:10
72:15

**forms** 58:1

**forward**
17:11 50:25
51:17

**FRENSLEY** 6:3

**Friday** 52:7
98:13 98:16
98:17

**Friends** 65:4

**full** 13:5
21:13 37:6

40:24 65:7
65:8 65:9
83:5 83:24
86:24 87:2
98:21

**fully** 84:10
84:13

**fun** 86:19

**funds** 11:6

**future** 30:7
47:8 47:12
47:12

---

### G

**games** 41:16

**gangs** 8:10

**Garcia** 6:8
6:8 10:21
10:25 11:6
11:22 15:18
18:21 20:23
20:25 21:15
26:13 27:21
28:7 28:9
28:16 29:13
30:5 30:16
31:1 32:11
37:24 38:10
40:7 40:9
40:10 41:10
41:15 42:5
42:8 42:9
43:2 43:5
43:7 43:20
45:20 46:25
49:25 50:19
50:21 51:13
53:25 55:5

55:12 56:15
56:19 56:22
57:10 58:15
59:4 60:22
61:20 62:2
63:14 66:14
67:23 71:10
72:2 72:21
76:4 76:13
76:23 82:2
82:13 82:20
82:24 83:6
83:7 83:12
85:21 86:15
94:11 96:2
96:11 97:4
100:21

**Garcia.Numch**
**1@gmail.com**
16:16

**Garcia's**
18:24 23:23
56:24 75:25
81:8

**gate** 80:3

**gates** 22:19
80:8

**general**
15:22 30:22
44:22 64:23
65:4 78:10

**generally**
31:13 32:7
50:17 78:3
96:5

**getting**
13:20 50:4
52:14 70:15

84:2 87:4
92:24

**girlfriend**
42:4 42:6

**gist** 54:21

**given** 7:12
50:10 84:24
100:25

**gives** 10:10

**giving** 9:23
10:3 15:2
89:21

**glad** 81:22

**God** 64:13
64:21 88:6
90:10 93:23

**gone** 74:2

**gotten** 58:23
65:11

**government**
6:18 15:10
15:12 20:17
23:17 25:12
26:3 27:15
28:4 28:13
29:7 31:25
38:5 47:16
55:25 57:3
57:11 74:16
75:23 79:24
94:21 99:11

**Governmental**
96:8

**Government's**
16:4 16:6
18:14 18:15

19:4 19:6
20:16 21:2
21:4 23:16
24:1 24:3
25:11 25:21
26:6 31:23
32:14 32:17
38:4 38:19
47:14 48:3
98:7

**grading**
62:15

**grandma**
81:10

**great** 10:13
34:12 59:23

**green** 39:24

**gritty** 10:14

**Guard** 11:23
22:2 22:11
22:15 26:15
27:20 52:3
66:16 80:2
80:18

**guarding**
22:18 80:2
80:8

**guardsman**
62:18 87:10

**guess** 84:23
89:16

**guidance**
9:24 10:3
10:11

**Guido** 19:16
20:3

**Guidofanelli
Contact@ren
tahitman.co
m** 19:15

**gun** 26:16
26:19 27:3
27:9 28:20

**guns** 65:7
65:9

**guys** 66:6
92:20

——————
——————
| H |
——————

**half** 45:25

**hallway** 95:5

**handle** 95:15

**hands** 51:25

**happen** 57:14
97:10

**happened**
10:15 12:9
44:6 44:6
46:19 55:2
59:2 69:25
84:1 86:25
86:25 87:3
87:8 90:14
90:16 93:20
96:15

**happens**
49:24

**happy** 37:1
92:6

**hard** 42:2
79:4

**hardship**

93:1

**harm** 27:9
70:20 89:7
90:22

**harmed** 57:8

**hat** 39:3

**haven't**
24:15 58:23
96:20

**having** 7:23
16:22 18:7
18:8 18:10
36:12 57:17
82:20

**head** 87:11
91:6

**heads** 88:3
92:19

**headshot**
20:1 21:16
29:15

**headshots**
21:9

**hear** 24:17
33:2 34:9
36:18 36:22
36:23 37:21
39:21 39:21
40:3 40:3
42:2 81:16
81:22 81:23
87:14 87:17
88:8 95:10
95:17
100:18

**heard** 24:16

34:17 34:21
40:13 41:6
74:20 75:16
75:17 80:14
81:23 84:12
91:1 95:19
95:22 96:4
97:16
100:22

**hearing** 6:1
6:12 17:12
101:9

**heart** 87:21

**Heather**
100:21

**he'd** 35:1
55:15

**height** 45:23
48:13

**Hello** 17:5
24:13

**help** 67:17

**helped** 87:7

**helpful** 99:9

**helps** 9:21

**Hendersonvil
le** 45:19

**herein** 49:16

**Hermitage**
83:10 83:11

**herself** 55:6

**he's** 10:12
35:7 41:5
62:22 83:8
84:6 84:7

County
**COURT REPORTERS**, Inc.
Videography • Litigation Technology™
800.262.8777 TOLL-FREE • 540.667.0600 LOCAL • 540.667.6562 FAX • CountyCourtReporters.com

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 115 of 131 PageID #: 158

87:10 87:25
88:2 89:3
89:8 90:15

**hidden** 33:11
33:24

**high** 22:4
43:7 84:22

**higher** 79:20

**highest**
79:19

**high-level**
55:24

**HIPAA** 20:10

**hire** 13:21
13:24 13:25
14:10

**hired** 52:5

**hiring** 15:5

**history** 8:6
75:25 76:1
76:3 93:6

**hit** 27:10

**hitman** 10:24
13:21 13:25
14:10 14:15
14:22 15:7
18:2 20:8
20:10 23:12
23:24 43:25
54:20 57:2
59:6 73:10
73:18 73:19

**hits** 47:12

**hold** 17:18
60:21

**holding**
38:10

**holds** 22:20
80:1

**home** 27:22
53:20 55:2
57:18 57:25
58:5 83:14
92:3 92:5
92:8 92:15
93:23

**honest** 87:16
87:18

**Honor** 6:22
7:2 7:6
36:4 37:10
59:16 59:25
77:3 81:2
81:6 82:1
86:9 94:4
94:6 94:9
94:18 94:23
97:1 97:23
97:24 99:14
100:6 101:8

**honorable**
6:2 84:8

**hope** 24:13
24:17

**hour** 37:4

**hour-long**
75:18

**house** 40:14
40:17 54:22

**H-U** 7:19

**human** 84:25

89:11 91:10

**humiliating**
93:18

**hundreds**
56:1

**Hunter** 7:8
7:15 7:19
7:19 7:23
8:3 37:21
39:21 60:16
60:17 80:22

**husband**
83:15 92:4

---

I

**I'd** 7:6
38:15 42:21

**ID** 20:2
21:10 21:14

**idea** 42:12
81:24 96:11

**identificati
on** 15:13
18:16 20:18
23:18 25:13
27:16 28:5
28:14 32:1
38:6 47:17

**identifiers**
45:22

**IDs** 80:8

**I'll** 60:10
60:20 69:5
81:13 82:2
95:10
100:16

100:17
100:18

**I'm** 16:3
17:5 18:13
19:3 19:12
21:1 23:15
24:16 24:20
25:10 26:2
29:7 30:20
31:4 31:12
31:22 35:25
37:1 42:13
47:13 68:10
69:5 69:6
73:15 78:24
80:10 81:22
86:17 91:4
94:7 95:1
95:20 96:17
96:18 97:17

**image** 20:2
21:10

**images** 25:22

**impede** 72:21
72:23

**impeded**
77:11

**importantly**
72:12 99:11

**impose** 85:16
85:23 86:7

**inaccurate**
64:22

**inadvertentl
y** 43:14

**incident**

**incomplete**
36:7 75:16

**indicated**
43:23

**info** 84:15
89:24

**information**
10:18 10:23
10:25 11:10
11:12 11:13
12:11 14:5
18:23 20:10
21:25 22:5
35:20 48:8
49:12 98:21
99:10

**informed**
11:25 38:24

**initial** 11:4
14:21 15:17
31:3 31:5
33:20 52:12
59:4 59:5
95:2 99:8

**initially**
11:8 41:12

**initials**
32:5

**in-person**
31:2 31:6
32:10 33:5
35:12 36:1
43:16 75:6
75:9

**inquiries**
13:21 14:21

15:22

**inquiry**
15:18 15:23

**inside** 42:9

**instant**
83:19

**instead**
36:12

**intel** 84:22

**interaction**
46:14

**interactions**
61:4 81:24

**interest**
53:16

**interested**
31:1 45:9

**interview**
20:2 31:3
31:5 51:18
53:25 54:7
54:16 54:23
56:9 58:15
67:12 69:18
70:2 74:22
78:8 91:24
93:5 100:25

**interviewed**
67:12
100:21

**interviewing**
78:18

**interviews**
62:10 74:21

**introduce**

31:9 81:7

**introduced**
47:24

**introductory**
30:23

**investigated**
8:23

**investigating** 8:17 9:2

**investigation** 9:16
10:16 12:2
22:13 25:3
61:5 61:7
72:20 72:22
73:5 77:11
77:20

**investigations** 9:12
80:6

**investigative** 62:20

**investigator**
88:15

**involve**
80:15

**involved** 9:9
11:1 11:3
45:13 84:18
85:2 90:8

**involvement**
84:11 96:6

**iron** 97:25

**isn't** 40:13
67:12 71:18

72:5 73:24
74:6 78:9

**issue** 95:18
96:21

**issues** 18:7
18:8

**it'd** 81:24

**items** 20:20

**It'll** 16:5
24:2 32:15
38:17

**I've** 6:14
6:15 8:8
36:6 59:7
62:13 84:16
93:19 95:19
95:21 96:4
97:4 97:16

---

**J**

**Jacob** 83:15

**jail** 86:2
93:1 93:18

**January** 28:8

**JEFFREY** 6:3

**job** 17:6
17:8 17:11
22:20 24:20
24:20 24:25
29:17 52:8
52:10 52:14
52:16 52:21
53:2 55:14
55:24 57:6
62:18 65:11
67:2 73:19

County **COURT REPORTERS**, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 117 of 131 PageID #: 160
800.262.8777 TOLL-FREE • 540.667.0600 LOCAL • 540.667.6562 FAX    CountyCourtReporters.com

73:23 73:25
74:7 74:13
79:2 79:8
79:17 80:1
83:25 87:3
88:20 88:22
89:16 89:17
90:24 91:8

**jobs** 88:6

**Josiah** 6:7
19:22 20:23
21:15 25:2
27:20 28:8
28:16 83:18
89:4

**Josie** 92:9

**judge** 56:2
70:25 79:19
91:9 91:10

**judges** 80:16
84:24 89:11
90:5

**July** 22:3
22:12

**June** 27:21
27:25

**jurisdiction**
12:3 14:7

**jurisdiction
s** 61:23

**justice** 93:8

---
K
---

**Kentucky**
48:15 48:16

**kid** 24:23

**kill** 40:14
42:24 49:17
79:24

**killed** 43:4
57:20 91:20

**killers**
57:15

**killing**
24:22 41:3
56:6 74:19
84:19 96:7

**knew** 41:12
54:20 54:21
56:12 79:22
84:13

**knowledge**
14:3 14:8
53:16 61:17
62:16 62:17
75:24 84:4

---
L
---

**land** 86:2

**laptop** 46:21
46:25 47:3
47:9 47:10
58:14 58:23
59:2 59:6

**last** 7:18
8:15 9:4
23:6 37:21
40:6 43:12

**latch** 60:8

**later** 26:21
26:21 47:1
53:21 68:13
68:14 69:15

71:12

**Laurel** 48:14

**law** 8:6 14:5
57:11 77:18
87:11 87:25
88:9

**lawyer** 50:13

**lawyers**
94:25 95:17

**lead** 12:4
96:14

**leadership**
22:6

**learned**
13:13

**least** 74:5

**leave** 51:6
68:18 69:16
70:2 70:10
77:17

**leaving**
69:23

**led** 67:5

**leery** 57:19

**legit** 17:10

**let's** 8:18
13:9 21:20
45:11 46:5
63:16 67:11
71:9 72:1
83:18 98:5
100:11

**letting**
19:22

**level** 79:20

**license**
20:23 29:15

**licenses**
23:7

**lie** 72:22
77:12 77:21
77:22 78:6
78:9 78:12
78:16

**life** 84:7
91:12 91:13
93:17 93:19

**light** 97:15

**limited** 58:5

**line** 35:8

**listen** 32:21
33:14 34:1

**listened**
36:6 62:10

**listening**
43:15

**little** 9:10
9:14 37:4
39:20 42:2
42:22 50:2
51:22 81:23
81:25 86:22
95:20

**live** 26:22
83:9 83:12
83:14 92:14
97:5

**lived** 53:22

**lives** 97:5

100:1

**location**
12:21 12:22
35:15 35:19
35:22 45:16
46:3 72:13

**logo** 39:10
76:12 76:13
76:15 76:22

**LOL** 27:22

**long** 40:8
60:21 88:25
89:2 93:7

**Lord** 84:9
90:11

**lot** 36:6
36:7 49:2
49:4 65:2
79:10 92:4
95:23

**loves** 84:8

**loving** 89:9

**lying** 72:23

**Lynn's** 92:6

_____
M
**M4A1** 28:18

**ma'am** 82:4
82:10 82:17
86:21 87:16
93:9

**magazine**
28:18

**male** 55:4

**man** 40:14

84:8

**marked** 24:23
25:11

**marksman**
22:25 62:2
62:15 62:23

**marksmanship**
23:5 23:8
23:9 41:14

**Maryland**
8:12

**matter** 6:7
6:12 6:13
95:1 96:13
97:18

**matters**
95:15 101:5

**may** 34:8
42:7 51:19
57:8 59:24
60:1 81:7
85:15 85:18
100:20

**maybe** 27:18
41:15 43:7
60:9 64:8
78:24 79:13
81:24 93:5

**mean** 26:20
27:6 29:3
64:7 68:13
70:24 85:18
89:5 93:24
93:24

**meaning** 15:1
58:5

**means** 85:13

**meant** 76:20

**media** 25:4

**Medical** 52:5
83:22

**meet** 44:24
46:2 54:10
54:12 55:13
74:2

**meeting** 11:4
11:5 31:3
31:7 32:10
32:11 33:5
33:8 33:11
33:16 33:19
33:20 33:25
34:3 35:12
35:19 36:1
38:25 43:13
43:17 44:11
45:4 45:9
45:16 45:18
45:19 46:6
46:7 46:16
50:1 51:14
53:9 53:13
53:17 69:1
75:9 75:18
76:6 76:8
79:9

**meetings**
63:12 75:7

**Memphis**
98:15

**mention**
88:12
100:22

**mentioned**
56:2 66:14
79:18 79:19
84:14 91:9
91:11 91:25

**mercenary**
66:17 66:19
66:25

**message**
30:23 35:17
44:18

**messages**
11:4 12:15
31:8 51:12
53:10 75:13

**met** 71:19
71:21 71:22
84:23

**meters** 40:11

**Middle** 22:20

**military**
17:7 22:6
22:9 23:4
24:21 39:6
39:7 41:13
55:21 55:22
62:14 62:19
73:23 74:1
74:8 74:12
74:12 76:17
76:18 78:21
79:14

**military-
style** 80:5

**military-
type** 39:11

millions
  56:21

mind 50:25
  51:5 52:19
  54:13 55:15
  67:20 68:8
  68:9 68:24
  68:25 69:2
  69:8 69:8
  69:19 69:21
  70:1 70:9
  71:5 96:1

mine 90:11

minute 21:9
  27:24 94:25

minutes 61:1
  61:2 64:20
  68:5 68:13
  68:14 68:20
  69:14 70:12
  71:11

Miranda
  50:10 50:21

mislead
  72:22

miss 23:9

missing 23:1

Mitchell
  48:12 49:9

mitigating
  96:1

mold 92:8

mom 78:20
  81:8 82:2

moment 95:8

Monday 52:8

money 43:2
  43:5 46:17
  51:6 51:15
  51:16 51:18
  51:21 51:24
  52:18 56:4
  67:17 68:13
  68:18 68:20
  69:10 69:14
  69:16 69:21
  70:2 70:6
  70:10 70:13
  71:6 71:7
  71:11 77:17
  78:14 91:8
  91:12 91:13
  92:18

month 52:4

morning
  98:16

mostly 97:25

mother 53:22
  54:9 54:11
  56:18 73:8
  73:9 73:9
  73:11 73:12
  73:17 73:19
  73:22 73:24
  74:5 78:18
  79:1 81:12

mothers
  87:22

motion 96:23

motivate
  92:12

motivational

64:16 64:20
  65:8

mouth 10:4
  27:2

move 43:13
  46:19 50:25
  51:17 92:22

moved 92:3
  92:5 92:15

movies 57:13
  79:11 84:16

muffled
  42:22

multiple
  14:1

murder 15:5

murder-for-
  hire 8:23
  9:4 9:6
  9:11

murdering
  96:13

myself 36:7
  50:18 50:20
  55:3 60:12
  86:5

—————
N

naivete
  95:23

Nashville
  8:14 8:16
  22:3 35:23

National
  11:23 22:2
  22:10 22:15

26:15 27:19
  52:3 62:18
  66:16 80:2
  80:17

nature 52:7
  58:12

nearly 40:25

nerves 93:13

nexus 59:1

nickname
  41:10 41:17

Nicknamed
  23:3

nine 42:1

nitty 10:14

note 36:4
  36:11 37:11
  39:2 39:22

noted 36:17
  37:15

nothing 7:13
  59:15 73:12
  80:19 82:9
  94:3

N-T-E-R 7:20

nurse's 52:6

—————
O

obstruction
  93:8

obtain 11:16

obvious
  78:12

obviously

49:6 95:23
96:2

**occur** 45:6
45:18

**occurred**
11:17 12:17
14:3 34:18
61:25 75:19

**offer** 38:15
52:10

**offered** 89:1
100:24

**offering**
16:3 19:3
21:1 23:25
26:2 32:13

**office** 9:3
9:20 10:18
12:2

**officer** 8:7
12:7 30:12
93:4

**Officially**
28:9

**oh** 20:7
34:12 40:1
60:5 64:5
88:19

**Ohio** 97:5
100:1

**Ok** 98:5

**okay** 8:22
9:8 10:1
10:13 11:8
11:16 11:20
12:4 13:1

14:2 14:8
14:13 14:17
15:19 18:9
18:22 19:19
21:25 22:4
23:15 24:10
24:13 26:1
27:1 28:12
29:18 30:8
30:11 30:14
30:17 31:16
31:19 33:14
34:25 35:11
35:18 35:22
36:14 37:8
37:23 38:14
39:5 39:9
39:13 39:16
40:20 41:5
44:4 44:12
44:19 45:8
46:1 47:6
48:10 49:15
50:13 52:21
53:4 55:1
58:4 58:19
60:20 61:9
61:12 61:16
62:1 62:7
63:2 63:8
63:14 65:10
65:16 65:24
66:2 66:4
66:9 67:11
67:23 68:1
68:7 70:16
71:9 72:1
73:1 74:20
75:20 75:23
76:4 76:11

76:19 76:22
77:1 77:15
78:5 78:17
81:11 83:18
84:4 85:7
86:9 88:17
89:23 90:4
91:23 94:1
98:12 99:17
99:23

**old** 48:13

**omitted**
43:14

**onboarding**
20:3

**one's** 48:19

**onto** 46:19

**op** 57:15

**operation**
45:13

**operations**
47:12 79:16
92:5

**opportunity**
50:7 68:9
68:19 68:24
69:3 69:16
69:22 70:11
88:20 88:22
97:17 99:13

**opposed** 15:4

**opposing**
98:2

**ops** 79:10

**options** 97:2

**order** 40:14

**OSI** 10:17
12:1

**others** 63:23
63:24 64:5

**otherwise**
81:18

**ought** 81:22

**overview**
10:15

**owned** 64:9

**owner** 13:13
14:11 14:19
30:4 30:9
61:21

**owner's**
11:13 19:17

---
P
---

**package** 11:6
45:20 46:16
47:20 51:2
51:24

**packet** 51:6

**page** 15:20
25:17 25:18
28:7 29:23
63:18 63:22
64:11 64:12
65:7

**paid** 84:2

**paint** 26:16
26:19 26:25

**paintball**
26:24 28:20

County
COURT REPORTERS, Inc.
Videography   Litigation Technology™

Case 3:23-cr-00081   Document 21-1   Filed 04/22/23   Page 121 of 131 PageID #: 164
800.262.8777 TOLL-FREE • 540.667.0600 LOCAL • 540.667.6562 FAX   CountyCourtReporters.com

58:17

**paintballs**
27:4

**paper** 48:7

**paragraph**
24:19

**parentheses**
24:22 25:1

**parents**
43:18 43:21
43:24 54:9
54:15 54:17
54:20 54:23

**park** 45:18
46:1 46:3
50:2 50:23
51:13

**parking** 49:2
49:4

**parody** 13:22

**participated**
56:8

**participatin
g** 9:11

**participatio
n** 52:14

**particular**
25:5 55:20
96:19

**particulars**
85:11

**partly** 98:21

**partner**
65:11

**party** 85:8
95:21

**pass** 15:9
17:17 29:7
59:21

**passed** 10:19
11:12 11:14

**passwords**
72:9 72:11

**past** 10:12

**path** 67:5

**Patricia**
81:8 82:2
82:13 82:20
83:6 100:21

**Patriot** 84:8

**patriotic**
65:3

**Patsy** 81:10

**pay** 92:20

**paychecks**
87:4

**paying** 87:5

**payment**
45:24 45:25
79:20

**pays** 24:20

**people** 13:16
13:21 14:9
14:20 39:7
42:24 43:4
55:25 56:6
56:17 57:7
57:20 64:21
74:17 74:19

78:11 79:17
79:24 80:16
85:1 85:1
91:19 96:13
98:22

**percent** 20:9

**perhaps** 17:8
96:23

**permission**
34:6

**person** 9:21
15:1 19:11
21:16 21:17
21:18 26:22
28:21 33:11
33:25 42:7
45:21 45:22
46:9 49:1
49:3 49:7
49:15 49:16
54:12 71:3
71:6 84:23
89:21 100:2
100:23
100:23

**personal**
61:4 61:12

**person's**
100:25

**Peter** 48:12
49:9

**phone** 11:4
12:8 12:16
16:17 16:21
21:22 31:4
31:5 31:15
32:9 33:1

34:18 35:11
46:7 49:2
53:11 59:11
59:12 63:12
72:6 72:9
75:6 75:10
75:11 75:14
75:21 93:5
97:6 100:6

**photo** 25:17
27:17 28:15
28:17 48:24
48:25 49:1
49:3 51:15

**photograph**
20:24

**photos** 45:21
63:17 64:1
64:8 64:8
64:24 64:25
65:1

**physically**
51:23

**pick** 51:7

**picked** 39:8

**picture**
26:12 26:13
28:6 28:20

**pictured**
58:13

**pictures**
30:20 49:6
63:21 63:25

**piece** 27:19

**pivot** 60:2

**places** 84:3

County
**COURT REPORTERS**, Inc.
Videography    Litigation Technology™

**plan** 45:16
70:2 70:10
96:19 99:9
99:19 99:21

**planned**
77:16

**plausible**
73:24 74:6

**play** 34:6
35:25 37:1
37:20 46:6

**played** 34:13
36:2 37:17
39:17 40:21
41:23 42:18
43:9 46:11
87:15

**playing**
36:17 42:13

**please** 7:16
8:5 17:11
19:21 24:10
24:12 28:3
50:16 82:5
82:11

**plugged**
87:17

**plus** 39:13

**podium** 60:2

**point** 20:8
35:18 55:9
58:8 59:14
68:19 72:21
100:19

**points** 77:8

**police** 62:20

80:5 86:5
87:7

**portion** 43:1
56:24 74:21
74:23 74:24

**portions**
36:21 75:3
92:21

**portrayed**
63:12 74:14

**portraying**
74:13 79:15

**pose** 90:12

**position**
22:14 80:15
86:19 87:1

**possible**
56:3 66:9
66:13 97:8

**possibly**
18:8 26:23
56:20 57:14

**post** 58:21

**post-arrest**
41:11 77:15

**posted** 27:24
28:23 29:22

**posts** 64:12
64:14 64:17
64:20 64:21
64:23 64:24
65:1 65:3
65:3 65:4
65:8 65:9

**potential**

96:6 100:23

**pound** 48:13

**powerless**
90:18

**practicing**
27:22

**preferred**
40:8 62:8
62:11

**pregnant**
93:13 93:14

**pre-marked**
15:10 18:14
20:15 23:16
25:21 31:23
38:4 47:14

**premise**
74:19

**present** 6:9
12:9 12:10
12:18 12:20
12:23 22:3
22:12 50:5
97:3

**presumably**
41:20

**pretrial**
6:14 99:12
99:16

**pretty** 97:11

**previous**
21:23 46:7

**previously**
53:4 65:16
65:18

**prior** 50:4
70:15 76:5
96:3

**Privacy**
20:10

**probably**
90:15 99:22

**probation**
85:19 86:5
93:4 97:7
100:21
100:24

**problem**
19:25

**proceed** 7:5
59:24 97:20
97:21

**proceeding**
36:25 96:23

**proceedings**
6:17 96:22

**process** 20:3

**profile** 25:8
25:23 28:15

**profiler**
88:14

**proof** 30:1
80:25 81:5
94:6 94:9
94:16 94:22
95:19 95:22
96:4 96:25
97:17 98:23
100:17

**proposal**
99:15

**propose** 99:8

**proposed**
95:20 96:16
100:1

**prosecutor**
86:18

**protection**
8:14 20:11
22:19 80:8

**prove** 90:19

**provide**
46:24

**provided**
21:25 37:6
37:7 45:20
47:2 72:5
72:8

**psychologica
l** 41:2

**public** 25:8
25:23

**pulled** 63:22
63:23

**Punisher**
39:4 39:5
76:12

**putting**
78:13 91:13

― Q ―
**Quantico** 8:9

**question**
34:16 66:21
67:1 68:23
69:20 71:19
71:23 77:10

77:13 78:17
78:19 78:22
78:25 93:3

**questioning**
67:6

**questions**
17:1 17:10
59:18 60:20
76:12 81:19
86:20 91:22

**quick** 95:2

**quickly**
42:23 97:12

**quotations**
23:3

**quoted** 90:10

― R ―
**raise** 82:19
95:18 96:21

**raised** 87:20
87:25

**ran** 76:1

**range** 27:8
62:12

**rank** 22:11

**reach** 11:9
18:2 44:17

**reached**
10:17 10:22
11:14 12:1
12:2 30:16
30:18 44:10
44:16

**reaching**

30:25

**ready** 6:18
6:21 7:1
7:2 95:10

**real** 49:7
95:2

**really** 10:14
13:9 78:25
84:17 85:1
88:23 91:14
92:17 94:11
96:18

**realm** 56:6

**Reaper** 23:4
38:12 39:14
41:6 41:7
41:8 43:8

**reason** 13:19
52:19 57:6

**rebuttal**
94:22 98:23

**recall** 43:16

**recap** 42:22

**receipt** 6:13

**received**
6:15 29:25
61:16

**recent** 89:19

**recently**
52:4

**recess** 95:12
95:16

**recognize**
15:14 15:16
15:19 15:24

18:17 18:19
18:22 20:20
20:22 23:19
23:22 25:14
25:16 38:3
47:15

**recollection**
30:22

**record** 7:17
29:11 37:15
46:7 82:12
95:16 96:3

**recorded**
32:22 32:24
33:9 33:19
74:23 75:4
75:7 75:12
75:12

**recording**
33:1 33:10
33:16 34:13
36:2 37:17
39:17 39:23
40:21 41:23
42:6 42:18
43:9 46:11
66:2

**recordings**
32:9 87:14
91:1

**records**
62:14

**redirect**
77:4 77:6

**refer** 14:6
17:19

**reference**

64:12

**referencing**
64:21

**referred**
14:4

**refresh**
30:21

**regard** 96:1
96:24

**regarding**
10:18 43:1
67:2 74:3

**Regardless**
41:17

**regards** 20:3

**relate** 73:21

**related**
24:21 54:4
65:9 73:25
74:7 74:13
74:18 79:23
80:15 83:7

**relates**
73:23

**relation**
61:18 61:19

**relationship**
9:15

**release**
96:19 96:20
99:9

**released**
85:16 93:25

**relevant**
59:8

**rely** 91:25

**remember**
39:3 43:15
44:12 77:12
78:22 93:3
93:21

**reminding**
40:2

**remove** 30:9

**rent** 18:2
20:8 23:12
23:24 56:24
59:5

**rentahitman.
com** 10:22
11:10 13:11
31:10

**repay** 90:11

**replay** 36:12
37:12

**report** 6:14
6:16 62:1
62:9 65:18
73:13 73:14

**representati
ve** 31:10

**request**
20:13 50:13

**requested**
15:2 24:15
29:14 62:13

**research**
30:2 59:5
75:24

**residence**

54:3

**resist** 71:16

**resituated**
92:24

**respectful**
84:6 88:1

**respond**
20:12 31:13
41:4 44:20

**response**
44:22 96:16

**responsible**
85:14

**resume** 15:2
15:8 20:1
20:25 21:9
21:21 21:21
29:16 41:13
62:25

**reviewed**
6:14 31:24

**rifle** 17:7
28:18 29:22
54:2 54:3
58:13 72:13

**rights** 50:21

**rookie** 43:8

**room** 54:2
55:10 72:16

**ruled** 96:20

**run** 100:14

**Russellville**
48:14

———————

S

**safety** 57:4
85:5 91:15
91:21

**sat** 50:20
92:16

**saw** 21:23
26:21 28:21
58:16 58:20
63:16 64:25

**scared** 51:19
70:5 70:7
71:1 89:3

**scarier** 71:7

**scary** 51:22
84:17

**scenario**
56:16 69:23
78:13

**Schiferle**
6:11 6:18
6:21 7:4
7:6 8:2
16:3 16:9
17:16 17:22
17:25 19:3
19:9 21:1
21:7 23:25
24:6 26:2
26:10 32:13
32:20 34:5
34:10 34:15
36:24 37:16
37:19 38:15
38:22 39:19
40:23 41:25
42:20 43:11
46:5 46:13
47:23 48:6

59:15 59:20
77:5 77:7
80:19 81:1
81:2 86:12
86:14 86:17
94:3 94:21
94:23 98:6
98:8 98:14
98:20 99:2
99:25
100:20

**school** 22:5
90:17

**screenshot**
38:9

**screenshots**
75:14

**Scripture**
90:10

**scroll** 64:19

**search** 54:2
58:5 58:6
58:24 59:13
72:16

**searched**
50:19 60:25

**seat** 7:22

**seats** 95:4

**second** 32:10
67:19 75:9
99:21

**secret** 55:25
74:15 79:9

**section**
16:25 19:10
22:8 23:7

**29:16 34:21**

**sections**
18:25

**secured**
50:19

**security**
22:2 22:18
62:19 66:17
66:19 80:4

**seek** 10:24

**seeking**
10:23 79:23

**seem** 45:9
73:22

**seemed** 56:25
79:21

**seems** 95:22

**seen** 57:13
57:13 79:10
84:16

**seize** 58:18
59:12

**seized** 58:19

**selfie** 20:24
48:25

**self-taken**
20:24 48:25

**send** 12:15
20:1 30:5

**sending**
24:16 29:14

**sense** 51:8
51:20 70:7
71:2 78:15

**sent** 10:23
14:20 19:12
19:19 23:12
24:8 24:14

**sentencing**
98:10

**sergeant**
87:6 87:9

**serious**
84:21 95:25

**service** 22:9
22:11

**services**
6:14 99:12

**settings**
39:11

**setups** 62:12

**several** 61:2

**sexual** 35:1
35:8

**sheet** 48:7

**she's** 28:17
29:2 36:17
74:13 79:10
100:4

**shirt** 38:10

**shoe** 83:1

**shoot** 26:25
27:4 27:8
27:11 40:8
40:16 42:10
49:17

**shooter** 63:3
63:6

**shooting**
23:2 24:22
27:5 54:19

**short** 95:16

**shoulder**
38:11 41:7
41:21

**showed** 57:22

**Showing**
20:15

**shown** 57:7

**shows** 88:15

**sick** 92:3
92:4 92:9

**sides** 33:2

**sideview**
49:2

**sidewalk**
69:10

**signature**
20:5

**signed** 25:2
50:22 54:1
54:5 58:9
58:10 72:15

**significance**
52:13

**significant**
9:10 95:25

**significantl
y** 27:10

**Silverado**
48:16

**similar**

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-1    Filed 04/22/23    Page 126 of 131 PageID #: 169
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX    CountyCourtReporters.com

simply 76:20

single 23:1

sir 7:10
24:13 59:19
60:19 83:13
83:17 83:21
84:6 85:6
85:6 85:9
85:17 85:24
86:3

sister 81:9
97:4 100:1

sit 82:15

site 61:18
61:25

situation
14:25 30:10
55:20 56:13
57:1 95:21
96:7 96:18

situations
95:23

six 8:10

skilled 62:2
62:23

skills 22:5
63:3 63:6

skillset
63:5 79:13

skull 38:12
39:4

small 27:18

smiley 28:10

social 25:4

solemnly
7:11 82:6

solution
20:9

somebody
41:3 55:13
78:8 84:14
88:20 96:12

somehow
74:10

someone
13:25 14:4
14:15 15:4
15:5 15:5
15:6 27:10
42:7 56:7
70:6 79:5
88:25 89:24

somewhat
96:10

son 57:21
83:8 83:15
85:8 86:6
87:20 90:8
91:25

sons 87:24

son's 85:5
91:15

sorry 19:12
31:4 42:13
73:15 94:7

sort 13:22
14:20 43:19
48:8 96:3
96:6 97:15

99:9 100:14

soul 89:9

sound 68:11

sounded 44:1
56:5

sounds 41:15
42:5 79:15
91:5

speak 31:15
50:7 60:23

speaking
50:14 60:22

Special 7:7
7:23 12:2
60:17 60:19
80:22

specialist
73:20

specific
14:25 33:10
45:3 57:12
58:5

specifically
54:19

spell 7:17

spent 8:9
8:10 8:13

spoke 11:15
12:13 41:11
50:23 53:19
55:11 57:23
73:2 73:8
74:22 74:24
79:20 93:4

spoken 56:15

66:15 97:4
97:7 99:16

staff 19:24

stage 96:21

stand 7:7
60:3 82:3

standpoint
99:12

start 27:21
52:8 60:22

started 6:20
11:1 11:2
13:18 13:18
13:20 41:8
42:13 52:8
52:11 53:1
87:6

Starting
26:11

starts 98:11

state 7:17
82:12

stated 69:6
70:17 73:1

statement
78:5

statements
54:24

States 6:7
6:11 22:11

stating
64:10

status 52:2

stay 60:8

95:4

**stayed** 92:3

**stays** 93:1

**step** 7:10
63:15 80:23
82:5 82:16
94:11 94:13
95:5

**Stephen** 7:8
7:19 7:23

**steps** 30:14

**stop** 50:14

**story** 51:8
68:11 68:17
69:7

**structured**
9:16

**struggling**
56:23

**stuff** 45:24
57:14 79:11
84:17 84:18
84:21 88:16
90:5 90:9
92:7 92:10
92:11 92:23

**style** 26:15
26:17 26:19
58:13

**submitted**
15:7 99:15

**subsequent**
33:18

**subsequently**
32:11 68:1

**substance**
18:5 19:21

**successful**
13:20

**sum** 42:3

**summarize**
40:5

**Sunday** 52:25

**super-secret**
57:3

**support**
24:23 43:21
43:24

**supposed**
83:24 87:2
87:5 92:4

**sure** 17:20
34:8 37:13
59:22 90:1
96:17 98:1
100:6

**surveillance**
22:7

**swear** 7:12
82:7

**sworn** 7:10
7:24 82:5
82:20

——————
T
——————

**tag** 45:23
48:16

**taking** 9:24
34:23 35:7
51:15 51:21
51:21 70:6

70:12

**talk** 13:9
42:17 44:5
45:11 55:23
61:9 63:16
67:11 71:9
72:1 72:2
83:18 90:16
93:12

**talked** 55:7
55:19 56:4
57:25 79:21

**talking**
37:23 41:14
42:4 42:23
42:23 61:3
66:10 93:15
96:12 98:8

**tan** 58:16
58:16

**target** 11:6
24:23 45:20
46:16 47:20
48:11 51:24
56:3 89:14
89:15

**targets** 23:1
27:6

**task** 8:11
10:20

**tattoo** 37:24
38:11 39:13
76:16

**tech** 90:17
90:18

**telephone**
30:19 31:17

31:19

**ten** 8:19

**tendencies**
55:16

**Tennessee**
22:3 22:21
27:19 35:24
45:19 83:11

**term** 57:21

**terms** 96:15

**test** 34:11

**testified**
7:25 52:23
53:5 79:25
82:21

**testify**
98:22

**testimony**
7:12 13:7
77:9 80:23
81:16 82:7
94:13

**text** 11:3
12:8 30:16
30:18 30:23
31:8 35:17
44:10 44:18
51:12 52:23
53:5 53:10
53:11 75:13

**texts** 30:21

**thank** 6:24
7:4 7:21
17:23 19:22
24:17 34:12
37:13 40:1

40:1 59:23
79:25 80:21
80:22 82:14
88:6 93:23
94:10 94:12
94:20 95:13
101:4 101:5
101:7

**that'd** 8:21
59:22

**that'll** 19:5
99:6 100:13

**themselves**
96:2

**there's**
16:25 20:5
22:4 22:8
23:6 42:22
43:13 60:7
82:18 97:8
100:23

**They'll** 26:4

**they're** 18:7
80:6

**they've**
81:15 99:16

**third** 85:7
95:21

**third-party**
81:15 81:18
96:16 97:2
97:8

**thoughts**
67:19 88:24

**thousands**
56:2

**thumbs** 28:11

**Thursday**
98:9

**till** 100:16

**tip** 11:9

**today** 6:12
6:17 13:7
21:18 33:15
34:2 80:1
80:24 84:11
86:19 94:12
97:10

**today's** 32:5

**tomorrow**
98:25 99:3
99:6 99:24
100:16
101:5

**top** 21:21
56:3

**torture**
34:23 35:7

**total** 8:18

**totally** 58:2

**touch** 30:6

**tough** 90:13
90:20

**towards** 9:19

**traditional**
88:9

**traffickers**
84:25 89:12
91:10

**trailer**

92:14

**training**
26:16 26:18
26:24 27:5
52:8 52:12
58:17 74:12
77:19

**TRANSCRIPTIO
N** 6:1

**traps** 100:14

**travel** 92:14
100:12

**Travelers**
83:10

**trophies**
34:23 35:8

**trouble**
18:10 55:15
93:15 93:17

**truck** 48:17
64:8

**Truckmasters**
48:17

**true** 35:10
67:13 69:12
70:3 70:23
71:18 72:5

**truth** 7:13
7:13 7:14
77:21 82:8
82:8 82:9

**try** 36:25
60:21 71:13
71:16 72:22
81:25 86:19
90:12 97:11

99:22 100:5

**trying** 10:9
13:16 13:21
14:15 90:20

**t-shirt**
26:14

**TUESDAY** 6:4

**turn** 40:24
57:5

**turned** 13:22

**two-page**
20:19

**type** 9:2
13:17 56:16
56:21 66:24
67:8 79:16
96:9

------------------

U

------------------

**UC** 11:2
12:11 30:23
35:16 35:19
38:24 40:7
41:1 41:7
42:11 42:15
42:23 43:3
43:17 43:24
44:9 44:10
44:16 45:1
45:17 46:1
46:9 46:23
47:9 49:22
50:24 51:3
51:7 51:14
51:19 51:19
52:15 52:24
53:6 53:12
54:10 71:21

71:22 74:3
77:17

**UC's** 51:18

**ultimately**
86:1

**undercover**
9:6 9:9
9:15 9:19
9:20 9:23
10:3 12:7
12:19 16:22
30:12 30:15
66:11 70:18
70:19 74:22
74:25

**underneath**
38:12

**understand**
27:3 69:11
69:20 73:17
89:7 90:23

**understandab**
**le** 87:19

**understandin**
**g** 80:7
89:17

**understateme**
**nt** 93:2

**uniform** 28:7

**unit** 76:16

**United** 6:7
6:11 22:11

**units** 39:7
76:17 76:18

**University**

83:21

**unless** 30:21

**upfront**
45:25 45:25

**uphold** 87:25

**upholding**
87:10

**upset** 55:6

**username**
41:16

————

V

**Vanderbilt**
52:5 66:12
83:21

**Vandy** 65:11

**vehicle**
45:23 48:15
50:21 51:3
64:8 70:15
77:16

**vengeance**
90:11

**veracity**
54:23

**verbatim**
31:12

**versus** 62:11

**via** 12:8
30:16 30:18
35:17 44:10

**video** 33:13
33:15 37:25
38:9 41:16
95:3 100:7

100:10
100:11
100:12

**videos** 34:2

**viewed** 32:4
37:25

**violate** 86:6

**violent** 8:11
8:15 8:17
10:20 55:16
55:17 63:9
76:5 76:8
76:24 84:5

**volume** 39:24
40:24 43:3

————

W

**wait** 17:17

**walk** 49:21
50:2 58:7
69:9

**walked** 50:1
51:2 57:24
83:1

**walking**
46:15 49:1
49:3 49:4
51:17 71:12

**wall** 27:11
27:12

**warnings**
50:11

**warrant**
58:24 59:13

**wasn't** 47:3
54:13 76:8

84:2 88:10

**watch** 82:16
88:15 94:13

**weapon** 26:16
26:17 26:18
26:19 26:22
27:17 58:17

**weapons** 23:2

**wearing**
38:25

**web** 19:23

**website**
10:21 11:13
11:18 11:24
13:13 13:13
13:14 13:18
13:22 14:4
14:11 14:16
14:19 14:21
15:7 15:18
18:2 18:7
18:8 18:10
18:11 18:20
18:23 19:17
23:24 29:6
29:13 30:1
30:4 30:9
59:6 61:22

**We'd** 6:11

**week** 97:12

**weekend** 52:4

**weighed** 41:2

**weight** 45:23
48:13

**weird** 82:18

**welcome** 6:6

95:3

**we'll** 95:8
95:10 95:11
100:15
100:16

**we're** 6:6
6:21 9:8
10:9 28:19
33:11 33:14
33:25 34:1
34:9 44:5
92:15 92:18
95:3 95:15
98:8

**we've** 34:17
41:6 81:23
95:21

**whatever**
14:6 43:22
60:3 95:5

**WHEREUPON**
15:12 16:6
18:15 19:6
20:17 21:4
23:17 24:3
25:12 26:6
27:15 28:4
28:13 31:25
32:17 34:13
36:2 37:17
38:5 38:19
39:17 40:21
41:23 42:18
43:9 46:11
47:16 48:3
95:12 101:9

**whether**
14:20 34:22

63:8 70:25
77:10 78:19
96:7

**whoever** 57:7

**whoever's**
57:20

**whole** 7:13
37:1 82:8
84:7 95:22

**who's** 9:22
19:16 49:15

**willing**
44:24 86:4
97:18

**willingly**
72:2

**witness**
15:12 18:15
20:17 23:17
25:12 27:15
28:4 28:13
31:25 38:5
47:16 59:18
60:3 82:10
82:13 86:12

**work** 9:20
9:22 9:23
10:10 10:20
12:14 22:1
54:13 54:14
54:18 55:25
56:17 56:21
57:3 65:19
65:23 66:1
66:5 66:14
66:17 66:17
66:19 66:19

66:22 66:24
66:25 67:8
74:2 74:3
74:7 74:16
78:21 78:21
79:24 92:17
92:20 99:1
99:4 99:13

**worked** 9:3
10:1 12:14
79:16

**working** 8:10
8:15 11:2
44:24 75:11
83:19 86:24
92:7

**works** 9:17
79:11

**worried** 57:4
57:20 79:13

**worries**
60:13

**worth** 91:12

**wrap** 87:11
88:3 91:6

**written** 17:4
28:25

**wrong** 87:23

**Www.rentahit
man.com**
20:9

———————
Y
———————

**y'all** 88:6
90:23 90:24

**yards** 50:3

**yet** 58:23
96:20

**young** 84:8

**you've** 6:15
8:17 36:14
41:2 80:11

County
**COURT REPORTERS**, Inc.
Videography   Litigation Technology™

800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX   CountyCourtReporters.com