TENNESSEE:

UNITED STATES DEPARTMENT OF JUSTICE

UNITED STATES ATTORNEY'S OFFICE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA,

      PLAINTIFF,

VS.                     CASE NO. 23-MJ-02033

JOSIAH ERNESTO GARCIA,

      DEFENDANT.

_____

AUDIO TRANSCRIPTION OF HEARING
BEFORE THE HONORABLE
JEFFREY S. FRENSLEY

TUESDAY, APRIL 19, 2023

FRED D. THOMPSON FEDERAL BUILDING AND COURTHOUSE
719 CHURCH STREET
NASHVILLE, TENNESSEE 37203

TOLL-FREE 800.262.8777
LOCAL 540.667.0600
FAX 540.667.6562

County COURT REPORTERS, Inc.
Videography Litigation Technology™

```
 1                    APPEARANCES

 2  ON BEHALF OF THE PLAINTIFF,

 3  UNITED STATES OF AMERICA:

 4  BROOKE K. SCHIFERLE,

 5  ASSISTANT UNITED STATES ATTORNEY

 6  UNITED STATES ATTORNEY'S OFFICE

 7  719 CHURCH STREET, SUITE 3300

 8  NASHVILLE, TENNESSEE 37203

 9  TELEPHONE: 615.736.5151

10  FASCIMILE: 615.401.6626

11

12  ON BEHALF OF THE DEFENDANT,

13  JOSIAH ERNESTO GARCIA:

14  DAVID FLETCHER, FEDERAL PUBLIC DEFENDER

15  OFFICE OF THE PUBLIC DEFENDER

16  810 BROADWAY

17  SUITE 200

18  NASHVILLE, TENNESSEE 37203

19

20

21

22

23

24

25
```

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™
CountyCourtReporters.com

```
 1                    APPEARANCES

 2  ON BEHALF OF THE DEFENDANT,

 3  JOSIAH ERNESTO GARCIA:

 4  CARYLL S. ALPERT,

 5  ASSISTANT FEDERAL PUBLIC DEFENDER

 6  OFFICE OF THE PUBLIC DEFENDER

 7  810 BROADWAY

 8  SUITE 200

 9  NASHVILLE, TENNESSEE 37203

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        INDEX

2                                              Page

3    **HEATHER NAOMI DIAZ:**

4    DIRECT EXAMINATION BY MR. FLETCHER       7

5    CROSS EXAMINATION BY MS. SCHIFERLE       12

6    REDIRECT EXAMINATION BY MR. FLETCHER    18

7

8

9

10                      EXHIBITS

11   Exhibit                                Page

12

13                RETAINED BY COUNSEL

14

15      3      Exhibit 3                    36

16

17

18

19

20

21

22

23

24

25

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 4 of 107 PageID #: 178
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1              **AUDIO TRANSCRIPTION OF HEARING**

2                  **BEFORE THE HONORABLE**

3                  **JEFFREY S. FRENSLEY**

4                **TUESDAY, APRIL 19, 2023**

5                  **BAILIFF:**  All rise.

6              **THE COURT:**  Thank you.  Be seated.

7                  Good afternoon everyone and

8  welcome.  We are here in the matter of United

9  States of America v. Josiah Garcia.  It's case

10  number 23MJ2033.  Mr. Garcia is present in the

11  courtroom today along with his attorneys.  And

12  Ms. Schiferle is here for the United States.

13  This is a continuance of the detention hearing we

14  started yesterday.  Before we get started, Ms.

15  Schiferle, are there any announcements from the

16  Government?

17              **MS. SCHIFERLE:**  No, Your Honor.

18              **THE COURT:**  All right.  Very good.

19  Are you ready?

20              **MS. SCHIFERLE:**  Yes.

21              **THE COURT:**  All right.  Thank you.

22              Mr. Fletcher, any announcements

23  before we get started, or are you ready?

24              **MR. FLETCHER:**  Yes, Your Honor.

25  We're ready.  We have, I'm going to call Mr.

1  Garcia's sister, Naomi Diaz.  And just for the

2  record, Your Honor, she drove about six hours

3  here.  I didn't ask her to drive here.  I told

4  her this could be video, but I got an email at 3

5  this morning, and she felt the need to be here

6  because she wanted to support.  So I'll call her

7  and ask her a few questions.

8              THE COURT:  All right.  Very good.

9  Ma'am, if you'd step up.

10             COURT CLERK:  Would you please

11 raise your right hand?  Do you solemnly swear or

12 affirm that the testimony you give in this case

13 will be the truth, the whole truth, and nothing

14 but the truth?

15 **(WHEREUPON, no audible response.)**

16             COURT CLERK:  Could you please

17 state your name for the record and spell your

18 last name?

19             **WITNESS:**  Heather Naomi Diaz, D-I-

20 A-Z.

21             **COURT CLERK:**  Thank you.  Please

22 have a seat.

23             **MR. FLETCHER:**  May I proceed, Your

24 Honor?

25             **THE COURT:**  You may.

County
COURT REPORTERS, Inc.
Videography        Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 6 of 107 PageID #: 180
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

 1  **HEATHER NAOMI DIAZ,** having been duly sworn by the

 2  CLERK, was examined and testified as follows:

 3  **DIRECT EXAMINATION**

 4  **BY MR. FLETCHER:**

 5      Q.    All right.  Ms. Diaz, could you please

 6  tell the Court where you live?

 7      A.    I live in Amanda, Ohio.  5635

 8  Chillicothe Lancaster Road.

 9      **Q.    And exactly how far is that from**

10  **Nashville?**

11      A.    About six-and-a-half-hour drive.

12      **Q.    And do you live alone?**

13      A.    No.

14      **Q.    Who lives with you?**

15      A.    My husband, Kendal Diaz, and my three

16  daughters, Natalia Hamilton.  She is 11.  Harley

17  Diaz, she's three.  And Kendal Diaz.  We named

18  her after him.  She's one.

19      **Q.    Okay.  And how long have you and your**

20  **husband been married?**

21      A.    Seven years.

22      **Q.    And do you work?**

23      A.    Not currently.

24      **Q.    Did you work?  Well, how long have you**

25  **been out of work?  I guess I should ask that.**

1      A.   Whenever I got pregnant with my

2  daughter Harley, COVID happened.  Daycares got

3  closed down, and I couldn't put her in daycare

4  whenever I could take her to daycare, so I lost

5  my job.  But I was an operations manager for YRC-

6  3.

7            THE COURT:  Mr. Fletcher, she's

8  got three kids.  She's probably working harder

9  than any of us.

10            MR. FLETCHER:  Agree, Your Honor.

11  CONTINUATION OF DIRECT EXAMINATION

12  BY MR. FLETCHER:

13      Q.   Does your husband work?

14      A.   Yes.

15      Q.   And what exactly does your husband do?

16      A.   He is a maintenance supervisor.  He

17  works for Magna Seating.

18      Q.   Okay.  And could you describe exactly

19  what he does there?

20      A.   He's a boss.  He hires.  He fires.  He

21  also fixes things.

22      Q.   Okay.  And how long has he been

23  employed there?

24      A.   Whew.  We lived in Bowling Green,

25  Kentucky before we moved to Ohio.  So, he

County
**COURT REPORTERS**, Inc.
Videography   Litigation Technology

1 transferred when COVID happened.  Approximately

2 13, 14 years.

3     Q.   Okay.  And how are you related to Mr.

4 Garcia?

5     A.   He's my brother.

6     Q.   And how often do you speak with him?

7     A.   Well, we used to text and call each

8 other on and off, I mean, his whole life.

9     Q.   And when was the last time you spoke?

10    A.   On Easter.

11    Q.   And when did you become aware of this

12 incident, the current incident that we're here

13 for today?

14    A.   The day my mom called me, telling me

15 that the FBI came to her house and that Josiah

16 had got arrested.

17    Q.   So, the last time you spoke with him

18 was before he was arrested?

19    A.   Correct.

20    Q.   And the only way you found out about

21 this was through your mom?

22    A.   Yes.

23    Q.   Okay.  And other than that, was there

24 any other information that you received about

25 what had happened with your brother?

1    A.    No.   Other than the news and what you

2    read out there, absolutely not.

3    **Q.    Okay.   And so let's go back to your**

4    **home.   Will you describe your home for me?   Just**

5    **describe, like, how your home is set up.**

6    A.    Okay.   I have a four-bedroom, two-bath.

7    I don't use the downstairs.   The downstairs is

8    like an apartment.   It has a bedroom, a living

9    space, and also a bathroom on its own.   And then

10   the upstairs has a main, main room, living room,

11   dining room, kitchen.   And then the third floor

12   has the girls up there with two bedrooms.

13   **Q.    Okay.   And based on our previous**

14   **conversations that we've had, isn't it true that**

15   **you previously stated to me that if Mr. Garcia**

16   **were to be released, he would be living in the**

17   **apartment in the bottom ...**

18   A.    Yes.

19   **Q.    Okay.   And is your home located in the**

20   **city or is it in the suburbs?**

21   A.    I want to say more or less the country.

22   **Q.    Okay.   And so, if Mr. Garcia were**

23   **released, you know by now that he would probably**

24   **have a difficult time finding employment?**

25   A.    Yes.

1    Q.    But would you be willing to assist him

2  in gaining employment?

3    A.    Yes.  And so would my husband Kendall.

4    Q.    Okay.  So, I'll ask you about you agree

5  to be a third-party custodian.  We spoke about

6  this a few weeks ago.  And I just want to go over

7  those, what you would be needing to do as a

8  third-party custodian.  You know what that means,

9  that you will be responsible for assisting him in

10  compliance with all the Court's orders or rules

11  that it puts in place, if the Court was to

12  release your brother?

13    A.    Yes.  I do realize that.

14    Q.    And you know this might mean having to

15  transport him to and from Nashville for court

16  hearings that he'll have in the future.  Would

17  you be willing to do that?

18    A.    Yes.

19    Q.    Do you know that this might also mean

20  contacting probation, myself, or any of the

21  authorities if your brother fails to comply with

22  these rules?

23    A.    Yes.

24    Q.    Would you be willing to do that?

25    A.    Yes.

1    Q.   Would you be willing to do that,

2  knowing that if you contacted them, this could

3  land him back in jail?

4    A.   Yes.

5            MR. FLETCHER:  Your Honor, I think

6  that's all I have for now, Your Honor.

7            THE COURT:   All right.  Thank

8  you.  Ms. Schiferle, do you have any questions

9  for this witness?

10            MS. SCHIFERLE:  Please.

11  CROSS EXAMINATION

12  BY MS. SCHIFERLE:

13    Q.   Good afternoon, Ms. Diaz.

14    A.   Afternoon.

15    Q.   Thank you for making that long drive to

16  be here today.  It's important for all of us when

17  someone is coming here and proposing to be a

18  third-party custodian, it's important for all of

19  us to see you in person and be able to sort of

20  have a real conversation about what that means.

21  So, we appreciate you being here.  I have a few

22  questions for you.

23            When you stated a moment ago that you'd

24  be able to help your brother have transportation

25  back and forth here, I'm a mom, too.

County
**COURT REPORTERS**, Inc.
Videography   Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 12 of 107 PageID #: 186
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1  **Logistically, how would that work for you with**

2  **your husband working, I assume full-time, and**

3  **having three kids at home?**

4        A.    My husband is salary, and he also has a

5  lot of vacation time he could take.  And he

6  watches the girls whenever that happens.  Like

7  today.

8        Q.    Okay.  So, he's taking vacation time

9  today ...

10       A.    Yes.

11       Q.    ... to be home with the girls so you

12  could come here?

13       A.    Yes.

14       Q.    Okay.  And that's something that he

15  would continue to be willing to do any time that

16  your brother had to be in Nashville for court?

17       A.    Yes.

18       Q.    Okay.  And it's not just when there is

19  a court appearance, but he could also potentially

20  be required to, you know what, I was going to say

21  he might have to come down and meet with a

22  probation officer, but I think they would have

23  someone in Ohio for him to meet with.  So,

24  disregard that. So, you've read the news

25  articles?

County
**Court REPORTERS, Inc.**
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 13 of 107 PageID #: 187
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1    A.    I have.

2    Q.    **About this case?  Have you read the**

3  **actual document that charged him, the criminal**

4  **complaint?**

5    A.    I've read the complaint.

6    Q.    **Okay.  What did you think?**

7    A.    It's mind-blowing.  It's, I know he was

8  under a lot of pressure, a lot of stress.  There

9  were things after he graduated, you know, that I

10  knew that he was going through.  It's, it's mind-

11  blowing.  It's a little disappointing to actually

12  think that, you know, there's a world out there

13  where he thought that was okay to do.  But I

14  think that his judgement was probably clouded by

15  that as well, from stress.

16    Q.    **Okay.  So, the last time you spoke with**

17  **him was on Easter?**

18    A.    Yes.

19    Q.    **It must be additionally mind-blowing**

20  **when you look at the dates and realize that he**

21  **was texting undercover on Easter Sunday about**

22  **having a meeting to get a job as a hitman.  Do**

23  **you think his stress level is going to go down if**

24  **he's released and goes to stay with you?**

25    A.    I believe that I can help him relieve a

County
**COURT REPORTERS, Inc.**
Videography        Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 14 of 107 PageID #: 188
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

```
 1  lot of the stress that he was in, and I could
 2  definitely guide him in the right direction that
 3  he would need to go.
 4      Q.   I think from some of the testimony that
 5  we heard yesterday and from some of the
 6  statements that your brother made, some of that
 7  stress came from a pressure on him to contribute
 8  to the household monetarily; is that right?
 9      A.   Correct.
10      Q.   Okay.  How is it that you'd be able to
11  help him alleviate that stress?
12      A.   Me and my husband already have a plan
13  to get him a job, and where my husband works,
14  it's only about seven miles away from our house.
15  We have two vehicles.  I know he has one.  I'm
16  not sure if he'll be able to use that or not.
17  Transportation is not a problem.  And giving him
18  a place to stay.  Food's never a problem either.
19      Q.   So just so I understand, it wouldn't
20  relieve his obligation to send money back home to
21  Mom and Dad, but you'd help him get a job to be
22  able to make that money?
23      A.   Correct.  And I would not let him send
24  money home to Mom and Dad.  I am so sorry, but
25  that is their responsibility.
```

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 15 of 107 PageID #: 189
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1      Q.    I didn't catch when you said the name

2  of the company your husband works for.

3      A.    Magna Seating of Columbus.

4      Q.    And what kind of company is that?

5      A.    They make seats for vehicles.

6      Q.    Oh, okay.

7             THE COURT:  You said seats?

8             WITNESS:  Yes.

9             THE COURT:  Okay.

10  CONTINUATION OF CROSS EXAMINATION

11  BY MS. SCHIFERLE:

12      Q.    And your husband supervises the

13  maintenance department?

14      A.    Yes.

15      Q.    Okay.  What kind of job does he think

16  that he would be able to get your brother?

17      A.    Operational job.  Any line work

18  probably.

19      Q.    I'm sorry?  Line work.  Is he the

20  ultimate say of someone who gets hired there, or

21  just enough to go through some upper ...

22      A.    HR.

23      Q.    Okay.  And do you know if he had

24  consulted HR to find out if they would employ

25  someone who's on release for a federal charge for

County
COURT REPORTERS, Inc.
Videography        Litigation Technology™

Case 3:23-cr-00081   Document 21-2   Filed 04/22/23   Page 16 of 107 PageID #: 190
800.262.8777 TOLL-FREE   540.667.0600 LOCAL   540.667.6562 FAX   CountyCourtReporters.com

1  **murder-for-hire?**

2      A.    As of right now, since everything

3  happened so quickly, he's in the process of doing

4  everything.

5      **Q.    Okay.**

6                THE COURT:  Ms. Schiferle, I don't

7  think he's charged with murder-for-hire.

8                MS. SCHIFERLE:  He is.  He's

9  charged with using an instrumentality of

10 commerce.

11                THE COURT:  Right.

12                MS. SCHIFERLE:  It's a murder-for-

13 hire statute.

14                THE COURT:  I'm sorry?

15                MS. SCHIFERLE:  It's the murder-

16 for-hire statute.

17                THE COURT:  Okay.

18                MS. SCHIFERLE:  I mean, I think

19 that's how it would appear.  Use of interstate

20 commerce facilities in the commission of murder-

21 for-hire.

22 **CONTINUATION OF CROSS EXAMINATION**

23 **BY MS. SCHIFERLE:**

24      **Q.    So, you haven't been able to get a**

25 **final answer on that; is that what you're saying?**

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 17 of 107 PageID #: 191
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1    A.    Correct.

2    **Q.    Okay.**

3              MS. SCHIFERLE:  I think those are

4  all my questions.

5              THE COURT:  Mr. Fletcher, do you

6  have any questions?

7              MR. FLETCHER:  Yes, Your Honor.  I

8  just have one question.

9              THE COURT:  Yes.  Sure.  Go ahead.

10 **REDIRECT EXAMINATION**

11 **BY MR. FLETCHER:**

12   **Q.    Ms. Diaz, could you just explain for**

13 **the Court, and we've had this conversation**

14 **before, why you believe that your brother would**

15 **have less stress coming back home to you versus**

16 **going back to his home?**

17   A.    Whew, that is a long story.  He was

18 under a lot of financial stress ever since he

19 graduated boot camp.  Should I just say the whole

20 story?

21   **Q.    I mean, just explain.  Again, when we**

22 **spoke about why you believe that your home would**

23 **be best.  I guess I should ask, when you said**

24 **your husband and you would be able to provide for**

25 **Mr. Garcia.**

1    A.   Yes.

2    **Q.   Would he have to immediately begin**

3 **working if he were released to you?**

4    A.   Oh, no.  He wouldn't have to

5 immediately begin working.  He could actually

6 have room to breathe.

7    **Q.   So even if your husband is unable to**

8 **find him employment, he would still be taken care**

9 **of?**

10    A.   Yes.

11           **MR. FLETCHER:**  Thank you.  Your

12 Honor, that's all I have.

13           **THE COURT:**  All right.  Had the

14 defendant talked to you at all about his

15 interests in participating in some sort of career

16 as being a hitman?

17           **WITNESS:**  No.

18           **THE COURT:**  Okay.

19           **WITNESS:**  I'm not sure he

20 actually understood what that meant in a way.

21           **THE COURT:**  What makes you say

22 that?

23           **WITNESS:**  His stress level.

24 Financial situations.  I feel like it clouded his

25 judgement.  I mean, even when you read the

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 19 of 107 PageID #: 193
800.262.8777 TOLL-FREE    •    540.667.0600 LOCAL    •    540.667.6562 FAX    •    CountyCourtReporters.com

1  articles, why would you apply as a hitman online?

2  Why would you leave any type of paper trail?  Why

3  would you put your real address?  There had to be

4  something there that clouded his judgement.  And

5  I know my parents.  I'm not going to cash in on

6  them, but I know how I grew up, and I got out of

7  it.  And he was homeschooled his whole life.  So,

8  I feel like his judgement toward many things has

9  been clouded.

10            **THE COURT:**  Do you have concerns

11  that if he's under your roof that he will

12  continue to exercise poor judgement in a way that

13  you can't deal with?

14            **WITNESS:**   No.

15            **THE COURT:**  Why is that?

16            **WITNESS:**  I have rules.  And I

17  would not allow that in my house.

18            **THE COURT:**  And if there was

19  something that he was doing that was either in

20  your mind something you couldn't abide by or was

21  a violation of some condition of his release,

22  what would you do under those circumstances?

23            **WITNESS:**  Confront him, and if

24  it's need be, let everybody else know.  Whoever I

25  need to let know.

1           **THE COURT:**  Okay.  And you

2    wouldn't have any problem doing that?

3           **WITNESS:**  It hurts, but he's 21.

4    I wouldn't have an issue with it.

5           **THE COURT:**  Okay.  Anybody need to

6    follow up on any of that?

7           **MR. FLETCHER:**  No, Your Honor.

8           **THE COURT:**  Ms. Schiferle?

9           **MS. SCHIFERLE:**  No, Your Honor.

10           **THE COURT:**  All right.  Very good.

11    All right.  Ms. Diaz, thank you very much.  I

12    really appreciate you being here.  You can step

13    down.

14           **WITNESS:**  Okay.

15           **THE COURT:**  You're welcome to stay

16    in the courtroom.  Watch your step there.

17    **(WHEREUPON, the WITNESS was excused.)**

18           **THE COURT:**  All right.  Mr.

19    Fletcher, do you have any proof you want to put

20    on?

21           **MR. FLETCHER:**  That's all, Your

22    Honor.

23           **THE COURT:**  All right.  Thank

24    you.  Ms. Schiferle, does the Government have any

25    other proof you want to put on?  I'll let you put

1  on anything you want.

2                    **MS. SCHIFERLE:**  No, Your Honor.

3  Thank you.

4                    **THE COURT:**  All right.  Very good.

5  Thank you very much.  Want to be heard?

6                    **MS. SCHIFERLE:**  Please.  "When can

7  I start?  I am ready.  I've been looking into

8  this for a long time.  I am excited."  Those are

9  just some of the quotes that Your Honor court in

10 this courtroom yesterday come straight out of the

11 defendant's mouth when talking about being

12 employed as a hired killer.

13                    On the first recorded phone call

14 that he had with the undercover, of all the

15 questions in the world, his first one was, "When

16 can I start?"  And the second was, "How much

17 money can I make?"  The conversation then turned

18 to specifics.  They talked about torture and

19 taking trophies, body parts.  He was fine with

20 that.  "If it's within my abilities, I'm fine

21 with it."  And the thing that makes that part

22 ring true is the fact that they then talked about

23 sexual assault.  And the defendant there drew the

24 line.  "I'm not going to rape anybody, but I'll

25 torture them.  I'll cut off their ear.  I'll cut

1  off their finger.  I'll shoot them from afar."

2  He was thinking it through.

3              He asked about what would happen

4  if he got caught, if the company would back him

5  up, what he should do to make sure it doesn't

6  come back to him.  Again, thinking it through the

7  steps.

8              At the in-person meeting, he said,

9  "I am excited.  I am ready."  The UC gave him

10  many opportunities to back out.  He basically

11  tried to talk him out of it.  The UC said to him,

12  and I'm paraphrasing, "You've got a lot going on.

13  You have college.  You have the military.  Is

14  this really what you want to do?"  The defendant

15  said yes.  He said he had considered the

16  psychological effects of killing someone and that

17  he was okay with it.

18              And then at the deal, he was given

19  more opportunities to decline.  It's true, the

20  first question he asked of the undercover in

21  person was, "Do I have to do this?"  Because the

22  undercover said no, and are you having any second

23  thoughts, and the defendant said no.

24              And a very important factor here

25  is that what he said after he took that target

1  package and he took the money.  After he took the

2  details about the fictional Peter Mitchell and

3  the photos of that person and all of his details

4  and $2,500 cash, he then told the UC what his

5  next steps were going to be.  He said, "I'm off

6  next weekend, so I'm going to go scope it out.

7  I'm going to drive up to Kentucky and check out

8  the area where this person lives."  He already

9  had steps in place.

10              And then the undercover asked him,

11  "Hey, did you buy that Sig yet?"  There were some

12  previous conversations where the defendant talked

13  about that he wanted to buy a Sig Sauer handgun.

14  And he said, "No, but now I have the money to do

15  it.  Now I have the money to buy more guns."

16              So what am I going to do now with

17  this target package and this money?  Two things.

18  I'm going to go surveil the location where I need

19  to kill somebody, and I'm going to buy more guns.

20  Not, I'm going to go rush home and give this

21  money to Mom to help pay the rent.  I'm going to

22  get back in my 2020 BMW that I drove to this deal

23  and go drive up to Kentucky and scope it out and

24  then buy some more guns.

25              He was so excited about this

1  opportunity that he told his family about it.  He

2  told his mom and he told his brother about this

3  great money-making opportunity that he had.  He

4  told him it involved high-end targets like

5  federal judges and human traffickers.

6              He had the tools.  He wasn't just

7  talking.  He thought facts through.  He thought

8  through his next steps.  And he had the tools and

9  the skills.  He had the firearm.  We know that

10 because it's now been recovered from his bedroom.

11 He had the ammunition.  And he had the skills.

12 He was taught shooting skills in the Air Force.

13              There's an adage I try to apply in

14 my own life.  When someone tells you who they

15 are, listen.  The defendant's own words are the

16 most powerful evidence in this hearing, and there

17 is no reason why any of us should question their

18 veracity.  He said he would kill people for

19 money.  He said he will kill numbers of them.

20 Fifty, that's rookie numbers for the Reaper.  He

21 said he would torture them, take ears and fingers

22 as trophies as necessary.

23              He's young, and he has no criminal

24 record.  And those are things that we often talk

25 about in this courtroom that would predict future

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 25 of 107 PageID #: 199
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  behavior and show that someone's dangerous, but

2  the absence of a criminal record and the fact

3  that he is young don't mean that we shouldn't

4  take his own words seriously.

5              If he didn't find rentahitman.com,

6  while admittedly he was online looking for paid

7  mercenary jobs, he would have found something

8  else.  Someone who has the tools and has the

9  skills and has the desire for the money and wants

10 to go out and kill people will find that

11 opportunity.

12             He made a mistake.  He chose a

13 website that's not the real thing, and he ended

14 up talking to an undercover officer.  Thank God.

15 He could and would find real options.  There are

16 hired killers in this world, in this district,

17 every day.  And he very well could have been one

18 of them.  Having a job at Vanderbilt or having a

19 job working in operations for a company that

20 makes seats, while that's certainly gainful

21 employment and would help him be a productive

22 member of society is not going to give him the

23 kind of money that he was eyeing for this kind of

24 work.

25             Your Honor, I submit that despite

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 26 of 107 PageID #: 200
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1 his youth and his lack of criminal record, this

2 defendant is a danger to society and to specific

3 people who are targets of hired killers.  I ask

4 you to detain him.

5          THE COURT:  Ms. Schiferle, what

6 exactly is the danger that I need to protect the

7 community from with regard to Mr. Garcia at this

8 point?

9          MS. SCHIFERLE:  He's expressed a

10 willingness and an interest to murder people for

11 money.  I don't see how that miraculously goes

12 away.  Someone who has thought through to the

13 point that he did, where he will perform certain

14 acts and not others, has the skillset and has

15 access to the weapon, granted that weapon has now

16 been seized, but there's no reason to believe

17 that that suddenly goes away and he's suddenly

18 going to go up to Ohio and do the right thing

19 with his sister and not get right back on the

20 internet or fall in with some unsavory characters

21 in Ohio and find some ways to make real money.

22          THE COURT:  So you think that if I

23 let him out, he's going to commit a murder-for-

24 hire?  He's going to murder somebody is what

25 you're saying?  That's the danger that I need to

1 protect from?

2             **MS. SCHIFERLE:**  I mean, I

3 certainly think it's possible.  The other jobs

4 that he was looking for, hired mercenary work,

5 are equally as dangerous to society.  I just

6 think we need to take this defendant at his own

7 word.  That's what he wants to do.  He wants to

8 get a job that fits his skillset.

9             **THE COURT:**  So when he had the

10 meeting on, was it April the 6th where he said he

11 wanted to murder the person who was abusing the

12 girlfriend ...

13             **MS. SCHIFERLE:**  Right.

14             **THE COURT:**  ... do we not need to

15 take him at his word then?

16             **MS. SCHIFERLE:**  Thank you for

17 reminding me.  I do think that that was an

18 important part of that interview, and that's why

19 I introduced the clip of it yesterday.  I think

20 that when you heard him say, "Everything in me

21 wanted to go and shoot him," that also showed

22 that not only do I have this desire to take this

23 skillset and employ it in a job where I'll get

24 fired, but I also just sort of view human life as

25 expungable.  And if someone is causing a problem

1  for me, being abusive to an ex-girlfriend, that's

2  within my arsenal of things that I can do to fix

3  that.

4                Now of course as the conversation

5  evolved, I think what made it ring more true,

6  someone of us say all the time, right, "I wanted

7  to kill him."  It's something people say.  Do we

8  put value in it?  I think in this context, yes,

9  we do.  And an important fact is that later in

10 the conversation, he said to the undercover, "In

11 fact, I've been waiting to ask you about it."  So

12 maybe I didn't feel comfortable doing it myself,

13 but you hire other killers, so you could hire

14 someone else to do it.  And then he went on to

15 say that the only reason he didn't want to kill

16 that man or hire someone to kill that man was

17 because it would make the ex-girlfriend sad.  So

18 that again shows a weighing.  Right, I'm thinking

19 this through.  I'm seriously considering killing

20 this person or hiring someone else to kill this

21 person, and then I've decided not to because it

22 might make her sad.

23                Well, what happens when she gets

24 back in touch with him, and the boyfriend beat

25 her up so bad, and now it's not going to make her

1 sad?  Then that barrier in his mind to the

2 killing is removed.

3 　　　　　　THE COURT:  So, you think that

4 that communication means that he's a danger from

5 this point going forward, but law enforcement

6 apparently didn't believe that it was enough of a

7 danger between that time and the time when he was

8 ultimately arrested, over a week later?  They

9 felt okay leaving him out when he said that, but

10 now that's a reason to detain him?

11 　　　　　　MS. SCHIFERLE:  Sure.  I

12 understand Your Honor's question.  But my answer

13 is that the undercover at the time he had that

14 meeting with the defendant, he had a concern and

15 said to him repeatedly, "Don't kill anybody.

16 Promise me."  They shook hands at the end of it.

17 And the undercover felt confident that he wasn't

18 going to kill anybody because that would

19 jeopardize his employment relationship with the

20 undercover.

21 　　　　　　THE COURT:  So, we can feel

22 confident based on a handshake at the meeting,

23 but we can't feel confident based on a court

24 order and supervision?

25 　　　　　　MS. SCHIFERLE:  I understand Your

1  Honor's point, but I think that there, I don't

2  really think they're equals in this exact

3  situation.  The undercover is trained in dealing

4  with these specific situations, and he felt

5  confident in that moment that he's not an

6  immediate danger to that person, to that specific

7  person, because we have an agreement.  It didn't

8  mean that he didn't think he's not a danger to

9  society, but we didn't have enough to arrest.

10  He had to go through with the exchange of the

11  target package and the money to make the arrest.

12  So he was at liberty for one more week to allow

13  the FBI to put together an operation to properly

14  charge him.  He was always deemed a danger to

15  society, but it was during that one week, okay,

16  we don't think he's going to go kill the ex-

17  girlfriend's new boyfriend because he really

18  wants this job.  I think that's sort of a very

19  specific situation in a vacuum.

20          Going on federal release several

21  states away, I don't think has the same power

22  over him, quite frankly.

23          **THE COURT:**  What does several

24  states away have to do with it?

25          **MS. SCHIFERLE:**  Well ...

County
COURT REPORTERS, Inc.
Videography          Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 31 of 107 PageID #: 205
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    County CourtReporters.com

 1                    THE COURT:  I mean, you said it.

 2  So, what does it have to do with it?

 3                    MS. SCHIFERLE:  I did.  I mean, I

 4  think it just makes him a little removed

 5  theoretically from the obligations of the court.

 6  Perhaps, easier to flee.

 7                    THE COURT:  So, you think he's a

 8  flight risk?

 9                    MS. SCHIFERLE:  I don't.  I'm

10  relying on dangerousness here.

11                    THE COURT:  Okay.  You talked

12  about the undercover officer and their training.

13  Were my notes correct when I wrote down that the

14  undercover officer said to him that, "Talking to

15  our company about this is not a crime"?  Is that

16  what the undercover officer said?

17                    MS. SCHIFERLE:  That's correct.

18                    THE COURT:  Isn't that in fact

19  what he's charged with?  Using interstate

20  commerce?  Isn't talking to the company about

21  murder-for-hire exactly what the crime is?

22                    MS. SCHIFERLE:  I think what he

23  was trying to relay to him is that this

24  conversation on the own isn't enough for the

25  crime, which is actually why he wasn't charged on

1  April 6th.  There has to actually be a promise to

2  pay or an actually receipt of something of

3  pecuniary value, which then occurred when he

4  actually made an agreement to kill a specific

5  person.

6          THE COURT:  If a telephone was

7  never used, if there was no instrument of

8  interstate communication used, if they just met

9  and had this meeting and an agreement was made,

10  could he be charged under this statute?

11          MS. SCHIFERLE:  He could for

12  driving a vehicle to the location to meet with

13  the undercover.

14          THE COURT:  Okay.

15          MS. SCHIFERLE:  There's three

16  different theories in the complaint of interstate

17  commerce which is the internet, the phone, and

18  the vehicle.

19          THE COURT:  Okay.  Talking about

20  the communications from the undercover agent, the

21  specific murder that was proposed, that was

22  something created by the agent, right?

23          MS. SCHIFERLE:  The identity of

24  the target?

25          THE COURT:  Yes.  And the

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 33 of 107 PageID #: 207
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1 background story around that, right?

2                    **MS. SCHIFERLE:**  Yes.

3                    **THE COURT:**  And it could have been

4 anybody, right?  I mean, they could have chosen

5 any scenario for a murder, right?

6                    **MS. SCHIFERLE:**  Yes.

7                    **THE COURT:**  And is it just a

8 coincidence that they chose a scenario that they

9 already knew he was really concerned and upset

10 about, a woman being abused by a man?

11                    **MS. SCHIFERLE:**  The only way I can

12 answer that question is to tell Your Honor about

13 the conversations that I had with the team in

14 preparation for the ops, and there were a lot of

15 discussions about what that person should be.  I

16 left it to the agents.  I frankly, I think they

17 chose that because it's just the most common

18 scenario.  I don't, as an officer of the court,

19 believe that it was chosen based on his comments

20 a week earlier that it was, you know, something

21 he was concerned about in his own personal life.

22                    **THE COURT:**  You don't think so?

23                    **MS. SCHIFERLE:**  I don't, but I let

24 the agents make that choice of who the target was

25 going to be, so I cannot speak to whether that

1  was a factor in their minds.  But based on the

2  conversations that we had, we discussed should it

3  be a witness in a case, you know, what kind of

4  back story should there be.  And at the end, I

5  left it to them.

6            **THE COURT:**  Okay.  One of the

7  things you've referred to a lot is this nickname,

8  the Reaper.  And I just want to make sure I

9  understand the proof that I heard.  The only

10 proof I heard about the source of this nickname

11 Reaper is from videogaming, right?  There wasn't

12 any other evidence that he was referred to as the

13 Reaper in any other context, was there?

14           **MS. SCHIFERLE:**  No.  And that's

15 all coming from statements from the defendant

16 himself.  He has the tattoo that says Reaper, and

17 in the conversation with the undercover, he sort

18 of presented that as that's my nickname.  Even

19 says on his resume, "Earned nickname, Reaper."

20 The source of that being as like initially used

21 in a video game, I think just came out in the

22 post-arrest interview.

23           **THE COURT:**  But you don't have

24 any, at least none was presented to me ...

25           **MS. SCHIFERLE:**  No.

 1                    **THE COURT:**  ... that there's any

 2  other source of that name than his video gaming

 3  activities, right?

 4                    **MS. SCHIFERLE:**  Nothing except his

 5  resume.  His resume says something like, "Earned

 6  nickname Reaper for marksmanship," or something.

 7  I don't have that in front of me.  But he gives

 8  his own characterization.

 9                    **MR. FLETCHER:**  Your Honor, it's

10  the second page of Exhibit 3.

11                    **MS. SCHIFERLE:**  "Nickname Reaper

12  earned from military experience and

13  marksmanship."

14                    **THE COURT:**  Okay.  All right.

15  Thank you, Ms. Schiferle, ...

16                    **MS. SCHIFERLE:**  Thank you.

17                    **THE COURT:**  ... for your argument.

18                    Mr. Fletcher?

19                    **MR. FLETCHER:**  Your honor, first

20  and foremost, I want to respond to some of the

21  things that opposing counsel brought up, and then

22  I'll get directly into my argument.  Your Honor,

23  Counsel stated that she lives by the adage that

24  when someone tells you who they are, you should

25  listen.  You know, frankly, Your Honor, if we all

1  live by that, we would be in a really messed up

2  position because what we do know is that people

3  lie.  We do know that people lie.

4              And that's one of the things that

5  I believe that has come out in the proof over the

6  last few days that Mr. Garcia did.  First and

7  foremost, Your Honor, there is no evidence, Your

8  Honor, that Mr. Garcia is a marksman.  The

9  evidence we do have is that he was a Guardsman at

10  the gate for over two years in Air National

11  Guard.  We don't have any other kind of proof

12  that, one, he used the AR15, that he used the

13  other gun that was found that was a training gun.

14  And for that matter, your honor, we do not have

15  any evidence that he ever used the gun at all.

16  Not even as a Guardsman at the Air National

17  Guard.  So there was an opportunity, Your Honor,

18  for the agents to verify that he was the

19  marksman, but we don't have that.  We don't have

20  any kind of evidence other than what he said, and

21  again, he put this on his resume that he earned

22  this from his military experience, the nickname

23  Reaper, Your Honor.  But again, we have no other

24  evidence or proof to determine or verify that he

25  ever shot a gun.  That's the one thing here that

County
COURT REPORTERS, Inc.
Videography      Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 37 of 107 PageID #: 211
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    County Court Reporters.com

1  we do not have, that he ever shot a gun.

2              I also disagree, Your Honor, with

3  council saying that he thought all this through.

4  That's not what happened.  He didn't think all

5  this through.  You heard on the clips almost

6  every time he communicated with one of the

7  officers, Your Honor, everything that he said was

8  in response to something that an officer asked

9  him or that the agent asked him.  He wasn't

10 coming there with any of these scenarios in his

11 head.  He was responding to everything that they

12 asked him, Your Honor.  And overall, what I

13 believe this case to be was the use of the

14 naivety of a 21-year-old who was under duress who

15 was trying to get a lot of money.

16             While this obviously can be viewed

17 as a foolish way to try to get money, Your Honor,

18 this wasn't him bringing this up in his own mind,

19 and I'm not taking away from the fact that he

20 went and he actually applied to be a hitman.  I'm

21 not taking that away, and nothing that I say I

22 want to relate that it makes it seem like I'm

23 trying to lessen the seriousness of these

24 charges, Your Honor.  But what the proof has

25 shown is that every time he communicated with the

County
CourtReporters, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 38 of 107 PageID #: 212
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  agents, the concerning things, Your Honor, were

2  things that the agents made up themselves.  The

3  agents made up the stuff about the torture.  He

4  never came and said anything, and he even told

5  them every time they brought up torture on the

6  clips, you heard every single time they brought

7  up torture, which I believe was three different

8  times, he would say, "Within my means."  That's

9  what he responded to the agents.

10                When he met with them in person,

11  again, the first thing he said was, "Do I have to

12  accept it?"  And while I do recognize that he did

13  accept the money, Your Honor, I do believe that

14  it's plausible that he was scared.  He's a 21-

15  year-old who's never done anything like this

16  before in his life.

17                He's a 21-year-old that the

18  evidence has shown that he had a job at

19  Vanderbilt.  So this was not the only, he wasn't

20  only looking for mercenary jobs.  He wasn't only

21  looking for hitman jobs or anything like that.

22  He was looking for other employment.  And he got

23  the job at Vanderbilt.  And there was an

24  opportunity to verify that, but that was not

25  corroborated by the agents that he got a job at

County
**COURT REPORTERS,** Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 39 of 107 PageID #: 213
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    County CourtReporters.com

 1  Vanderbilt.

 2                    And yesterday, Your Honor, the

 3  issue about him telling his family about what he

 4  wanted to do, he clearly lied to his family about

 5  what he was trying to do.  And I think it's

 6  obviously that he didn't want his family to know

 7  exactly what he was doing because even with what

 8  he was doing, they tried to talk him out of it.

 9  That was the proof that came out yesterday.

10  That's what they told Agent Hunter when they

11  spoke with him is that they tried to talk him out

12  of it.  As wild as it may seem to us, Your Honor,

13  and as off base as it may seem to us, Your Honor,

14  I do genuinely believe that his family genuinely

15  believed that this was some kind of legal

16  governmental job that he was doing, being some

17  kind of a CIA special assassin.  And for that

18  matter, Your Honor, I just don't believe that has

19  family was condoning him doing something illegal

20  in particular.

21                    But we've heard a lot, and Counsel

22  basically put on her whole case, Your Honor.  But

23  we did not hear was what we're here for, Your

24  Honor.  The Court has to make a determination

25  about whether to detain or release Mr. Garcia

County
CourtReporters, Inc.
Videography          Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 40 of 107 PageID #: 214
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  based on the factors that he's a danger to the

2  community and he's a flight risk.  Your Honor, I

3  submit that there is no evidence that he's a

4  flight risk.  He's never been to court.  He's

5  never had traffic ticket.  Never has had a need

6  to go to court, and so the mere argument that he

7  might be a flight risk if he goes to Ohio, if the

8  Court releases him to there, if the Court

9  releases him back to Nashville with his

10  community, it's pure speculation to say that he's

11  a flight risk.  We have absolutely no evidence

12  that he's a flight risk.

13                What we do know, Your Honor, and I

14  believe that this can be said, I would submit is

15  that he's a rule follower.  I mean, he followed

16  the rules to the T with what the agent was

17  saying.  He sent everything he needed to send in

18  for the application, Your Honor.  He talked with

19  the agent every time the agent spoke with him.

20  When he apparently had the opportunity to go

21  shoot someone, he listened to the agent when the

22  agent said, "Don't do anything."  And I would

23  submit, Your Honor, that a part of that

24  conversation was that he did say that, "I'm not

25  going to do it because I don't want my girlfriend

County
CourtREPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 41 of 107 PageID #: 215
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    County CourtReporters.com

1  to be hurt," or, "my ex-girlfriend to be hurt,"
2  Your Honor.  At this point, Your Honor, we don't
3  even know that there was a girlfriend present.
4  We'd be of no clue that there was ever a
5  girlfriend, Your Honor.  This was just a
6  conversation where the agent was obviously lying
7  to Mr. Garcia, and Mr. Garcia was lying to the
8  agent.  So I don't think that you can believe him
9  for his word with everything that he told the
10 agent, everything that he responded to the
11 agent's question.  I don't think that you can
12 believe him and take him to his word because I
13 think there are a lot of inaccuracies and a lot
14 of things that weren't true in his resume, with
15 the things he was telling the agent.
16            And Your Honor, just simply, he
17 had the gun well before these meetings even
18 started.  He had the firearm.  He had the
19 ammunition.  When they got the ammunition, well,
20 first of all, Your Honor, we don't even know when
21 this firearm was bought.  We know that it was
22 purchased before he had conversations with the
23 undercover agent.  But we don't know when it was
24 purchased.  We don't know that when they took the
25 firearm, we didn't even know that they took the

County
COURT REPORTERS, Inc.
Videography        Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 42 of 107 PageID #: 216
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    County CourtReporters.com

1  magazine with it.  There was opportunity to say,

2  well, some of this was used, some of the bullets

3  in the gun were used.  We don't even know that.

4  What we know now is that there was never a gun

5  shot.  He never shot the gun.  If he was

6  dangerous, Your Honor, it wouldn't have taken him

7  getting paid to go and shoot someone.  He could

8  have done that on his own because he had the gun

9  well before he started talking to the undercover

10 agent.

11              So being that there is no flight

12 risk, Your Honor, the obvious issue right now

13 that we will have to fight about is the danger to

14 the community issue.  Your Honor, I will submit

15 that everything that has been presented to this

16 Court over the last two days to say that Mr.

17 Garcia is a danger to the community is pure

18 speculation.  When we come before the Court,

19 normally, Your Honor, we have a number of things

20 that we can look back on in someone's criminal

21 history to determine that, yes, they're a danger

22 to the community, or a danger to the community

23 because this, this, this happened.  They're a

24 flight risk because this, this, and this

25 happened.   Mr. Garcia's PSR is I believe two

1  pages long.  Maybe three pages long.  But what's

2  absent from it is any kind of criminal history.

3  Any kind of criminal history.  We don't know that

4  he's had any issue with mental health.  We don't

5  know that he's had any issues aside from mental

6  health issue that would warrant a finding that

7  he's dangerous.

8              He, in the most odd way, Your

9  Honor, went about the wrong way of trying to get

10  money, and again, I do believe that if we can say

11  that he genuinely wanted to change his mind and

12  his plan was to lay the money on a corner, get

13  back in the car, and leave, Your Honor.  He never

14  had that chance.  He never had the chance.  As

15  soon as he walked off, two to five minutes later,

16  he was arrested.  So he never had the chance to,

17  like, go with his plan to leave the money on the

18  corner.  I think it would be a little more

19  plausible, Your Honor, to allow him to go

20  forward, drive the car off or whatever, and do

21  what he's going to do.  If they thought he wasn't

22  this dangerous when he said that he wanted to

23  kill his ex-girlfriend's boyfriend, then they

24  couldn't have thought he was this dangerous when

25  he took the money to try to go kill some person

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 44 of 107 PageID #: 218
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    County CourtReporters.com

1  that he didn't know.

2          But most importantly, Your Honor,

3  I just don't see that as being evidence of

4  dangerousness.  Mainly because, again, this is

5  speculation about what he was going to do.  He

6  had this gun for a number of months before all of

7  this took place, and if he had that gun, he could

8  have used the gun, and that, Your Honor, in any

9  way, at least if he had used the gun and shoot

10  cans, Your Honor, I feel like that's a little bit

11  closer to saying that he's dangerous than just to

12  say just because he had this gun he's dangerous.

13          The Government used a photo from

14  Facebook.  It was selected use of photos from

15  Facebook, Your Honor, to show that this is when

16  he bought the gun, but we know that he could have

17  bought the gun at any point and posted this gun.

18  And it could have just been posted on the day

19  that he happened to be or around the time that he

20  happened to be talking to the undercover agent.

21  But I submit, Your Honor, that the gun was

22  purchased months before that.  He had this gun.

23  He never used the gun, Your Honor, and there's

24  been no proof put on to show that he's dangerous

25  because he used this gun.

1          He talked about the Sig, Your

2 Honor.  I believe that there were conversations

3 beforehand that he should have bought the Sig or

4 he could have bought the Sig, Your Honor.

5 Obviously, he didn't buy the Sig.  He said that

6 he could have bought the Sig with the money and

7 whatever, Your Honor.  But what we do know is

8 that he's a legal gun owner.  He had the AR-15

9 legally.  He could have got the Sig legally, but

10 he didn't get it legally.  But more importantly,

11 Your Honor, he just didn't use it.  He didn't use

12 the gun, the AR-15.  He never bought the Sig.

13 He never bought the Sig to try to help his

14 chances out of getting this job, Your Honor.  And

15 that's mainly because he was responding to

16 everything that the agent was telling him at the

17 time.

18          I do believe, Your Honor, that his

19 sister, who is here today, I believe that the

20 proof that was put on through her testimony, Your

21 Honor, shows that she would be a good third-party

22 custodian.  I think that this would probably be

23 just a better environment overall for Mr. Garcia

24 to go back to.  We know that her husband has a

25 job.  Her husband's actively trying, without even

1  knowing if he could be released.  Her husband's

2  actively trying to see if he can get Mr. Garcia a

3  job employed where he is.  Mr. Garcia will not be

4  in an environment where he's bunked up in a room.

5  He'll have his own space that's generally away

6  from the other occupants in the home, Your Honor.

7              And I think most importantly what

8  Ms. Diaz said was that the stress that he was

9  under that led him to this incident in the first

10  place, Your Honor, he will not have while he's

11  staying with her.  She said that she could

12  provide for him up until the time that he gets a

13  job, and even if he didn't get a job, Your Honor,

14  if he's unable to get a job, she'll still be able

15  to provide for him.  And I think that that's

16  important, Your Honor, because we're taking him

17  out of the situation that he would have gone back

18  to, Your Honor, that led to him being under this

19  kind of duress, being under this stress, where

20  he's unable to get money and is trying to get

21  this money to help his family out.

22              I think that detaining him based

23  on the evidence presented again is just detaining

24  him on speculation, Your Honor, that he's a

25  danger to the community.  Recognizing that these

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 47 of 107 PageID #: 221
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    County CourtReporters.com

1 are serious charges, Your Honor, but this is

2 literally the bare minimum.  We don't have any

3 evidence that he's ever used guns.  We don't have

4 any evidence that he's ever been violent towards

5 anyone.  We don't have any evidence that anyone

6 in his family has been violent towards anyone.

7 So we can't even say that he grew up in an

8 environment where there was violence.  We can't

9 even say that he's engaged in school at any time

10 or in social circles, Your Honor, where he was

11 around people who were violent, Your Honor.  We

12 don't have any of that evidence, Your Honor, and

13 I would submit that that's because the evidence

14 is not there.

15         I think that we cannot overlook

16 the fact, Your Honor, that there were points in

17 time that even on those clips that Mr. Garcia

18 expressed hesitation.  Again, the first thing

19 that he asked the undercover agent when he met

20 with them was, "Do I have to accept this?"  And

21 the only thing that we can gain from that, Your

22 Honor, is that there was some kind of hesitation

23 expressed.  And I do think that in speaking with

24 the undercover agent at many different times,

25 there were things said about the Reaper thing,

County
CourtReporters, Inc.
Videography   Litigation Technology™

Case 3:23-cr-00081   Document 21-2   Filed 04/22/23   Page 48 of 107 PageID #: 222
800.262.8777 TOLL-FREE   540.667.0600 LOCAL   540.667.6562 FAX   CountyCourtReporters.com

1  Your Honor.

2           Like, as far as I know, Your

3  Honor, the Reaper thing could be something from

4  Marvel movies, the Punisher.  I've spoken with

5  Mr. Garcia, and I'll proffer, Your Honor, that

6  again is something that's connected military

7  units.  Agent Hunter confirmed that yesterday

8  that that tattoo is connected to military units.

9  It has nothing to do with violence, Your Honor.

10  And if it does have anything to do with violence,

11  Your Honor, we didn't get that proof over the

12  last two days.

13           So I do believe that there are a

14  combination of conditions that the Court can set,

15  Your Honor, that will reasonably ensure that Mr.

16  Garcia is not a danger to the community because

17  we have no evidence that he would be a flight

18  risk at all.  The only evidence that he's a

19  danger to the community right now, Your Honor,

20  right now presently is just speculation that he

21  would do something that, for all we know, has

22  never been his character.  Never been his

23  character before, even with his military

24  background.  We have no clue that he's ever used

25  a gun.  We have no clue that he's a marksman.  We

1 have no clue that he could have done what he said

2 he was going to do.  He never shot the gun, Your

3 Honor.

4                    So I would submit that if the

5 Court would allow him to return to his sister's

6 house, I think she'd be a great third-party

7 custodian, Your Honor.  I think that there are

8 even additional conditions that the Court could

9 set that would reasonably ensure that the

10 community is safe.  That could be in the form of

11 home detention.  That could be in the form of GPS

12 monitoring.  There's no history of substance

13 abuse issues that has come out in proof.  We

14 don't have any kind of issues with substance

15 abuse.  And so I do believe that based on the

16 proof and what has come out over the last few

17 days, I would ask the Court to release Mr. Garcia

18 to his sister's home, under the standard

19 conditions and any conditions that the Court

20 finds necessary to ensure that Mr. Garcia is not

21 a danger to the community.

22                    **THE COURT:**  Mr. Fletcher, you

23 talked a lot about speculation, but as you

24 probably know, that's really what the detention

25 determination is trying to predict what's going

1  to happen in the future.  And first of all, let

2  me ask you what you think about Ms. Schiferle's

3  argument about what the actual danger is, that

4  there's a risk that he'll engaged in similar

5  conduct that will be successful in its ends,

6  resulting in murder?

7          **MR. FLETCHER:**  Your Honor, I don't

8  think that there's any merit to that argument,

9  Your Honor, because she didn't put on any

10  evidence that he ever used a gun to start off

11  with.  She didn't put on any evidence that he

12  truly thought about this his self.  I recognize,

13  Your Honor, that this whole thing started alleged

14  because he reached out to this site.  I recognize

15  that, Your Honor.  I would also recognize that

16  this entire thing happened or whatever because he

17  was under pressure.  His mom testified yesterday

18  that at that time, they needed money.  He had

19  just gotten out of the Army.  He was looking for

20  other work.  And they needed money to pay their

21  rent.  I think that because ...

22          **THE COURT:**  Well, I don't think

23  he'd been in the Army, had he?  I thought there

24  was some idea that he was going to have a

25  different job with the Air Guard, and then

County
**COURT REPORTERS**, Inc.
Videography        Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 51 of 107 PageID #: 225
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  something went awry and it ended up only being a

2  one-weekend-a-month or something like that.

3  That's what my recollection the mother testified.

4           **MR. FLETCHER:**  I'm sorry.  He was

5  doing that, Your Honor, but when that ended,

6  that's when kind of the duress started.  I would

7  submit, Your Honor, that that's when they needed

8  money.  He needed money to help his parents pay

9  their rent.  I just don't think that those issues

10  would be present if he was at his sister's house

11  because it's a more stable home.  She testified

12  that they can take care of him whether he had a

13  job or not.

14           But I think that the idea that

15  he's going to go out and start shooting someone

16  you or reaching out to another website, I don't

17  believe that to be plausible, Your Honor, because

18  again, he had this gun months before he ever

19  started talking to the undercover agents.  If he

20  was going to do something, Your Honor, that we

21  should be worried about, it would have and could

22  have happened before then.  He didn't need to

23  speak with anyone to go use the gun.  He could

24  have shot the ex-girlfriend's boyfriend if he

25  wanted to.  He had the means to do it, and he

County
**COURT REPORTERS, Inc.**
Videography    Litigation Technology™

Case 3:23-cr-00081   Document 21-2   Filed 04/22/23   Page 52 of 107 PageID #: 226
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1 didn't do it, Your Honor.

2           **THE COURT:**  Okay.  Thank you.

3           Ms. Schiferle, I'll give you the

4 last word if you want it since it's the

5 Government's burden.

6           **MS. SCHIFERLE:**  Thank you, Your

7 Honor.  Just a few counterpoints.  First, when we

8 introduced the photograph of the gun that was

9 posted on Facebook, it was not intended to be an

10 insinuation that he purchased the gun on that

11 day.  It was intended to show that that's what he

12 was thinking about ...

13           **THE COURT:**  You're not talking

14 about the paintball gun; you're talking about the

15 other one?

16           **MS. SCHIFERLE:**  Correct.  The AR.

17 He posted the picture of the AR with the caption

18 that said, "She's beautiful," on February 20th,

19 the same day when he's exchanging messages with

20 rentahitman.com.  So the point of introducing

21 that picture and the timing was to show that

22 that's what's on his mind.  He's emailing

23 rentahitman.com, trying to get this job, and then

24 at the same time, posting about how his gun is

25 beautiful, right?  So those things are sort of

1  part and parcel of what's going on in his mind.

2  That was the point of that evidence.

3              The other comments I want to make

4  are just regarding the third-party custodian.

5              **THE COURT:**  Before you do that,

6  what does that mean?  What's the significance of

7  that?  You said it's what's going on in his mind.

8  But what does it mean for purposes of these

9  proceedings?

10             **MS. SCHIFERLE:**  Right.  So that

11 that was the tool he had available to get that

12 job.  So I'm simultaneously applying for this

13 job, telling this company that I have this

14 skillset and they should hire me, and then while

15 I'm doing that, I'm thinking about my gun and

16 posting a picture of my gun on social media and

17 talking about how it's so beautiful.

18             **THE COURT:**  Okay.  But he didn't

19 send any of those posts to the parody website,

20 did he?

21             **MS. SCHIFERLE:**  No.

22             **THE COURT:**  Okay.  All right.

23 Okay.  I think I follow you.

24             **MS. SCHIFERLE:**  It was just

25 simultaneous internet activity.

County
**COURT REPORTERS**, Inc.
Videography          Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 54 of 107 PageID #: 228
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX    County Court Reporters.com

1                **THE COURT:**  Okay.  I follow you.

2                **MS. SCHIFERLE:**  Regarding the

3    proposed third-party custodian, the defendant's

4    sister certainly seems to be an upstanding member

5    of society.  I don't have any critique of her

6    personally.  The two points that I would just

7    make are that there's no guarantee he can get

8    this job in Ohio, and so if it's a condition of

9    his release to be employed, I don't think there's

10   any evidence that he definitely has that ability

11   to obtain employment up there.  And the argument

12   that she can take care of him even if he doesn't

13   have a job, I don't see how that helps him meet

14   that condition, if that condition is in place.

15                The other thing is that I don't

16   understand how if he goes to Ohio and stays with

17   the sister, the stress of sending money home just

18   goes away.  His mother testified yesterday, I

19   asked her, "Will it be a financial hardship for

20   you if he stays in jail?"  And she said, "That's

21   an understatement."  Now I understand that the

22   sister testified today that she won't allow him

23   to send money back home.  But I don't understand

24   how that pressure from Mom miraculously goes

25   away, right?  Mom has still said, "I need you.  I

1  need your monetary contributions to make our rent

2  and keep our home."  So I think that the

3  financial pressure to get a job, either legal or

4  illegal, is still going to be there for him.  I

5  don't see how that goes away.

6            So without any proof that he can

7  definitely get a legal job, to me, that

8  strengthens this idea that then he would still be

9  able to look for jobs that meet the skillset that

10 he believes that he has or that he likes to

11 market himself as having.  And so if he's able to

12 go up there and not obtain legal employment, or

13 even if he is able to obtain legal employment but

14 it's a minimum-wage job, and he still continues

15 to have this financial pressure from Mom, that

16 sort of factor that clouded his judgement, as his

17 sister testified, I don't see how that goes away.

18            **THE COURT:**  So you think that

19 because he would have that pressure that he would

20 then just seek out more jobs as a hitman?

21            **MS. SCHIFERLE:**  And probably be

22 more careful about it.

23            **THE COURT:**  Okay.

24            **MS. SCHIFERLE:**  I mean, that's his

25 skillset.  That's what he's put on his resume.

1  So I'm just taking his words.  I'm just taking

2  the information that he is giving me and doing my

3  best to try to protect people, Your Honor.

4              **THE COURT:**  Okay.  Thank you.

5              I want to take just a short recess

6  and look at a couple of things for just a minute.

7  If y'all will bear with me, I will be right back.

8  Thank you.  We'll be in recess.

9              **BAILIFF:**  All rise.

10  **(WHEREUPON, the Court took a brief recess.)**

11             **BAILIFF:**  All rise.

12             **THE COURT:**   All right.  We're

13  back on the record after a short recess.  First

14  of all, I want to take just a minute to thank the

15  lawyers for your efforts.  I appreciate your

16  skill and advocacy on these tough issues that the

17  Court has to decide and the benefit of strong

18  counsel is really important in these matters.  So

19  I want to acknowledge and thank both the lawyers

20  for your work in this case.

21             I also want to take a minute to

22  thank Ms. Diaz for being here today.  I know that

23  there's probably just about anywhere else in the

24  world you'd rather be than the federal courthouse

25  in Nashville, Tennessee on a Wednesday afternoon

1  or any other time for that matter.  But it's

2  really important to me for you to know how much I

3  appreciate you making the effort to be here.  I

4  know that wasn't easy for you.  You live a long

5  way away and the fact that you felt compelled to

6  come down here and your willingness to serve as

7  third-party custodian and your testimony and

8  those factors all mean a lot to me, and I just

9  want you know that.  There are a lot of people

10  that come in front of this court who don't have

11  anybody who's willing to stand up for them and

12  support them and be there for them no matter what

13  happens, and the fact that you have made the

14  efforts that you have really means a lot to me,

15  and I want you to know that.  I suspect and

16  certainly hope that my appreciation pales in

17  comparison to that of your brother's though

18  because at the end of the day, he's the one

19  you're here for, not me.  So I wanted to

20  acknowledge that and thank you for making that

21  effort.

22              The Bail Reform Act ordinarily

23  requires that a defendant be released pending

24  trial unless there are no conditions that will

25  reasonably ensure the appearance of the person at

1  future court proceedings and the safety of the

2  community.  The Court's to consider a number of

3  factors, including the nature and circumstance of

4  the offense charged; the weight of the evidence

5  against the defendant; the history and

6  characteristics of the definitely; and the nature

7  and seriousness of the danger posed by the

8  defendant's release.  In our society, liberty is

9  the norm and detention prior to trial or without

10  trial is the carefully limited exception, and

11  this Court's mindful of the tension between the

12  Bail Reform Act and the presumption of innocence

13  that applies to Mr. Garcia and all other

14  individuals who are accused of criminal offenses.

15            As the parties are aware, the

16  Court has to determine whether or not the

17  individual poses a likelihood of flight,

18  nonappearance, at future court proceedings, and

19  the issue of dangerousness to the community.

20  I'll first address the issue of flight.

21            The issue of flight is not really

22  a significant issue in this case.  The Government

23  didn't substantially argue it, although Ms.

24  Schiferle made allusions to it.  The Court

25  doesn't have any evidence before it that would

County
COURT REPORTERS, Inc.
Videography        Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 59 of 107 PageID #: 233
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  suggest that Mr. Garcia poses a risk of flight.

2  He has ties to the community.  He's been a member

3  of the military.  There's no evidence of prior

4  nonappearance.  Mostly, that's because he doesn't

5  have any prior criminal record that would have

6  involved court appearances.  But in any event, to

7  the extent that there's any risk or concern of

8  nonappearance in this case, the Court's satisfied

9  that there are conditions that I could impose

10 that would reasonably ensure his appearance at

11 future court proceedings.

12            With respect to the issue of

13 dangerousness which, as Mr. Fletcher pointed out,

14 is really sort of the meat and potatoes of this

15 determination, in order for a defendant to be

16 preventively detained, the Court must identify an

17 articulatable threat posed by the defendant to an

18 individual or the community.  And while that

19 threat need not be one of physical violence, it

20 must be clearly identified.  It must be

21 considered in context.  And in the final

22 analysis, a detention determination must be made

23 individually based on the evidence before the

24 Court regarding a particular defendant and

25 whether a defendant poses a particular threat

County
**COURT REPORTERS**, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 60 of 107 PageID #: 234
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  depends on the nature of the threat identified

2  and the resources and capabilities of a

3  particular defendant.

4                    This case is a difficult case in a

5  lot of regards.  The sort of sensational nature

6  of the allegations is unescapable.  As Ms.

7  Schiferle notes, this type of alleged conduct of

8  participating in murder-for-hire is extremely

9  concerning.  It's obviously concerning to the

10 Government.  It's concerning to the Court.  The

11 defendant's apparent willingness to engage in

12 this type of conduct is concerning as well.  The

13 Court notes as Ms. Schiferle pointed out, over

14 and over again, Mr. Garcia was given opportunity

15 after opportunity to say, no, I'm not going to do

16 this, I don't want to do this, I'm not interested

17 in doing this, I'm going to cut off conversation

18 and communication about this.  And he didn't do

19 so.  After he was arrested, he indicated that he

20 had a change of heart and didn't intend to do it.

21 But the problem is that no one ever really knows.

22                    He was also advised repeatedly

23 that he could reject this at any time.  And so

24 presumably, when the rubber met the road, so to

25 speak, and he had to make a determination about

County
CourtReporters, Inc.
Videography        Litigation Technology

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 61 of 107 PageID #: 235
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1  whether he was actually going to go through with

2  some sort of conduct, certainly at that point, he

3  could have.  And we'll never know for sure what

4  he would have done.  We can certainly hope what

5  he would have done, but this Court doesn't have

6  any certainty with regard to what would have

7  happened there.

8              What I do know is that he was led

9  down a path by the undercover agent in this case

10  that, in this Court's opinion, preyed upon some

11  vulnerabilities that this particular defendant

12  had in terms of his level of sophistication and

13  knowledge and also matters that were unknown and

14  unseen by the law enforcement officials that have

15  been testified to with regard to the family

16  situation that he was in and the burdens that

17  were being placed upon him in those

18  circumstances.  I think in large measures, it's

19  clear to the parties, and the Court made clear

20  during the hearing that a return to that familial

21  situation would not be an ideal scenario, and the

22  Court indicated I did not believe that would be

23  an appropriate release condition in the case,

24  which is what led to Ms. Diaz being called as a

25  witness in this matter and offered as a third-

County
**COURT REPORTERS, Inc.**
Videography    Litigation Technology™

Case 3:23-cr-00081   Document 21-2   Filed 04/22/23   Page 62 of 107 PageID #: 236
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1 party custodian.

2          As concerning as those facts are,

3 as I indicated, the threat has to be considered

4 in full context, given consideration to the

5 individual as well as their resources and

6 capabilities.  And that's where, in a lot of

7 ways, this case takes a totally different turn.

8 The website at issue is referred to, identified

9 in the complaint as a parody website.  There's

10 link to that website in the criminal complaint,

11 and the Court's looked at that website in the

12 context of this case.  It's almost unimaginable

13 that anybody could look at that website and think

14 it was any way real whatsoever.  They offer group

15 discounts and senior discounts.  It's just

16 unimaginable, I think as Ms. Diaz talked about,

17 that anybody would take further action upon

18 looking at that, but Mr. Garcia did.

19          And once he did, he started down a

20 path that I think the Government facilitated to a

21 certain extent with regard to its interactions to

22 him.  It's significant to me that he was advised

23 that just talking to them was not a crime, when

24 in fact it's using those instrumentalities,

25 communication through the internet and the

1 telephone, that is what he's charged with in this

2 case.  And again, it's particularly concerning to

3 me that of all the scenarios that the Government

4 could have come up with for him to engage in this

5 conduct, they chose a scenario that he had just

6 told them that was so concerning and so upsetting

7 to him that he actually considered violence

8 against an individual over it, and that is abuse

9 of a woman.  And that's the very scenario that

10 they presented to him as the proposed murder-for-

11 hire scheme in this case.

12            I think that's the significant

13 issue as it relates to determining the danger

14 that Mr. Garcia posed and his release would pose

15 in this case.  In my discussion with Ms.

16 Schiferle during argument, I noted that the

17 Government was aware of his desire, intention,

18 belief that he should engage in some sort of

19 violent acts against the girlfriend's abuser, and

20 Ms. Schiferle told me that they weren't concerned

21 about it because they shook hands about it, and

22 they didn't think that that was really a reason

23 to think he was a danger between that time and

24 the time he was arrested in this particular case.

25            I give great weight to that

County
COURT REPORTERS, Inc.
Videography   Litigation Technology

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 64 of 107 PageID #: 238
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

 1  determination by the Government because I

 2  recognize that the Government has investigative

 3  work to do.  They want to try to make cases and

 4  that sort of thing.  But if the harm that the

 5  Government's identified in this case that I have

 6  to protect the community from is that Mr. Garcia

 7  is going to engage in murderous conduct if I

 8  release him, then the fact that he indicated a

 9  desire or intent to engage in that type of

10  conduct and the Government decided they didn't

11  really need to do anything about it because they

12  shook hands on it suggests to me that maybe

13  everybody doesn't really think he's as dangerous

14  as he claims himself to be.

15              And I'm persuaded by Mr.

16  Fletcher's argument.  There was a whole lot of

17  puffery going on in this case, both from the

18  Government's standpoint in terms of things that

19  they were saying to sort of egg Mr. Garcia on, to

20  identify certain weaknesses that he had with

21  regard to things that would be appealing to him,

22  whether it be financial gain or whether it be a

23  sense of morality, if you will, about actions

24  that an individual should take.  But I'm not

25  convinced that there's reason to believe that Mr.

County
COURT REPORTERS, Inc.
Videography          Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 65 of 107 PageID #: 239
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    County Court Reporters.com

1  Garcia would engage in this conduct but for that

2  type of arrangement and situation.  And certainly

3  now understanding the consequences of his conduct

4  and understanding the error of his ways, based

5  upon those facts as well as the facts Mr.

6  Fletcher points out with regard to his lack of

7  prior criminal record, his lack of any

8  information involved with or engaging in criminal

9  conduct, I'm not satisfied that he poses a

10 significant danger to the community in

11 consideration of the particular circumstances

12 around this individual defendant and considering

13 his resources and capabilities.

14               I also, having made those findings

15 and recognizing that there remains a bit of a

16 tension in terms of the potential risk to the

17 community as well as those factors that suggest

18 that he does not pose a danger to the community

19 doesn't necessarily end the inquiry.  I still

20 have to determine whether or not there are

21 conditions that would reasonably ensure the

22 safety of the community in this particular

23 circumstance.

24               The defendant has offered Ms. Diaz

25 to serve as a third-party custodian.  The Court

1  has heard her testimony.  The Court is impressed

2  with Ms. Diaz as a witness.  The Court's

3  impressed with Ms. Diaz's level of commitment and

4  competency.  The fact that she, apparently on her

5  own after the Court had offered the opportunity

6  for remote proceedings, felt like it was

7  important enough for her to drive all the way

8  down here from Ohio to testify in this case tells

9  me a lot about the kind of person that she is.

10  More importantly, I think when I compare the

11  juxtaposition between Mr. Garcia's other family

12  members and Ms. Diaz, it seems to be an entirely

13  different type of situation and one that is much

14  better for a lot of reasons.  The Court believes

15  that Ms. Diaz is a no-nonsense kind of person.  I

16  believe that she understands the role and

17  responsibilities of a third-party custodian.

18  She's indicated a willingness to serve in that

19  capacity.  I believe she also recognizes some of

20  the limitations that her brother has and how

21  those limitations might have been fed into by his

22  living situation here in Nashville.  Ms. Diaz has

23  described her home as being a place that's in a

24  rural area that would be removed from a lot of

25  the potential opportunities that might exist for

County
CourtReporters, Inc.
Videography        Litigation Technology

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 67 of 107 PageID #: 241
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1 Mr. Garcia to potentially cause or create a risk

2 to the community.  And I think that this, along

3 with other conditions of release, would go a long

4 way toward mitigating any risk that might exist

5 to the community.

6              Having considered all of these

7 matters at length, giving appropriate

8 consideration to the 3142(g) factors, I'm

9 satisfied that there are conditions of release

10 that will reasonably ensure the safety of the

11 community.  And therefore, I'm going to order

12 that Mr. Garcia be released subject to the

13 following conditions.

14              Mr. Garcia, I want you to listen

15 closely to me.  I'm going to go through these

16 conditions at this time.  When I finish this, I'm

17 going to ask you some questions about it.  I'll

18 go through it rather quickly, but you will

19 receive a copy of it, and you'll have an

20 opportunity to discuss this and any other matters

21 that you need to with your lawyers.

22              It will be the order of the Court

23 that you will be released subject to the

24 following conditions.  You must not violate any

25 federal, state, or local law while on release.

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 68 of 107 PageID #: 242
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

1   You must advise the Court or pre-trial services

2   in writing before making any change of residence

3   or telephone number.  You must appear in court as

4   required.  If convicted, you must surrendered as

5   direct to serve any sentence the Court might

6   impose.

7              I'm going to order that you be

8   placed in the custody of Heather Diaz.  I will

9   order that you submit to supervision by and

10  report for supervision to the pre-trial services

11  office as directed.  You are to continue or

12  actively seek employment.  You're to surrender

13  your passport to the U.S. Probation Office.

14  You're not to obtain a passport or other

15  international travel documents.  You're to abide

16  by the following restrictions on personal

17  association, residence, or travel, meaning your

18  travel be limited to the Southern District of

19  Ohio and the Middle District of Tennessee without

20  prior approval of pre-trial services.  You're to

21  avoid all contact, directly or indirectly, with

22  any person who is or may be a victim or witness

23  in the investigation or prosecution of this

24  matter.

25              You're not to possess a firearm,

1  destructive device, or other dangerous weapon.

2  You're not use alcohol excessively.  You're not

3  to use or unlawfully possess a narcotic drug or

4  other controlled substance defined by the law

5  unless prescribed by a licensed medical

6  practitioner.  You're to submit to testing for

7  prohibited substances if required by pre-trial

8  services.  That testing may be used with random

9  frequency and may include urine testing, wearing

10  of a sweat patch, or testing system or any other

11  form of prohibited substance screening or

12  testing.  You're not to obstruct, attempt to

13  obstruct, or tamper with the efficiency or

14  inaccuracy of a prohibited substance screening or

15  testing.

16              You're to participate in the

17  following location restriction program and comply

18  with the requirements as directed by pre-trial

19  services, of home detention.  You'll be

20  restricted to your residence at all times except

21  for employment, education, religious services,

22  medical, substance abuse, or mental health

23  treatment, attorney visits, court appearances,

24  court-ordered obligations, or other activities

25  approved in advance by pre-trial services.

1  You're to submit to the location monitoring as

2  directed by pre-trial services and comply with

3  all the program requirements and instructions

4  provided for a period of 180 days.  You must pay

5  for all or part of the cost of the program based

6  on your ability to pay as determined by pre-trial

7  services.

8                    You're to report as soon as

9  possible within 48 hours to pre-trial services

10  every contact with law enforcement personnel

11  including arrests, questioning, or traffic stop.

12  You're to permit pre-trial services to visit you

13  at home or elsewhere at any time and allow the

14  officer to confiscate any contraband in plain

15  view.

16                    Violating any of the foregoing

17  conditions on release may result in an immediate

18  issuance of a warrant for your arrest or

19  revocation of your release, an order of

20  detention, and prosecution for contempt in court,

21  and could result in imprisonment, a fine, or

22  both.

23                    While on release if you commit a

24  federal felony offense, the punishment judicial

25  prison term of not more than ten years, and for a

County COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 71 of 107 PageID #: 245
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

 1  federal misdemeanor offense punishment judicial

 2  term of not more than one year.  The sentence

 3  will be consecutive, meaning in addition to any

 4  other sentence you receive.  It is a crime

 5  punishable up to ten years in prison and $250,000

 6  fine or both to obstruct a criminal

 7  investigation, tamper with a witness, victim, or

 8  informant, retaliate or attempt to retaliate

 9  against a witness, victim, or informant, or

10  intimidate or attempt to intimidate a witness,

11  victim, juror, informant, or officer of the

12  court.  The penalties for tapering, retaliation,

13  or intimidation are significantly more serious if

14  they involve the killing or attempted killing.

15              If after release you knowingly

16  fail to appear as the conditions of release

17  require or surrender to serve a sentence, you may

18  be prosecuted for failure to appear.  An

19  additional punishment may be imposed if you're

20  convicted of an offense punishable by a term of

21  imprisonment of five years or more but less than

22  15, you'll be fined not more than $250,000, or

23  imprisoned for not more than five years or both.

24  For a misdemeanor, you'd be fine not more than

25  $100,000 or imprisoned for not more than one year

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 72 of 107 PageID #: 246
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    CountyCourtReporters.com

 1  or both.  The term of imprisonment for failure to

 2  appear or surrender will be consecutive to any

 3  other sentence you receive.

 4             Ms. Diaz, if I could ask you to

 5  step back up, please, and I'm going to pass the

 6  order setting conditions of release down.  Mr.

 7  Fletcher, if you could assist Ms. Diaz in

 8  executing the document at the appropriate place

 9  on page 2 at the top.

10             **THE COURT:**  Wait right here, Ms.

11  Diaz.  Mr. Fletcher, if you have your client go

12  ahead and execute the document at page 3 on the

13  bottom.

14             The Court's in receipt of the

15  order setting conditions of release executed here

16  in open court today by Heather Diaz, whereas she

17  agrees to supervise the defendant and use every

18  effort to ensure the defendant's appearance at

19  all court proceedings and to notify the Court

20  immediately if the defendant violates a condition

21  of release or is no longer in her custody.

22             Ms. Diaz, is this your agreement,

23  and do you continue to commit to that agreement

24  to the Court?

25             **MS. DIAZ:**  I do.

1            **THE COURT:**  And you understand

2   that if you violate your obligations to the Court

3   that you could be held personally responsible?

4            **MS. DIAZ:**  I do.

5            **THE COURT:**  Does anything about

6   any of that or anything else that's happened

7   cause you any hesitation or make you want to

8   rethink your decision to serve as the third-party

9   custodian?

10           **MS. DIAZ:**  No.

11           **THE COURT:**  All right.  Thank you,

12  ma'am.

13           **MS. DIAZ:**  Thank you.

14           **THE COURT:**  The document's also

15  been executed here in open court by the

16  defendant, acknowledging that he's a defendant in

17  this case, that he's aware of the conditions of

18  release.  He promises to obey all the conditions

19  of release, to appear as directed, and surrender

20  to serve any sentence imposed and that he's aware

21  of the penalties and sanctions set forth in the

22  document that I reviewed.  This will be the order

23  of the Court.  Mr. Garcia is being released

24  subject to these conditions pending any

25  additional processing that may be required by the

1  marshals.

2              Mr. Garcia, I want you to know

3  that first of all, not everybody who come to

4  federal court gets released.  Obviously, the

5  Government believed that you should be detained

6  and they have vigorously asserted that position.

7  And while I disagree, it doesn't change the fact

8  that what you're charged with is extremely

9  serious.  And as serious as what you're charged

10 with is your actual conduct.  And I think that

11 you need to understand that the Court's going to

12 release you under some very strict conditions

13 here.

14             And it's very important that you

15 comply with all of these conditions.  Mr.

16 Fletcher and Ms. Alpert will tell you the most

17 important thing you can do between now and the

18 time you resolve this case is to sleep at the

19 foot of the cross and not have any more problems

20 with anything and that you not violate any of

21 these conditions of release because if you do,

22 you're going to end up right back there in that

23 green jumpsuit, and it's going to severely impede

24 your ability to aid in the defense of your case,

25 and it's also not going to be particularly

County
COURT REPORTERS, Inc.
Videography          Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 75 of 107 PageID #: 249
800.262.8777 TOLL-FREE    540.667.0600 LOCAL    540.667.6562 FAX    County CourtReporters.com

1  helpful for the outcome of your case, whatever

2  that may be.

3              If all of that is not motivation

4  enough, I certainly hope that your sister's

5  commitment and willingness to be here and stand

6  up for you and to serve as third-party custodian

7  will add to that feeling.  Because I hope you

8  wouldn't want to do anything that puts her in a

9  difficult position where she could ultimately get

10 in trouble for something that you're doing.  So I

11 think it's very important that you understand

12 that and that you comply with these conditions of

13 release.

14             All right.  That'll be the order

15 of the Court.  Ms. Schiferle, is there anything

16 further from the Government's standpoint?

17             **MS. SCHIFERLE:**  Yes, Your Honor.

18 The Government intends to appeal.  Will you grant

19 a stay for 24 hours?

20             **THE COURT:**  I'll give you until

21 10:00 tomorrow.

22             **MS. SCHIFERLE:**  10:00 tomorrow

23 morning?

24             **THE COURT:**  Yes.

25             **MS. SCHIFERLE:**  Thank you.

1          **THE COURT:**  Mr. Fletcher?

2          **MR. FLETCHER:**  Your Honor,

3  obviously, I would disagree with that you've

4  already, I don't think that there's a legal basis

5  for a stay.  Just for the record, Your Honor,

6  you've already determined that he should be

7  released.  I don't think there's anything legally

8  that entitles them to a stay, Your Honor.  But I

9  understand the Court's concern.  I understand

10 you're trying to balance the interest of both the

11 Government and the defendant, but I just want to

12 put that on the record for now.  But other than

13 that, Your Honor, that's it.

14         **THE COURT:**  All right.  Well, it's

15 3:00 in the afternoon.  If I denied the motion,

16 that just means everybody's going to have to

17 break their neck to get to the district court.

18 So I accept the Government's word that their

19 intention to appeal the decision, and I think

20 that a stay until tomorrow morning until 10:00 is

21 reasonable and provides adequate time for

22 everybody to do what they need to do and what

23 they think they need to do in this case.

24         Mr. Fletcher, anything further for

25 your client?

1              **MR. FLETCHER:**  Nothing further,

2    Your Honor.  Thank you.

3              **THE COURT:**  All right.  Very well.

4    We'll be in recess.  Thank you all.

5    **(WHEREUPON, the HEARING was adjourned.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CAPTION

2

3  The foregoing matter was taken on the date, and at

4  the time and place set out on the title page hereof.

5

6  It was requested that the matter be transcribed from

7  an audio recording and that the same be reduced to

8  typewritten form.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF TRANSCRIBER AND SECURE ENCRYPTED

2          SIGNATURE AND DELIVERY OF CERTIFIED TRANSCRIPT

3          I, **KATHRYN REED**, do hereby certify that the

4    forgoing matter was transcribed verbatim from an

5    audio recording provided to me, that the transcript

6    prepared by me or under my direction, is a true and

7    accurate record of same to the best of my knowledge

8    and ability; that there is no relation nor employment

9    by any attorney or counsel employed by the parties

10   hereto, nor financial or otherwise interest in the

11   action filed or its outcome.

12         This transcript and certificate have been

13   digitally signed and securely delivered through our

14   encryption server.

15         IN WITNESS HEREOF, I have here unto set my hand

16   this 22ND day of APRIL, 2023.

17

18

19

20

21   /s/ KATHRYN REED

22   TRANSCRIBER

23

24

25

**$**

**$100,000**
  72:25

**$2,500** 24:4

**$250,000**
  72:5 72:22

**1**

**10:00** 76:21
  76:22 77:20

**11** 7:16

**13** 9:2

**14** 9:2

**15** 72:22

**180** 71:4

**19** 5:4

**2**

**2** 73:9

**2020** 24:22

**2023** 5:4

**20th** 53:18

**21** 21:3
  39:14

**21-year-old**
  38:14 39:17

**23MJ2033**
  5:10

**24** 76:19

**3**

**3** 6:4 8:6
  36:10 73:12

**3:00** 77:15

**3142(g** 68:8

**4**

**48** 71:9

**5**

**5635** 7:7

**6**

**6th** 28:10
  33:1

**A**

**abide** 20:20
  69:15

**abilities**
  22:20

**ability**
  55:10 71:6
  75:24

**able** 12:19
  12:24 15:10
  15:16 15:22
  16:16 17:24
  18:24 47:14
  56:9 56:11
  56:13

**absence** 26:2

**absent** 44:2

**absolutely**
  10:2 41:11

**abuse** 50:13
  50:15 64:8
  70:22

**abused** 34:10

**abuser** 64:19

**abusing**
  28:11

**abusive** 29:1

**accept** 39:12
  39:13 48:20
  77:18

**access** 27:15

**accused**
  59:14

**acknowledge**
  57:19 58:20

**acknowledgin
g** 74:16

**Act** 58:22
  59:12

**action** 63:17

**actions**
  65:23

**actively**
  46:25 47:2
  69:12

**activities**
  36:3 70:24

**activity**
  54:25

**acts** 27:14
  64:19

**actual** 14:3
  51:3 75:10

**actually**
  14:11 19:5
  19:20 32:25
  33:1 33:2
  33:4 38:20

  62:1 64:7

**adage** 25:13
  36:23

**add** 76:7

**addition**
  72:3

**additional**
  50:8 72:19
  74:25

**additionally**
  14:19

**address** 20:3
  59:20

**adequate**
  77:21

**adjourned**
  78:5

**admittedly**
  26:6

**advance**
  70:25

**advise** 69:1

**advised**
  61:22 63:22

**advocacy**
  57:16

**afar** 23:1

**affirm** 6:12

**afternoon**
  5:7 12:13
  12:14 57:25
  77:15

**against** 59:5
  64:8 64:19

County **COURT REPORTERS**, Inc.
Videography   Litigation Technology™
800.262.8777 TOLL-FREE   •   540.667.0600 LOCAL   •   540.667.6562 FAX   CountyCourtReporters.com

Case 3:23-cr-00081   Document 21-2   Filed 04/22/23   Page 81 of 107 PageID #: 255

72:9

**agent** 33:20
33:22 38:9
40:10 41:16
41:19 41:19
41:21 41:22
42:6 42:8
42:10 42:15
42:23 43:10
45:20 46:16
48:19 48:24
49:7 62:9

**agents** 34:16
34:24 37:18
39:1 39:2
39:3 39:9
39:25 52:19

**agent's**
42:11

**ago** 11:6
12:23

**agreement**
31:7 33:4
33:9 73:22
73:23

**ahead** 18:9
73:12

**aid** 75:24

**Air** 25:12
37:10 37:16
51:25

**alcohol** 70:2

**allegations**
61:6

**alleged**
51:13 61:7

**alleviate**
15:11

**allow** 20:17
31:12 44:19
50:5 55:22
71:13

**allusions**
59:24

**alone** 7:12

**Alpert** 75:16

**already**
15:12 24:8
34:9 77:4
77:6

**am** 15:24
22:7 22:8
23:9 23:9
24:16

**Amanda** 7:7

**America** 5:9

**ammunition**
25:11 42:19
42:19

**analysis**
60:22

**announcement
s** 5:15 5:22

**answer** 17:25
30:12 34:12

**anybody** 21:5
22:24 30:15
30:18 34:4
58:11 63:13
63:17

**anyone** 48:5

48:5 48:6
52:23

**anything**
22:1 39:4
39:15 39:21
41:22 49:10
65:11 74:5
74:6 75:20
76:8 76:15
77:7 77:24

**anywhere**
57:23

**apartment**
10:8 10:17

**apparent**
61:11

**apparently**
30:6 41:20
67:4

**appeal** 76:18
77:19

**appealing**
65:21

**appear** 17:19
69:3 72:16
72:18 73:2
74:19

**appearance**
13:19 58:25
60:10 73:18

**appearances**
60:6 70:23

**application**
41:18

**applied**
38:20

**applies**
59:13

**apply** 20:1
25:13

**applying**
54:12

**appreciate**
12:21 21:12
57:15 58:3

**appreciation**
58:16

**appropriate**
62:23 68:7
73:8

**approval**
69:20

**approved**
70:25

**Approximatel
y** 9:1

**April** 5:4
28:10 33:1

**AR** 53:16
53:17

**AR15** 37:12

**AR-15** 46:8
46:12

**area** 24:8
67:24

**argue** 59:23

**argument**
36:17 36:22
41:6 51:3
51:8 55:11

64:16 65:16

**Army** 51:19
51:23

**arrangement**
66:2

**arrest** 31:9
31:11 71:18

**arrested**
9:16 9:18
30:8 44:16
61:19 64:24

**arrests**
71:11

**arsenal** 29:2

**articles**
13:25 20:1

**articulatabl
e** 60:17

**aside** 44:5

**assassin**
40:17

**assault**
22:23

**asserted**
75:6

**assist** 11:1
73:7

**assisting**
11:9

**association**
69:17

**assume** 13:2

**attempt**
70:12 72:8

72:10

**attempted**
72:14

**attorney**
70:23

**attorneys**
5:11

**audible** 6:15

**AUDIO** 5:1

**authorities**
11:21

**available**
54:11

**avoid** 69:21

**aware** 9:11
59:15 64:17
74:17 74:20

**away** 15:14
27:12 27:17
31:21 31:24
38:19 38:21
47:5 55:18
55:25 56:5
56:17 58:5

**awry** 52:1

**A-Z** 6:20

———————
B
———————

**background**
34:1 49:24

**bad** 29:25

**Bail** 58:22
59:12

**BAILIFF** 5:5

57:9 57:11

**balance**
77:10

**bare** 48:2

**barrier** 30:1

**base** 40:13

**based** 10:13
30:22 30:23
34:19 35:1
41:1 47:22
50:15 60:23
66:4 71:5

**basically**
23:10 40:22

**basis** 77:4

**bathroom**
10:9

**bear** 57:7

**beat** 29:24

**beautiful**
53:18 53:25
54:17

**become** 9:11

**bedroom** 10:8
25:10

**bedrooms**
10:12

**beforehand**
46:3

**begin** 19:2
19:5

**behavior**
26:1

**belief** 64:18

**believe**
14:25 18:14
18:22 27:16
30:6 34:19
37:5 38:13
39:7 39:13
40:14 40:18
41:14 42:8
42:12 43:25
44:10 46:2
46:18 46:19
49:13 50:15
52:17 62:22
65:25 67:16
67:19

**believed**
40:15 75:5

**believes**
56:10 67:14

**benefit**
57:17

**best** 18:23
57:3

**better** 46:23
67:14

**bit** 45:10
66:15

**blowing**
14:11

**BMW** 24:22

**body** 22:19

**boot** 18:19

**boss** 8:20

**bottom** 10:17
73:13

**bought** 42:21

45:16 45:17
46:3 46:4
46:6 46:12
46:13

**Bowling** 8:24

**boyfriend**
29:24 31:17
44:23 52:24

**break** 77:17

**breathe** 19:6

**brief** 57:10

**bringing**
38:18

**brother** 9:5
9:25 11:12
11:21 12:24
13:16 15:6
16:16 18:14
25:2 67:20

**brother's**
58:17

**brought**
36:21 39:5
39:6

**bullets** 43:2

**bunked** 47:4

**burden** 53:5

**burdens**
62:16

**buy** 24:11
24:13 24:15
24:19 24:24
46:5

————————
C
————————

**camp** 18:19

**cans** 45:10

**capabilities**
61:2 63:6
66:13

**capacity**
67:19

**caption**
53:17

**car** 44:13
44:20

**care** 19:8
52:12 55:12

**career** 19:15

**careful**
56:22

**carefully**
59:10

**case** 5:9
6:12 14:2
35:3 38:13
40:22 57:20
59:22 60:8
61:4 61:4
62:9 62:23
63:7 63:12
64:2 64:11
64:15 64:24
65:5 65:17
67:8 74:17
75:18 75:24
76:1 77:23

**cases** 65:3

**cash** 20:5
24:4

**catch** 16:1

**caught** 23:4

**cause** 68:1
74:7

**causing**
28:25

**certain**
27:13 63:21
65:20

**certainly**
26:20 28:3
55:4 58:16
62:2 62:4
66:2 76:4

**certainty**
62:6

**chance** 44:14
44:14 44:16

**chances**
46:14

**change** 44:11
61:20 69:2
75:7

**character**
49:22 49:23

**characterist
ics** 59:6

**characteriza
tion** 36:8

**characters**
27:20

**charge** 16:25
31:14

**charged** 14:3
17:7 17:9

32:19 32:25
33:10 59:4
64:1 75:8
75:9

**charges**
38:24 48:1

**check** 24:7

**Chillicothe**
7:8

**choice** 34:24

**chose** 26:12
34:8 34:17
64:5

**chosen** 34:4
34:19

**CIA** 40:17

**circles**
48:10

**circumstance**
59:3 66:23

**circumstance
s** 20:22
62:18 66:11

**city** 10:20

**claims** 65:14

**clear** 62:19
62:19

**clearly** 40:4
60:20

**CLERK** 6:10
6:16 6:21
7:2

**client** 73:11
77:25

clip 28:19

clips 38:5
39:6 48:17

closed 8:3

closely
68:15

closer 45:11

clouded
14:14 19:24
20:4 20:9
56:16

clue 42:4
49:24 49:25
50:1

coincidence
34:8

college
23:13

Columbus
16:3

combination
49:14

comfortable
29:12

coming 12:17
18:15 35:15
38:10

comments
34:19 54:3

commerce
17:10 17:20
32:20 33:17

commission
17:20

commit 27:23
71:23 73:23

commitment
67:3 76:5

common 34:17

communicated
38:6 38:25

communicatio
n 30:4 33:8
61:18 63:25

communicatio
ns 33:20

community
27:7 41:2
41:10 43:14
43:17 43:22
43:22 47:25
49:16 49:19
50:10 50:21
59:2 59:19
60:2 60:18
65:6 66:10
66:17 66:18
66:22 68:2
68:5 68:11

company 16:2
16:4 23:4
26:19 32:15
32:20 54:13

compare
67:10

comparison
58:17

compelled
58:5

competency

67:4

complaint
14:4 14:5
33:16 63:9
63:10

compliance
11:10

comply 11:21
70:17 71:2
75:15 76:12

concern
30:14 60:7
77:9

concerned
34:9 34:21
64:20

concerning
39:1 61:9
61:9 61:10
61:12 63:2
64:2 64:6

concerns
20:10

condition
20:21 55:8
55:14 55:14
62:23 73:20

conditions
49:14 50:8
50:19 50:19
58:24 60:9
66:21 68:3
68:9 68:13
68:16 68:24
71:17 72:16
73:6 73:15
74:17 74:18

74:24 75:12
75:15 75:21
76:12

condoning
40:19

conduct 51:5
61:7 61:12
62:2 64:5
65:7 65:10
66:1 66:3
66:9 75:10

confident
30:17 30:22
30:23 31:5

confirmed
49:7

confiscate
71:14

Confront
20:23

connected
49:6 49:8

consecutive
72:3 73:2

consequences
66:3

consider
59:2

consideratio
n 63:4
66:11 68:8

considered
23:15 60:21
63:3 64:7
68:6

considering

29:19 66:12

**consulted**
16:24

**contact**
69:21 71:10

**contacted**
12:2

**contacting**
11:20

**contempt**
71:20

**context** 29:8
35:13 60:21
63:4 63:12

**continuance**
5:13

**CONTINUATION**
8:11 16:10
17:22

**continue**
13:15 20:12
69:11 73:23

**continues**
56:14

**contraband**
71:14

**contribute**
15:7

**contribution
s** 56:1

**controlled**
70:4

**conversation**
12:20 18:13
22:17 29:4

29:10 32:24
35:17 41:24
42:6 61:17

**conversation
s** 10:14
24:12 34:13
35:2 42:22
46:2

**convicted**
69:4 72:20

**convinced**
65:25

**copy** 68:19

**corner** 44:12
44:18

**correct** 9:19
15:9 15:23
18:1 32:13
32:17 53:16

**corroborated**
39:25

**cost** 71:5

**council** 38:3

**counsel**
36:21 36:23
40:21 57:18

**counterpoint
s** 53:7

**country**
10:21

**couple** 57:6

**course** 29:4

**court** 5:6
5:18 5:21
6:8 6:10

6:16 6:21
6:25 7:6
8:7 11:11
11:15 12:7
13:16 13:19
16:7 16:9
17:6 17:11
17:14 17:17
18:5 18:9
18:13 19:13
19:18 19:21
20:10 20:15
20:18 21:1
21:5 21:8
21:10 21:15
21:18 21:23
22:4 22:9
27:5 27:22
28:9 28:14
30:3 30:21
30:23 31:23
32:1 32:5
32:7 32:11
32:18 33:6
33:14 33:19
33:25 34:3
34:7 34:18
34:22 35:6
35:23 36:1
36:14 36:17
40:24 41:4
41:6 41:8
41:8 43:16
43:18 49:14
50:5 50:8
50:17 50:19
50:22 51:22
53:2 53:13
54:5 54:18
54:22 55:1

56:18 56:23
57:4 57:10
57:12 57:17
58:10 59:1
59:16 59:18
59:24 60:6
60:11 60:16
60:24 61:10
61:13 62:5
62:19 62:22
66:25 67:1
67:5 67:14
68:22 69:1
69:3 69:5
70:23 71:20
72:12 73:10
73:16 73:19
73:19 73:24
74:1 74:2
74:5 74:11
74:14 74:15
74:23 75:4
76:15 76:20
76:24 77:1
77:14 77:17
78:3

**courthouse**
57:24

**court-
ordered**
70:24

**courtroom**
5:11 21:16
22:10 25:25

**Court's**
11:10 59:2
59:11 60:8
62:10 63:11
67:2 73:14

75:11 77:9

COVID 8:2
9:1

create 68:1

created
33:22

crime 32:15
32:21 32:25
63:23 72:4

criminal
14:3 25:23
26:2 27:1
43:20 44:2
44:3 59:14
60:5 63:10
66:7 66:8
72:6

critique
55:5

cross 12:11
16:10 17:22
75:19

current 9:12

currently
7:23

custodian
11:5 11:8
12:18 46:22
50:7 54:4
55:3 58:7
63:1 66:25
67:17 74:9
76:6

custody 69:8
73:21

cut 22:25

22:25 61:17

---
D
---

Dad 15:21
15:24

danger 27:2
27:6 27:25
30:4 30:7
31:6 31:8
31:14 41:1
43:13 43:17
43:21 43:22
47:25 49:16
49:19 50:21
51:3 59:7
64:13 64:23
66:10 66:18

dangerous
26:1 28:5
43:6 44:7
44:22 44:24
45:11 45:12
45:24 65:13
70:1

dangerousnes
s 32:10
45:4 59:19
60:13

dates 14:20

daughter 8:2

daughters
7:16

day 9:14
26:17 45:18
53:11 53:19
58:18

daycare 8:3

8:4

Daycares 8:2

days 37:6
43:16 49:12
50:17 71:4

deal 20:13
23:18 24:22

dealing 31:3

decide 57:17

decided
29:21 65:10

decision
74:8 77:19

decline
23:19

deemed 31:14

defendant
19:14 22:23
23:14 23:23
24:12 27:2
28:6 30:14
35:15 58:23
59:5 60:15
60:17 60:24
60:25 61:3
62:11 66:12
66:24 73:17
73:20 74:16
74:16 77:11

defendant's
22:11 25:15
55:3 59:8
61:11 73:18

defense
75:24

defined 70:4

definitely
15:2 55:10
56:7 59:6

denied 77:15

department
16:13

depends 61:1

describe
8:18 10:4
10:5

described
67:23

desire 26:9
28:22 64:17
65:9

despite
26:25

destructive
70:1

details 24:2
24:3

detain 27:4
30:10 40:25

detained
60:16 75:5

detaining
47:22 47:23

detention
5:13 50:11
50:24 59:9
60:22 70:19
71:20

determinatio
n 40:24

50:25 60:15
60:22 61:25
65:1

**determine**
37:24 43:21
59:16 66:20

**determined**
71:6 77:6

**determining**
64:13

**device** 70:1

**D-I** 6:19

**Diaz** 6:1
6:19 7:1
7:5 7:15
7:17 7:17
12:13 18:12
21:11 47:8
57:22 62:24
63:16 66:24
67:2 67:12
67:15 67:22
69:8 73:4
73:7 73:11
73:16 73:22
73:25 74:4
74:10 74:13

**Diaz's** 67:3

**different**
33:16 39:7
48:24 51:25
63:7 67:13

**difficult**
10:24 61:4
76:9

**dining** 10:11

**direct** 7:3
8:11 69:5

**directed**
69:11 70:18
71:2 74:19

**direction**
15:2

**directly**
36:22 69:21

**disagree**
38:2 75:7
77:3

**disappointin
g** 14:11

**discounts**
63:15 63:15

**discuss**
68:20

**discussed**
35:2

**discussion**
64:15

**discussions**
34:15

**disregard**
13:24

**district**
26:16 69:18
69:19 77:17

**document**
14:3 73:8
73:12 74:22

**documents**
69:15

**document's**

74:14

**done** 39:15
43:8 50:1
62:4 62:5

**downstairs**
10:7 10:7

**drew** 22:23

**drive** 6:3
7:11 12:15
24:7 24:23
44:20 67:7

**driving**
33:12

**drove** 6:2
24:22

**drug** 70:3

**duly** 7:1

**duress** 38:14
47:19 52:6

**during** 31:15
62:20 64:16

_____
E
_____
**ear** 22:25

**earlier**
34:20

**earned** 35:19
36:5 36:12
37:21

**ears** 25:21

**easier** 32:6

**Easter** 9:10
14:17 14:21

**easy** 58:4

**education**
70:21

**effects**
23:16

**efficiency**
70:13

**effort** 58:3
58:21 73:18

**efforts**
57:15 58:14

**egg** 65:19

**either** 15:18
20:19 56:3

**else** 20:24
26:8 29:14
29:20 57:23
74:6

**elsewhere**
71:13

**email** 6:4

**emailing**
53:22

**employ** 16:24
28:23

**employed**
8:23 22:12
47:3 55:9

**employment**
10:24 11:2
19:8 26:21
30:19 39:22
55:11 56:12
56:13 69:12
70:21

**enforcement**

30:5 62:14
71:10

**engage** 61:11
64:4 64:18
65:7 65:9
66:1

**engaged** 48:9
51:4

**engaging**
66:8

**ensure** 49:15
50:9 50:20
58:25 60:10
66:21 68:10
73:18

**entire** 51:16

**entirely**
67:12

**entitles**
77:8

**environment**
46:23 47:4
48:8

**equally** 28:5

**equals** 31:2

**error** 66:4

**event** 60:6

**everybody**
20:24 65:13
75:3 77:22

**everybody's**
77:16

**everyone** 5:7

**everything**
17:2 17:4

28:20 38:7
38:11 41:17
42:9 42:10
43:15 46:16

**evidence**
25:16 35:12
37:7 37:9
37:15 37:20
37:24 39:18
41:3 41:11
45:3 47:23
48:3 48:4
48:5 48:12
48:13 49:17
49:18 51:10
51:11 54:2
55:10 59:4
59:25 60:3
60:23

**evolved** 29:5

**ex** 31:16

**exact** 31:2

**exactly** 7:9
8:15 8:18
27:6 32:21
40:7

**EXAMINATION**
7:3 8:11
12:11 16:10
17:22 18:10

**examined** 7:2

**except** 36:4
70:20

**exception**
59:10

**excessively**

70:2

**exchange**
31:10

**exchanging**
53:19

**excited** 22:8
23:9 24:25

**excused**
21:17

**execute**
73:12

**executed**
73:15 74:15

**executing**
73:8

**exercise**
20:12

**ex-**
**girlfriend**
29:1 29:17
42:1

**ex-**
**girlfriend'**
**s** 44:23
52:24

**Exhibit**
36:10

**exist** 67:25
68:4

**experience**
36:12 37:22

**explain**
18:12 18:21

**expressed**
27:9 48:18

48:23

**expungable**
28:25

**extent** 60:7
63:21

**extremely**
61:8 75:8

**eyeing** 26:23

---
F
---

**Facebook**
45:14 45:15
53:9

**facilitated**
63:20

**facilities**
17:20

**fact** 22:22
26:2 29:9
29:11 32:18
38:19 48:16
58:5 58:13
63:24 65:8
67:4 75:7

**factor** 23:24
35:1 56:16

**factors** 41:1
58:8 59:3
66:17 68:8

**facts** 25:7
63:2 66:5
66:5

**fail** 72:16

**fails** 11:21

**failure**

72:18 73:1

**fall** 27:20

**familial**
62:20

**family** 25:1
40:3 40:4
40:6 40:14
40:19 47:21
48:6 62:15
67:11

**FBI** 9:15
31:13

**February**
53:18

**fed** 67:21

**federal**
16:25 25:5
31:20 57:24
68:25 71:24
72:1 75:4

**feel** 19:24
20:8 29:12
30:21 30:23
45:10

**feeling** 76:7

**felony** 71:24

**felt** 6:5
30:9 30:17
31:4 58:5
67:6

**fictional**
24:2

**Fifty** 25:20

**fight** 43:13

**final** 17:25

**financial**
18:18 19:24
55:19 56:3
56:15 65:22

**finding**
10:24 44:6

**findings**
66:14

**finds** 50:20

**fine** 22:19
22:20 71:21
72:6 72:24

**fined** 72:22

**finger** 23:1

**fingers**
25:21

**finish** 68:16

**firearm** 25:9
42:18 42:21
42:25 69:25

**fired** 28:24

**fires** 8:20

**first** 22:13
22:15 23:20
36:19 37:6
39:11 42:20
47:9 48:18
51:1 53:7
57:13 59:20
75:3

**fits** 28:8

**five** 44:15
72:21 72:23

**fix** 29:2

**fixes** 8:21

**flee** 32:6

**Fletcher**
5:22 5:24
6:23 7:4
8:7 8:10
8:12 12:5
18:5 18:7
18:11 19:11
21:7 21:19
21:21 36:9
36:18 36:19
50:22 51:7
52:4 60:13
66:6 73:7
73:11 75:16
77:1 77:2
77:24 78:1

**Fletcher's**
65:16

**flight** 32:8
41:2 41:4
41:7 41:11
41:12 43:11
43:24 49:17
59:17 59:20
59:21 60:1

**floor** 10:11

**follower**
41:15

**Food's** 15:18

**foolish**
38:17

**foot** 75:19

**Force** 25:12

**foregoing**
71:16

**foremost**
36:20 37:7

**for-hire**
17:16 17:21

**form** 50:10
50:11 70:11

**forth** 12:25
74:21

**forward** 30:5
44:20

**four-bedroom**
10:6

**frankly**
31:22 34:16
36:25

**FRENSLEY** 5:3

**frequency**
70:9

**front** 36:7
58:10

**full** 63:4

**full-time**
13:2

**future** 11:16
25:25 51:1
59:1 59:18
60:11

———————
G
———————

**gain** 48:21
65:22

**gainful**
26:20

County
COURT REPORTERS, Inc.
Videography   Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 90 of 107 PageID #: 264
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX    CountyCourtReporters.com

gaining 11:2

game 35:21

gaming 36:2

Garcia 5:9
  5:10 9:4
  10:15 10:22
  18:25 27:7
  37:6 37:8
  40:25 42:7
  42:7 43:17
  46:23 47:2
  47:3 48:17
  49:5 49:16
  50:17 50:20
  59:13 60:1
  61:14 63:18
  64:14 65:6
  65:19 66:1
  68:1 68:12
  68:14 74:23
  75:2

Garcia's 6:1
  43:25 67:11

gate 37:10

generally
  47:5

genuinely
  40:14 40:14
  44:11

gets 16:20
  29:23 47:12
  75:4

getting 43:7
  46:14

girlfriend
  28:12 41:25

42:3 42:5

girlfriend's
  31:17 64:19

girls 10:12
  13:6 13:11

given 23:18
  61:14 63:4

gives 36:7

giving 15:17
  57:2 68:7

God 26:14

gone 47:17

gotten 51:19

Government
  5:16 21:24
  45:13 59:22
  61:10 63:20
  64:3 64:17
  65:1 65:2
  65:10 75:5
  76:18 77:11

governmental
  40:16

Government's
  53:5 65:5
  65:18 76:16
  77:18

GPS 50:11

graduated
  14:9 18:19

grant 76:18

granted
  27:15

great 25:3

50:6 64:25

green 8:24
  75:23

grew 20:6
  48:7

group 63:14

guarantee
  55:7

Guard 37:11
  37:17 51:25

Guardsman
  37:9 37:16

guess 7:25
  18:23

guide 15:2

gun 37:13
  37:13 37:15
  37:25 38:1
  42:17 43:3
  43:4 43:5
  43:8 45:6
  45:7 45:8
  45:9 45:12
  45:16 45:17
  45:17 45:21
  45:22 45:23
  45:25 46:8
  46:12 49:25
  50:2 51:10
  52:18 52:23
  53:8 53:10
  53:14 53:24
  54:15 54:16

guns 24:15
  24:19 24:24
  48:3

H

Hamilton
  7:16

hand 6:11

handgun
  24:13

hands 30:16
  64:21 65:12

handshake
  30:22

happen 23:3
  51:1

happened 8:2
  9:1 9:25
  17:3 38:4
  43:23 43:25
  45:19 45:20
  51:16 52:22
  62:7 74:6

happens 13:6
  29:23 58:13

harder 8:8

hardship
  55:19

Harley 7:16
  8:2

harm 65:4

haven't
  17:24

having 7:1
  11:14 13:3
  14:22 23:22
  26:18 26:18
  56:11 66:14

68:6

**head** 38:11

**health** 44:4
44:6 70:22

**hear** 40:23

**heard** 15:5
22:5 28:20
35:9 35:10
38:5 39:6
40:21 67:1

**hearing** 5:1
5:13 25:16
62:20 78:5

**hearings**
11:16

**heart** 61:20

**Heather** 6:19
7:1 69:8
73:16

**he'd** 51:23

**held** 74:3

**he'll** 11:16
15:16 47:5
51:4

**help** 12:24
14:25 15:11
15:21 24:21
26:21 46:13
47:21 52:8

**helpful** 76:1

**helps** 55:13

**he's** 8:20
9:5 13:8
14:24 17:3
17:7 17:8

20:11 21:3
25:23 27:9
27:17 27:23
27:24 30:4
31:5 31:8
31:16 32:7
32:19 39:14
39:17 41:1
41:2 41:3
41:4 41:4
41:10 41:12
41:15 44:4
44:5 44:7
44:21 45:11
45:12 45:24
46:8 47:4
47:10 47:14
47:20 47:24
48:3 48:4
48:9 49:18
49:24 49:25
52:15 53:19
53:22 56:11
56:25 58:18
60:2 64:1
65:13 74:16
74:17 74:20

**hesitation**
48:18 48:22
74:7

**Hey** 24:11

**high-end**
25:4

**hire** 17:13
27:24 29:13
29:13 29:16
54:14 64:11

**hired** 16:20

22:12 26:16
27:3 28:4

**hires** 8:20

**hiring** 29:20

**history**
43:21 44:2
44:3 50:12
59:5

**hitman** 14:22
19:16 20:1
38:20 39:21
56:20

**home** 10:4
10:4 10:5
10:19 13:3
13:11 15:20
15:24 18:15
18:16 18:22
24:20 47:6
50:11 50:18
52:11 55:17
55:23 56:2
67:23 70:19
71:13

**homeschooled**
20:7

**honor** 5:17
5:24 6:2
6:24 8:10
12:5 12:6
18:7 19:12
21:7 21:9
21:22 22:2
22:9 26:25
34:12 36:9
36:19 36:22
36:25 37:7
37:8 37:14

37:17 37:23
38:2 38:7
38:12 38:17
38:24 39:1
39:13 40:2
40:12 40:13
40:18 40:22
40:24 41:2
41:13 41:18
41:23 42:2
42:2 42:5
42:16 42:20
43:6 43:12
43:14 43:19
44:9 44:13
44:19 45:2
45:8 45:10
45:15 45:21
45:23 46:2
46:4 46:7
46:11 46:14
46:18 46:21
47:6 47:10
47:13 47:16
47:18 47:24
48:1 48:10
48:11 48:12
48:16 48:22
49:1 49:3
49:5 49:9
49:11 49:15
49:19 50:3
50:7 51:7
51:9 51:13
51:15 52:5
52:7 52:17
52:20 53:1
53:7 57:3
76:17 77:2
77:5 77:8

77:13 78:2

**HONORABLE**
  5:2

**Honor's**
  30:12 31:1

**hope** 58:16
  62:4 76:4
  76:7

**hours** 6:2
  71:9 76:19

**house** 9:15
  15:14 20:17
  50:6 52:10

**household**
  15:8

**HR** 16:22
  16:24

**human** 25:5
  28:24

**Hunter** 40:10
  49:7

**hurt** 42:1
  42:1

**hurts** 21:3

**husband** 7:15
  7:20 8:13
  8:15 11:3
  13:2 13:4
  15:12 15:13
  16:2 16:12
  18:24 19:7
  46:24

**husband's**
  46:25 47:1

———————
          I

**idea** 51:24
  52:14 56:8

**ideal** 62:21

**identified**
  60:20 61:1
  63:8 65:5

**identify**
  60:16 65:20

**identity**
  33:23

**I'll** 6:6
  11:4 21:25
  22:24 22:25
  22:25 23:1
  28:23 36:22
  49:5 53:3
  59:20 68:17
  76:20

**illegal**
  40:19 56:4

**I'm** 5:25
  12:25 15:15
  16:19 17:14
  19:19 20:5
  22:20 22:24
  23:12 24:5
  24:6 24:7
  24:18 24:19
  24:20 24:21
  29:18 29:19
  32:9 38:19
  38:20 38:22
  41:24 52:4
  54:12 54:15
  54:15 57:1
  57:1 61:15
  61:16 61:17
  65:15 65:24

66:9 68:8
  68:11 68:15
  68:16 69:7
  73:5

**immediate**
  31:6 71:17

**immediately**
  19:2 19:5
  73:20

**impede** 75:23

**important**
  12:16 12:18
  23:24 28:18
  29:9 47:16
  57:18 58:2
  67:7 75:14
  75:17 76:11

**importantly**
  45:2 46:10
  47:7 67:10

**impose** 60:9
  69:6

**imposed**
  72:19 74:20

**impressed**
  67:1 67:3

**imprisoned**
  72:23 72:25

**imprisonment**
  71:21 72:21
  73:1

**inaccuracies**
  42:13

**inaccuracy**
  70:14

**incident**

9:12 9:12
  47:9

**include** 70:9

**including**
  59:3 71:11

**indicated**
  61:19 62:22
  63:3 65:8
  67:18

**indirectly**
  69:21

**individual**
  59:17 60:18
  63:5 64:8
  65:24 66:12

**individually**
  60:23

**individuals**
  59:14

**informant**
  72:8 72:9
  72:11

**information**
  9:24 57:2
  66:8

**initially**
  35:20

**innocence**
  59:12

**in-person**
  23:8

**inquiry**
  66:19

**insinuation**
  53:10

instructions
71:3

instrument
33:7

instrumental
ities 63:24

instrumental
ity 17:9

intend 61:20

intended
53:9 53:11

intends
76:18

intent 65:9

intention
64:17 77:19

interactions
63:21

interest
27:10 77:10

interested
61:16

interests
19:15

internationa
l 69:15

internet
27:20 33:17
54:25 63:25

interstate
17:19 32:19
33:8 33:16

interview
28:18 35:22

intimidate
72:10 72:10

intimidation
72:13

introduced
28:19 53:8

introducing
53:20

investigatio
n 69:23
72:7

investigativ
e 65:2

involve
72:14

involved
25:4 60:6
66:8

isn't 10:14
32:18 32:20
32:24

issuance
71:18

issue 21:4
40:3 43:12
43:14 44:4
44:6 59:19
59:20 59:21
59:22 60:12
63:8 64:13

issues 44:5
50:13 50:14
52:9 57:16

I've 14:5
22:7 29:11

29:21 49:4

—————
J
—————
jail 12:3
55:20

JEFFREY 5:3

jeopardize
30:19

job 8:5
14:22 15:13
15:21 16:15
16:17 26:18
26:19 28:8
28:23 31:18
39:18 39:23
39:25 40:16
46:14 46:25
47:3 47:13
47:13 47:14
51:25 52:13
53:23 54:12
54:13 55:8
55:13 56:3
56:7 56:14

jobs 26:7
28:3 39:20
39:21 56:9
56:20

Josiah 5:9
9:15

judgement
14:14 19:25
20:4 20:8
20:12 56:16

judges 25:5

judicial
71:24 72:1

jumpsuit
75:23

juror 72:11

juxtapositio
n 67:11

—————
K
—————
Kendal 7:15
7:17

Kendall 11:3

Kentucky
8:25 24:7
24:23

kids 8:8
13:3

kill 24:19
25:18 25:19
26:10 29:7
29:15 29:16
29:20 30:15
30:18 31:16
33:4 44:23
44:25

killer 22:12

killers
26:16 27:3
29:13

killing
23:16 29:19
30:2 72:14
72:14

kitchen
10:11

knew 14:10
34:9

knowingly

County
COURT REPORTERS, Inc.
Videography   Litigation Technology™

72:15

**knowledge**
62:13

---
L
---

**lack** 27:1
66:6 66:7

**Lancaster**
7:8

**land** 12:3

**large** 62:18

**last** 6:18
9:9 9:17
14:16 37:6
43:16 49:12
50:16 53:4

**later** 29:9
30:8 44:15

**law** 30:5
62:14 68:25
70:4 71:10

**lawyers**
57:15 57:19
68:21

**lay** 44:12

**least** 35:24
45:9

**leave** 20:2
44:13 44:17

**leaving** 30:9

**led** 47:9
47:18 62:8
62:24

**legal** 40:15
46:8 56:3

56:7 56:12
56:13 77:4

**legally** 46:9
46:9 46:10
77:7

**length** 68:7

**less** 10:21
18:15 72:21

**lessen** 38:23

**let's** 10:3

**level** 14:23
19:23 62:12
67:3

**liberty**
31:12 59:8

**licensed**
70:5

**lie** 37:3
37:3

**lied** 40:4

**life** 9:8
20:7 25:14
28:24 34:21
39:16

**likelihood**
59:17

**limitations**
67:20 67:21

**limited**
59:10 69:18

**line** 16:17
16:19 22:24

**link** 63:10

**listen** 25:15

36:25 68:14

**listened**
41:21

**literally**
48:2

**little** 14:11
32:4 44:18
45:10

**live** 7:6 7:7
7:12 37:1
58:4

**lived** 8:24

**lives** 7:14
24:8 36:23

**living** 10:8
10:10 10:16
67:22

**local** 68:25

**located**
10:19

**location**
24:18 33:12
70:17 71:1

**Logistically**
13:1

**long** 7:19
7:24 8:22
12:15 18:17
22:8 44:1
44:1 58:4
68:3

**longer** 73:21

**lost** 8:4

**lot** 13:5
14:8 14:8

15:1 18:18
23:12 34:14
35:7 38:15
40:21 42:13
42:13 50:23
58:8 58:9
58:14 61:5
63:6 65:16
67:9 67:14
67:24

**lying** 42:6
42:7

---
M
---

**ma'am** 6:9
74:12

**magazine**
43:1

**Magna** 8:17
16:3

**main** 10:10
10:10

**mainly** 45:4
46:15

**maintenance**
8:16 16:13

**man** 29:16
29:16 34:10

**manager** 8:5

**market** 56:11

**marksman**
37:8 37:19
49:25

**marksmanship**
36:6 36:13

**married** 7:20

**marshals**
75:1

**Marvel** 49:4

**matter** 5:8
37:14 40:18
58:1 58:12
62:25 69:24

**matters**
57:18 62:13
68:7 68:20

**may** 6:23
6:25 40:12
40:13 69:22
70:8 70:9
71:17 72:17
72:19 74:25
76:2

**maybe** 29:12
44:1 65:12

**mean** 9:8
11:14 11:19
17:18 18:21
19:25 26:3
28:2 31:8
32:1 32:3
34:4 41:15
54:6 54:8
56:24 58:8

**meaning**
69:17 72:3

**means** 11:8
12:20 30:4
39:8 52:25
58:14 77:16

**meant** 19:20

**measures**

62:18

**meat** 60:14

**media** 54:16

**medical** 70:5
70:22

**meet** 13:21
13:23 33:12
55:13 56:9

**meeting**
14:22 23:8
28:10 30:14
30:22 33:9

**meetings**
42:17

**member** 26:22
55:4 60:2

**members**
67:12

**mental** 44:4
44:5 70:22

**mercenary**
26:7 28:4
39:20

**mere** 41:6

**merit** 51:8

**messages**
53:19

**messed** 37:1

**met** 33:8
39:10 48:19
61:24

**Middle** 69:19

**miles** 15:14

**military**

23:13 36:12
37:22 49:6
49:8 49:23
60:3

**mind** 14:10
20:20 30:1
38:18 44:11
53:22 54:1
54:7

**mind-blowing**
14:7 14:19

**mindful**
59:11

**minds** 35:1

**minimum** 48:2

**minimum-wage**
56:14

**minute** 57:6
57:14 57:21

**minutes**
44:15

**miraculously**
27:11 55:24

**misdemeanor**
72:1 72:24

**mistake**
26:12

**Mitchell**
24:2

**mitigating**
68:4

**mom** 9:14
9:21 12:25
15:21 15:24
24:21 25:2

51:17 55:24
55:25 56:15

**moment** 12:23
31:5

**monetarily**
15:8

**monetary**
56:1

**money** 15:20
15:22 15:24
22:17 24:1
24:14 24:15
24:17 24:21
25:19 26:9
26:23 27:11
27:21 31:11
38:15 38:17
39:13 44:10
44:12 44:17
44:25 46:6
47:20 47:21
51:18 51:20
52:8 52:8
55:17 55:23

**money-making**
25:3

**monitoring**
50:12 71:1

**months** 45:6
45:22 52:18

**morality**
65:23

**morning** 6:5
76:23 77:20

**Mostly** 60:4

**mother** 52:3

55:18

motion 77:15

motivation
76:3

mouth 22:11

moved 8:25

movies 49:4

murder 17:15
17:20 27:10
27:24 28:11
33:21 34:5
51:6

murder-for
17:12 27:23
64:10

murder-for-
hire 17:1
17:7 32:21
61:8

murderous
65:7

myself 11:20
29:12

_____
        N
naivety
38:14

Naomi 6:1
6:19 7:1

narcotic
70:3

Nashville
7:10 11:15
13:16 41:9
57:25 67:22

Natalia 7:16

National
37:10 37:16

nature 59:3
59:6 61:1
61:5

necessarily
66:19

necessary
25:22 50:20

neck 77:17

news 10:1
13:24

nickname
35:7 35:10
35:18 35:19
36:6 36:11
37:22

nonappearanc
e 59:18
60:4 60:8

none 35:24

no-nonsense
67:15

norm 59:9

normally
43:19

noted 64:16

notes 32:13
61:7 61:13

nothing 6:13
36:4 38:21
49:9 78:1

notify 73:19

_____
        O
obey 74:18

obligation
15:20

obligations
32:5 70:24
74:2

obstruct
70:12 70:13
72:6

obtain 55:11
56:12 56:13
69:14

obvious
43:12

obviously
38:16 40:6
42:6 46:5
61:9 75:4
77:3

occupants
47:6

occurred
33:3

odd 44:8

offense 59:4
71:24 72:1
72:20

offenses
59:14

offer 63:14

offered
62:25 66:24
67:5

office 69:11
69:13

officer
13:22 26:14
32:12 32:14
32:16 34:18
38:8 71:14
72:11

officers
38:7

officials
62:14

Oh 16:6 19:4

Ohio 7:7
8:25 13:23
27:18 27:21
41:7 55:8
55:16 67:8
69:19

okay 7:19
8:18 8:22
9:3 9:23
10:3 10:6
10:13 10:19
10:22 11:4
13:8 13:14
13:18 14:6
14:13 14:16
15:10 16:6
16:9 16:15
16:23 17:5
17:17 18:2
19:18 21:1
21:5 21:14
23:17 30:9
31:15 32:11
33:14 33:19
35:6 36:14

53:2 54:18
54:22 54:23
55:1 56:23
57:4

**one-weekend-a-month**
52:2

**online** 20:1
26:6

**open** 73:16
74:15

**operation**
31:13

**Operational**
16:17

**operations**
8:5 26:19

**opinion**
62:10

**opportunities** 23:10
23:19 67:25

**opportunity**
25:1 25:3
26:11 37:17
39:24 41:20
43:1 61:14
61:15 67:5
68:20

**opposing**
36:21

**ops** 34:14

**options**
26:15

**order** 30:24

60:15 68:11
68:22 69:7
69:9 71:19
73:6 73:15
74:22 76:14

**orders** 11:10

**ordinarily**
58:22

**others** 27:14

**outcome** 76:1

**overall**
38:12 46:23

**overlook**
48:15

**owner** 46:8

—————
P
—————

**package** 24:1
24:17 31:11

**page** 36:10
73:9 73:12

**pages** 44:1
44:1

**paid** 26:6
43:7

**paintball**
53:14

**pales** 58:16

**paper** 20:2

**paraphrasing**
23:12

**parcel** 54:1

**parents** 20:5
52:8

**parody** 54:19
63:9

**participate**
70:16

**participating** 19:15
61:8

**particular**
40:20 60:24
60:25 61:3
62:11 64:24
66:11 66:22

**particularly**
64:2 75:25

**parties**
59:15 62:19

**party** 63:1

**pass** 73:5

**passport**
69:13 69:14

**patch** 70:10

**path** 62:9
63:20

**pay** 24:21
33:2 51:20
52:8 71:4
71:6

**pecuniary**
33:3

**penalties**
72:12 74:21

**pending**
58:23 74:24

**people** 25:18
26:10 27:3

27:10 29:7
37:2 37:3
48:11 57:3
58:9

**perform**
27:13

**Perhaps** 32:6

**period** 71:4

**permit** 71:12

**person** 12:19
23:21 24:3
24:8 28:11
29:20 29:21
31:6 31:7
33:5 34:15
39:10 44:25
58:25 67:9
67:15 69:22

**personal**
34:21 69:16

**personally**
55:6 74:3

**personnel**
71:10

**persuaded**
65:15

**Peter** 24:2

**phone** 22:13
33:17

**photo** 45:13

**photograph**
53:8

**photos** 24:3
45:14

**physical**

**picture**
53:17 53:21
54:16

**placed** 62:17
69:8

**plain** 71:14

**plan** 15:12
44:12 44:17

**plausible**
39:14 44:19
52:17

**please** 6:10
6:16 6:21
7:5 12:10
22:6 73:5

**point** 27:8
27:13 30:5
31:1 42:2
45:17 53:20
54:2 62:2

**pointed**
60:13 61:13

**points** 48:16
55:6 66:6

**poor** 20:12

**pose** 64:14
66:18

**posed** 59:7
60:17 64:14

**poses** 59:17
60:1 60:25
66:9

**position**
37:2 75:6

**possess**
69:25 70:3

**possible**
28:3 71:9

**post-arrest**
35:22

**posted** 45:17
45:18 53:9
53:17

**posting**
53:24 54:16

**posts** 54:19

**potatoes**
60:14

**potential**
66:16 67:25

**potentially**
13:19 68:1

**power** 31:21

**powerful**
25:16

**practitioner**
70:6

**predict**
25:25 50:25

**pregnant** 8:1

**preparation**
34:14

**prescribed**
70:5

**present** 5:10
42:3 52:10

**presented**

35:18 35:24
43:15 47:23
64:10

**presently**
49:20

**pressure**
14:8 15:7
51:17 55:24
56:3 56:15
56:19

**presumably**
61:24

**presumption**
59:12

**pre-trial**
69:1 69:10
69:20 70:7
70:18 70:25
71:2 71:6
71:9 71:12

**preventively**
60:16

**previous**
10:13 24:12

**previously**
10:15

**preyed** 62:10

**prior** 59:9
60:3 60:5
66:7 69:20

**prison** 71:25
72:5

**probably** 8:8
10:23 14:14
16:18 46:22
50:24 56:21

57:23

**probation**
11:20 13:22
69:13

**problem**
15:17 15:18
21:2 28:25
61:21

**problems**
75:19

**proceed** 6:23

**proceedings**
54:9 59:1
59:18 60:11
67:6 73:19

**process** 17:3

**processing**
74:25

**productive**
26:21

**proffer** 49:5

**program**
70:17 71:3
71:5

**prohibited**
70:7 70:11
70:14

**promise**
30:16 33:1

**promises**
74:18

**proof** 21:19
21:25 35:9
35:10 37:5
37:11 37:24

38:24 40:9
45:24 46:20
49:11 50:13
50:16 56:6

**properly**
31:13

**proposed**
33:21 55:3
64:10

**proposing**
12:17

**prosecuted**
72:18

**prosecution**
69:23 71:20

**protect** 27:6
28:1 57:3
65:6

**provide**
18:24 47:12
47:15

**provided**
71:4

**provides**
77:21

**PSR** 43:25

**psychologica**
**l** 23:16

**puffery**
65:17

**punishable**
72:5 72:20

**Punisher**
49:4

**punishment**

71:24 72:1
72:19

**purchased**
42:22 42:24
45:22 53:10

**pure** 41:10
43:17

**purposes**
54:8

**puts** 11:11
76:8

————————
           Q
**question**
18:8 23:20
25:17 30:12
34:12 42:11

**questioning**
71:11

**questions**
6:7 12:8
12:22 18:4
18:6 22:15
68:17

**quickly** 17:3
68:18

**quite** 31:22

**quotes** 22:9

————————
           R
**raise** 6:11

**random** 70:8

**rape** 22:24

**rather** 57:24
68:18

**reached**
51:14

**reaching**
52:16

**ready** 5:19
5:23 5:25
22:7 23:9

**real** 12:20
20:3 26:13
26:15 27:21
63:14

**realize**
11:13 14:20

**really** 21:12
23:14 31:2
31:17 34:9
37:1 50:24
57:18 58:2
58:14 59:21
60:14 61:21
64:22 65:11
65:13

**Reaper** 25:20
35:8 35:11
35:13 35:16
35:19 36:6
36:11 37:23
48:25 49:3

**reason** 25:17
27:16 29:15
30:10 64:22
65:25

**reasonable**
77:21

**reasonably**
49:15 50:9
58:25 60:10

66:21 68:10

**reasons**
67:14

**receipt** 33:2
73:14

**receive**
68:19 72:4
73:3

**received**
9:24

**recess** 57:5
57:8 57:10
57:13 78:4

**recognize**
39:12 51:12
51:14 51:15
65:2

**recognizes**
67:19

**recognizing**
47:25 66:15

**recollection**
52:3

**record** 6:2
6:17 25:24
26:2 27:1
57:13 60:5
66:7 77:5
77:12

**recorded**
22:13

**recovered**
25:10

**REDIRECT**
18:10

**referred**
35:7  35:12
63:8

**Reform** 58:22
59:12

**regard** 27:7
62:6  62:15
63:21  65:21
66:6

**regarding**
54:4  55:2
60:24

**regards** 61:5

**reject** 61:23

**relate** 38:22

**related** 9:3

**relates**
64:13

**relationship**
30:19

**relay** 32:23

**release**
11:12  16:25
20:21  31:20
40:25  50:17
55:9  59:8
62:23  64:14
65:8  68:3
68:9  68:25
71:17  71:19
71:23  72:15
72:16  73:6
73:15  73:21
74:18  74:19
75:12  75:21
76:13

**released**
10:16  10:23
14:24  19:3
47:1  58:23
68:12  68:23
74:23  75:4
77:7

**releases**
41:8  41:9

**relieve**
14:25  15:20

**religious**
70:21

**relying**
32:10

**remains**
66:15

**reminding**
28:17

**remote** 67:6

**removed** 30:2
32:4  67:24

**rent** 24:21
51:21  52:9
56:1

**rentahitman.
com** 26:5
53:20  53:23

**repeatedly**
30:15  61:22

**report** 69:10
71:8

**require**
72:17

**required**

13:20  69:4
70:7  74:25

**requirements**
70:18  71:3

**requires**
58:23

**residence**
69:2  69:17
70:20

**resolve**
75:18

**resources**
61:2  63:5
66:13

**respect**
60:12

**respond**
36:20

**responded**
39:9  42:10

**responding**
38:11  46:15

**response**
6:15  38:8

**responsibili
ties** 67:17

**responsibili
ty** 15:25

**responsible**
11:9  74:3

**restricted**
70:20

**restriction**
70:17

**restrictions**
69:16

**result** 71:17
71:21

**resulting**
51:6

**resume** 35:19
36:5  36:5
37:21  42:14
56:25

**retaliate**
72:8  72:8

**retaliation**
72:12

**rethink** 74:8

**return** 50:5
62:20

**reviewed**
74:22

**revocation**
71:19

**ring** 22:22
29:5

**rise** 5:5
57:9  57:11

**risk** 32:8
41:2  41:4
41:7  41:11
41:12  43:12
43:24  49:18
51:4  60:1
60:7  66:16
68:1  68:4

**road** 7:8
61:24

**role** 67:16

**roof** 20:11

**rookie** 25:20

**room** 10:10
  10:10 10:11
  19:6 47:4

**rubber** 61:24

**rule** 41:15

**rules** 11:10
  11:22 20:16
  41:16

**rural** 67:24

**rush** 24:20

———————
S
———————

**sad** 29:17
  29:22 30:1

**safe** 50:10

**safety** 59:1
  66:22 68:10

**salary** 13:4

**sanctions**
  74:21

**satisfied**
  60:8 66:9
  68:9

**Sauer** 24:13

**scared** 39:14

**scenario**
  34:5 34:8
  34:18 62:21
  64:5 64:9

**scenarios**
  38:10 64:3

**scheme** 64:11

**Schiferle**
  5:12 5:15
  5:17 5:20
  12:8 12:10
  12:12 16:11
  17:6 17:8
  17:12 17:15
  17:18 17:23
  18:3 21:8
  21:9 21:24
  22:2 22:6
  27:5 27:9
  28:2 28:13
  28:16 30:11
  30:25 31:25
  32:3 32:9
  32:17 32:22
  33:11 33:15
  33:23 34:2
  34:6 34:11
  34:23 35:14
  35:25 36:4
  36:11 36:15
  36:16 53:3
  53:6 53:16
  54:10 54:21
  54:24 55:2
  56:21 56:24
  59:24 61:7
  61:13 64:16
  64:20 76:15
  76:17 76:22
  76:25

**Schiferle's**
  51:2

**school** 48:9

**scope** 24:6

24:23

**screening**
  70:11 70:14

**seat** 6:22

**seated** 5:6

**Seating** 8:17
  16:3

**seats** 16:5
  16:7 26:20

**second** 22:16
  23:22 36:10

**seek** 56:20
  69:12

**seem** 38:22
  40:12 40:13

**seems** 55:4
  67:12

**seized** 27:16

**selected**
  45:14

**self** 51:12

**send** 15:20
  15:23 41:17
  54:19 55:23

**sending**
  55:17

**senior** 63:15

**sensational**
  61:5

**sense** 65:23

**sent** 41:17

**sentence**
  69:5 72:2
  72:4 72:17

73:3 74:20

**serious** 48:1
  72:13 75:9
  75:9

**seriously**
  26:4 29:19

**seriousness**
  38:23 59:7

**serve** 58:6
  66:25 67:18
  69:5 72:17
  74:8 74:20
  76:6

**services**
  69:1 69:10
  69:20 70:8
  70:19 70:21
  70:25 71:2
  71:7 71:9
  71:12

**setting** 73:6
  73:15

**seven** 7:21
  15:14

**several**
  31:20 31:23

**severely**
  75:23

**sexual** 22:23

**she'd** 50:6

**she'll** 47:14

**she's** 7:17
  7:18 8:7
  8:8 53:18
  67:18

County
COURT REPORTERS, Inc.
Videography   Litigation Technology™

Case 3:23-cr-00081   Document 21-2   Filed 04/22/23   Page 102 of 107 PageID #: 276
800.262.8777 TOLL-FREE   540.667.0600 LOCAL   540.667.6562 FAX   CountyCourtReporters.com

**shook** 30:16 64:21 65:12

**shoot** 23:1 28:21 41:21 43:7 45:9

**shooting** 25:12 52:15

**short** 57:5 57:13

**shot** 37:25 38:1 43:5 43:5 50:2 52:24

**showed** 28:21

**shown** 38:25 39:18

**shows** 29:18 46:21

**Sig** 24:11 24:13 46:1 46:3 46:4 46:5 46:6 46:9 46:12 46:13

**significance** 54:6

**significant** 59:22 63:22 64:12 66:10

**significantl y** 72:13

**similar** 51:4

**simply** 42:16

**simultaneous** 54:25

**simultaneous ly** 54:12

**single** 39:6

**sister** 6:1 27:19 46:19 55:4 55:17 55:22 56:17

**sister's** 50:5 50:18 52:10 76:4

**site** 51:14

**situation** 31:3 31:19 47:17 62:16 62:21 66:2 67:13 67:22

**situations** 19:24 31:4

**six** 6:2

**six-and-a- half-hour** 7:11

**skill** 57:16

**skills** 25:9 25:11 25:12 26:9

**skillset** 27:14 28:8 28:23 54:14 56:9 56:25

**sleep** 75:18

**social** 48:10 54:16

**society** 26:22 27:2

28:5 31:9 31:15 55:5 59:8

**solemnly** 6:11

**somebody** 24:19 27:24

**someone** 12:17 13:23 16:20 16:25 23:16 25:14 26:8 27:12 28:25 29:6 29:14 29:16 29:20 36:24 41:21 43:7 52:15

**someone's** 26:1 43:20

**sophisticati on** 62:12

**sorry** 15:24 16:19 17:14 52:4

**sort** 12:19 19:15 28:24 31:18 35:17 53:25 56:16 60:14 61:5 62:2 64:18 65:4 65:19

**source** 35:10 35:20 36:2

**Southern** 69:18

**space** 10:9

47:5

**speak** 9:6 34:25 52:23 61:25

**speaking** 48:23

**special** 40:17

**specific** 27:2 31:4 31:6 31:19 33:4 33:21

**specifics** 22:18

**speculation** 41:10 43:18 45:5 47:24 49:20 50:23

**spell** 6:17

**spoke** 9:9 9:17 11:5 14:16 18:22 40:11 41:19

**spoken** 49:4

**stable** 52:11

**stand** 58:11 76:5

**standard** 50:18

**standpoint** 65:18 76:16

**start** 22:7 22:16 51:10 52:15

**started** 5:14

5:14 5:23
42:18 43:9
51:13 52:6
52:19 63:19

**state** 6:17
68:25

**stated** 10:15
12:23 36:23

**statements**
15:6 35:15

**states** 5:9
5:12 31:21
31:24

**statute**
17:13 17:16
33:10

**stay** 14:24
15:18 21:15
76:19 77:5
77:8 77:20

**staying**
47:11

**stays** 55:16
55:20

**step** 6:9
21:12 21:16
73:5

**steps** 23:7
24:5 24:9
25:8

**stop** 71:11

**story** 18:17
18:20 34:1
35:4

**straight**

22:10

**strengthens**
56:8

**stress** 14:8
14:15 14:23
15:1 15:7
15:11 18:15
18:18 19:23
47:8 47:19
55:17

**strict** 75:12

**strong** 57:17

**stuff** 39:3

**subject**
68:12 68:23
74:24

**submit** 26:25
41:3 41:14
41:23 43:14
45:21 48:13
50:4 52:7
69:9 70:6
71:1

**substance**
50:12 50:14
70:4 70:11
70:14 70:22

**substances**
70:7

**substantiall
y** 59:23

**suburbs**
10:20

**successful**
51:5

**suddenly**

27:17 27:17

**suggest** 60:1
66:17

**suggests**
65:12

**Sunday** 14:21

**supervise**
73:17

**supervises**
16:12

**supervision**
30:24 69:9
69:10

**supervisor**
8:16

**support** 6:6
58:12

**sure** 15:16
18:9 19:19
23:5 30:11
35:8 62:3

**surrender**
69:12 72:17
73:2 74:19

**surrendered**
69:4

**surveil**
24:18

**suspect**
58:15

**swear** 6:11

**sweat** 70:10

**sworn** 7:1

**system** 70:10

**T**

**taking** 13:8
22:19 38:19
38:21 47:16
57:1 57:1

**talk** 23:11
25:24 40:8
40:11

**talked** 19:14
22:18 22:22
24:12 32:11
41:18 46:1
50:23 63:16

**talking**
22:11 25:7
26:14 32:14
32:20 33:19
43:9 45:20
52:19 53:13
53:14 54:17
63:23

**tamper** 70:13
72:7

**tapering**
72:12

**target** 23:25
24:17 31:11
33:24 34:24

**targets** 25:4
27:3

**tattoo** 35:16
49:8

**taught** 25:12

**team** 34:13

**telephone**

33:6 64:1
69:3

**ten** 71:25
72:5

**Tennessee**
57:25 69:19

**tension**
59:11 66:16

**term** 71:25
72:2 72:20
73:1

**terms** 62:12
65:18 66:16

**testified**
7:2 51:17
52:3 52:11
55:18 55:22
56:17 62:15

**testify** 67:8

**testimony**
6:12 15:4
46:20 58:7
67:1

**testing** 70:6
70:8 70:9
70:10 70:12
70:15

**text** 9:7

**texting**
14:21

**thank** 5:6
5:21 6:21
12:7 12:15
19:11 21:11
21:23 22:3
22:5 26:14

28:16 36:15
36:16 53:2
53:6 57:4
57:8 57:14
57:19 57:22
58:20 74:11
74:13 76:25
78:2 78:4

**That'll**
76:14

**themselves**
39:2

**theoreticall
y** 32:5

**theories**
33:16

**therefore**
68:11

**there's**
14:12 25:13
27:16 33:15
36:1 45:23
50:12 51:4
51:8 55:7
55:9 57:23
60:3 60:7
63:9 65:25
77:4 77:7

**they're** 31:2
43:21 43:23

**third** 10:11
62:25

**third-party**
11:5 11:8
12:18 46:21
50:6 54:4
55:3 58:7

66:25 67:17
74:8 76:6

**thoughts**
23:23

**threat** 60:17
60:19 60:25
61:1 63:3

**ticket** 41:5

**ties** 60:2

**today** 5:11
9:13 12:16
13:7 13:9
46:19 55:22
57:22 73:16

**tomorrow**
76:21 76:22
77:20

**tool** 54:11

**tools** 25:6
25:8 26:8

**top** 73:9

**torture**
22:18 22:25
25:21 39:3
39:5 39:7

**totally** 63:7

**touch** 29:24

**tough** 57:16

**toward** 20:8
68:4

**towards** 48:4
48:6

**traffic** 41:5
71:11

**traffickers**
25:5

**trail** 20:2

**trained** 31:3

**training**
32:12 37:13

**TRANSCRIPTIO
N** 5:1

**transferred**
9:1

**transport**
11:15

**transportati
on** 12:24
15:17

**travel** 69:15
69:17 69:18

**treatment**
70:23

**trial** 58:24
59:9 59:10

**tried** 23:11
40:8 40:11

**trophies**
22:19 25:22

**trouble**
76:10

**true** 10:14
22:22 23:19
29:5 42:14

**truly** 51:12

**truth** 6:13
6:13 6:14

**try** 25:13

38:17 44:25
46:13 57:3
65:3

**trying** 32:23
38:15 38:23
40:5 44:9
46:25 47:2
47:20 50:25
53:23 77:10

**TUESDAY** 5:4

**turn** 63:7

**turned** 22:17

**two-bath**
10:6

**type** 20:2
61:7 61:12
65:9 66:2
67:13

---
U
---
**U.S** 69:13

**UC** 23:9
23:11 24:4

**ultimate**
16:20

**ultimately**
30:8 76:9

**unable** 19:7
47:14 47:20

**undercover**
14:21 22:14
23:20 23:22
24:10 26:14
29:10 30:13
30:17 30:20
31:3 32:12

32:14 32:16
33:13 33:20
35:17 42:23
43:9 45:20
48:19 48:24
52:19 62:9

**understand**
15:19 30:12
30:25 35:9
55:16 55:21
55:23 74:1
75:11 76:11
77:9 77:9

**understandin
g** 66:3 66:4

**understands**
67:16

**understateme
nt** 55:21

**understood**
19:20

**unescapable**
61:6

**unimaginable**
63:12 63:16

**United** 5:8
5:12

**units** 49:7
49:8

**unknown**
62:13

**unlawfully**
70:3

**unless** 58:24
70:5

**unsavory**
27:20

**unseen** 62:14

**upon** 62:10
62:17 63:17
66:5

**upper** 16:21

**upset** 34:9

**upsetting**
64:6

**upstairs**
10:10

**upstanding**
55:4

**urine** 70:9

---
V
---
**vacation**
13:5 13:8

**vacuum** 31:19

**value** 29:8
33:3

**Vanderbilt**
26:18 39:19
39:23 40:1

**vehicle**
33:12 33:18

**vehicles**
15:15 16:5

**veracity**
25:18

**verify** 37:18
37:24 39:24

**versus** 18:15

**victim** 69:22
72:7 72:9
72:11

**video** 6:4
35:21 36:2

**videogaming**
35:11

**view** 28:24
71:15

**viewed** 38:16

**vigorously**
75:6

**violate**
68:24 74:2
75:20

**violates**
73:20

**Violating**
71:16

**violation**
20:21

**violence**
48:8 49:9
49:10 60:19
64:7

**violent** 48:4
48:6 48:11
64:19

**visit** 71:12

**visits** 70:23

**vulnerabilit
ies** 62:11

---
W
---
**Wait** 73:10

County
**COURT REPORTERS**, Inc.
Videography    Litigation Technology™

Case 3:23-cr-00081    Document 21-2    Filed 04/22/23    Page 106 of 107 PageID #: 280
800.262.8777 TOLL-FREE • 540.667.0600 LOCAL • 540.667.6562 FAX    CountyCourtReporters.com

waiting
  29:11

walked 44:15

warrant 44:6
  71:18

wasn't 25:6
  30:17 32:25
  35:11 38:9
  38:18 39:19
  39:20 44:21
  58:4

Watch 21:16

watches 13:6

ways 27:21
  63:7 66:4

weaknesses
  65:20

weapon 27:15
  27:15 70:1

wearing 70:9

website
  26:13 52:16
  54:19 63:8
  63:9 63:10
  63:11 63:13

We'd 42:4

Wednesday
  57:25

week 30:8
  31:12 31:15
  34:20

weekend 24:6

weeks 11:6

weighing

29:18

weight 59:4
  64:25

welcome 5:8
  21:15

we'll 57:8
  62:3 78:4

we're 5:25
  9:12 40:23
  47:16 57:12

we've 10:14
  18:13 40:21

whatever
  44:20 46:7
  51:16 76:1

whatsoever
  63:14

whenever 8:1
  8:4 13:6

whereas
  73:16

WHEREUPON
  6:15 21:17
  57:10 78:5

whether
  34:25 40:25
  52:12 59:16
  60:25 62:1
  65:22 65:22
  66:20

Whew 8:24
  18:17

Whoever
  20:24

whole 6:13

9:8 18:19
  20:7 40:22
  51:13 65:16

who's 16:25
  39:15 58:11

wild 40:12

willing 11:1
  11:17 11:24
  12:1 13:15
  58:11

willingness
  27:10 58:6
  61:11 67:18
  76:5

witness 6:19
  12:9 16:8
  19:17 19:19
  19:23 20:14
  20:16 20:23
  21:3 21:14
  21:17 35:3
  62:25 67:2
  69:22 72:7
  72:9 72:10

woman 34:10
  64:9

work 7:22
  7:24 7:25
  8:13 13:1
  16:17 16:19
  26:24 28:4
  51:20 57:20
  65:3

working 8:8
  13:2 19:3
  19:5 26:19

works 8:17

15:13 16:2

world 14:12
  22:15 26:16
  57:24

worried
  52:21

writing 69:2

wrong 44:9

wrote 32:13

———————
        Y
———————
y'all 57:7

year-old
  39:15

yesterday
  5:14 15:5
  22:10 28:19
  40:2 40:9
  49:7 51:17
  55:18

yet 24:11

you'll 68:19
  70:19 72:22

young 25:23
  26:3

youth 27:1

you've 13:24
  23:12 35:7
  77:3 77:6

YRC 8:5