# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | Case No. 3:23-00081 |
| v. ) | JUDGE CRENSHAW |
| ) | |
| ) | |
| JOSIAH ERNESTO GARCIA ) | |

## JOSIAH GARCIA'S MEMORADUM ADDRESSING 3553(a) FACTORS

The underlying conviction represents Josiah Garcia's very first *and only* criminal conviction. Before this, he had never had any sort of contact with law enforcement. As a result of curiosity, naivete, and a desire to help take care of his family, he engaged in unlawful conduct. But nothing about Mr. Garcia's conduct was dangerous or violent. He talked a good talk, but none of his actions reflect any intent to harm anyone. What his actions did reflect is a young man who was very naïve and easily manipulated. But he makes no excuses. He accepted responsibility and pled guilty to the single count in the Indictment. See (D.E. 30).

Through counsel, he files this memorandum addressing the sentencing factors. Considering those factors, Mr. Garcia requests the Court impose a non-custodial sentence of 3 years of supervised release. This sentence is sufficient but not greater than necessary to satisfy the objectives of sentencing.

I. **Mr. Garcia's personal characteristics and the nature and circumstances of the offense.**

Mr. Garcia was born in Spring Hill, Florida to the marital union of Marvin and Patricia Garcia. His father has always worked in warehouses to support the family. His mother was a homemaker who raised the family in an "extremely devout Christian household". Mr. Garcia has

one full sibling, his brother Jacob. He also has three older maternal half sisters – Heather, Sarah, and Tiffany. He was not raised in a home with either of his sisters.

When Mr. Garcia was born, his sisters had already moved out of the house. The relationship between his sisters and his mother was fractured to say the least. His sisters' description of his home life was much different that Mr. Garcia's. His oldest sister, Tiffany, was the first to move out of the home due to issues with their mother. Sarah and Heather were both removed from the home due to physical abuse and at one point because their mother was in prison. After being placed back in the household, both sisters eventually left on their own due to their mother's controlling nature.

Mrs. Garcia controlled every part of her children's life. After his older sisters moved out, his mother decided to homeschool he and Jacob. Mr. Garcia reports having very little interaction with other children or family members outside of the home. Due to his mother's religious lifestyle, the family moved a lot, living from house to house or hotel to hotel. His mother was so controlling that she required Mr. Garcia to sleep in the bed with her until he was a teenager. Mr. Garcia himself states that he was very spoiled and that his parents gave him whatever he asked as long as it was within the bounds of his mother's religion. This wasn't much.

Mr. Garcia was not allowed to play "dangerous" video games or watch movies with more than a "PG" rating. He was allowed to play some sports – particularly soccer with a community team when the family relocated to Nashville. This would represent Mr. Garcia's first time interacting with teens his age that were not his brother Jacob or other extended family members.

It is important to note that neither Mr. Garcia nor his brother ever experienced physical abuse in their homes. They were never exposed to any drugs or alcohol during their childhood. Likewise, they were never exposed to violence in any community they lived in. Other than the

2

controlling and sometimes tumultuous nature of his mother, Mr. Garcia's basic needs were largely met.

Once he graduated from home school, he looked for ways to help support his family. He eventually joined the Air National Guard in Nashville in July 2021. He started boot camp one year later due to COVID restrictions. In August 2022, he began boot camp and was eventually certified as an "expert marksman". This certification was a certification that generally everyone in the cohort received and was not indicative of any superior shooting skills. In early 2023, he began working full-time on the base. After a few months however, his full-time status (alone with many others) was terminated. This created an issue for him as he used his money from this job to help provide for his family.

The loss of his job is primarily what precipitated the underlying conduct that led to his conviction. On February 16, 2023, he sent an employment inquiry to www.rentahitman.com ("Rentahitman") after learning about it from one of his former military colleagues. Rentahitman was a website that purported to offer hitman services. Essentially, one could go to the website to rent a hitman to kill a person of their choosing. Mr. Garcia is the first and only person to have ever applied for a job. The website is clearly not real.

The next day, February 17, Mr. Garcia contacts the site again to let operators know that the site was not working properly. On February 18, Bob Innes, owner of the site, responded to Mr. Garcia requesting a headshot, a resume, and an identification card. The next day, Mr. Garcia sent the requested documents. On February 20, Mr. Garcia sent a follow-up email touting his skills and informing Mr. Innes that he was "ready for the job". On the same day, Mr. Innes responded, informing Mr. Garcia that his application was still being reviewed. Mr. Innes found Mr. Garcia's

3

Facebook profile and was alarmed by a photo of Mr. Garcia holding what appeared to be a semi-automatic firearm while in his army uniform. This concern caused Mr. Innes to reach out to the FBI and inform them of the situation. This took place on February 23.

Mr. Garcia reached out to Innes one more time on March 23, 2023. During that same time, Mr. Garcia was searching for other positions at this point, which included a Care Provider position at Vanderbilt hospital. Mr. Innes was in communication with FBI Agent Stephen Hunter about what steps he should take next. On March 16, at the direction of Agent Hunter, Mr. Innes informed Mr. Garcia that a "field representative" would contact him regarding the next steps.

Over three weeks later, on April 3, 2023, Agent Hunter texted Mr. Garcia asking him if he was still interested in the job. At the time, Mr. Garcia wasn't even sure what job he had applied for. A phone call was set up and the two eventually spoke two days later. On that call, Agent Hunter essentially asked Mr. Garcia a barrage of questions and got him to agree to meet in person. Mr. Garcia acquiesced. An in-person meeting took place on April 6, 2023, at a cigar shop in Nashville. At this meeting, Agent Hunter described the job and asked Mr. Garcia if he had any questions. Mr. Garcia stated he had none. Agent Hunter continued to talk about the job and asked Mr. Garcia if he had questions about it and suggested he should ask questions no less than seven times. After finally asking about the pay for the job, Mr. Garcia agreed to accept it.

On April 13, Mr. Garcia met with Agent Hunter at a park in Hendersonville, Tennessee to give Mr. Garcia the target package which included a fake address and the photo of a person who did not exist, amongst other information. Prior to this meeting, Mr. Garcia spoke with his family about the job and told them he decided he was not going to take it. He had also been hired by Vanderbilt at this point.

4

Once the Mr. Garcia met with Agent Hunter, the very first words that came out of his mouth were, "do I still have to do this?" Agent Hunter reaffirmed that he did not have to move forward but still provided him with the package. Because of his personality and social awkwardness, Mr. Garcia did not tell Agent Hunter he did not want to proceed and instead planned to leave the money on the curb and drive off. Before a withdrawal could take place, he was immediately swarmed upon by law enforcement and arrested without incident. After being arrested, he told officers he had no plans to take the money, informed officers of where his firearm was, and provided officers with the credentials for his phone and computer.

Mr. Garcia's personal characteristics and history reflect a young man who was not mature enough to recognize the seriousness of his conduct. He was raised in a home where he was extremely sheltered. His primary goal for searching for this job was to help support his family. But even still, he understands that his conduct was unlawful and has accepted responsibility for his actions. While very serious, his actions were not at all indicative of who he was before the conduct and who is has been since he was charged with this crime and after he was convicted. Those years largely outweigh the month and a half he engaged in the underlying conduct and should be viewed as a more accurate representation of who he is and who he will be if he is allowed to remain in the community.

II. **The sentence is just, provides adequate deterrence and will protect the public from future crime.**

Mr. Garcia engaged in very serious conduct, but he meant no harm to anyone. It is not conduct that is so serious as to warrant anything close to what the Government requests. Mr. Garcia is a first-time offender. Prevention of crime and public safety are goals, but so are fair treatment, proportionality, parsimony, and potential for rehabilitation. Michael Tonry, *Doing Justice in*

5

*Sentencing*, The University of Chicago (2021). Imprisonment does not improve our safety, and it may be criminogenic. Denver, M. & Ballou, A., *Collateral Consequences and Public Safety*, The Arnold Foundation (2022). Simply punishing people convicted of crimes fails to address the underlying problems that may have led to the crimes in the first place. Travis, J. et al, *The Growth of Incarceration in the United States Exploring Causes and Consequences*, The Committee on Law and Justice of the National Academies (2014).

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: *The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, Measuring Recidivism"]. *See also* Part IV.A.3. And according to "the beset available evidence, … prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Empirical evidence demonstrates that sentence length does not affect general or specific deterrence, regardless of the type of crime. See Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates … were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Micheal Tonry, *Purposes of Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects … Three National Academy

6

of Science panels, all appointed by Republican presidents, reached the conclusion, as has every major survey of the evidence."); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders,* 48 Criminology 357 (2010) (studying over a thousand offenders who sentences varied substantially in prison time and probation and finding that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame"). When it comes to general deterrence, certainty of punishment is more important than severity of punishment. Tonry, at 30. Increases in the severity of punishment seldom, if ever, prevent crime. *Id.* at 29.

The sentence Mr. Garcia requests is just, protects the public, and will deter him from further crime. Quite frankly he has already been deterred. In the nearly two years that he has been out on pretrial release, he has had no issues and has consistently followed the Court's orders. That in and of itself is evidence that he has been deterred. Moreover, the Government is correct that this fact should weigh in Mr. Garcia's favor. But his performance on pretrial release is not the only fact that the Court should consider that weighs in favor of his requested sentence. During the time he has been out, Mr. Garcia has consistently remained employed. This is true even though he has found it difficult to remain employed due to the publicity of his charges. Likewise, he has taken the initiative to enroll in educational programs that will assist him in becoming a more productive citizen. He did not have to take this route – especially when the world was aware of the charges he was facing. But with his own perseverance, he consistently maintained employment.

7

**III.    The requested sentence will allow Mr. Garcia to continue to engage in mental health treatment.**

Mr. Garcia has been engaged in mental health treatment since he was released on conditions. The treatment has been a benefit to him thus far. If he is allowed to remain in the community, he can continue the treatment he started years ago. Taking him from that treatment would be reductive. Rehabilitation can be best achieved with Mr. Garcia in the community – not in prison.

**IV.    Conclusion**

Based on the foregoing reasons, Mr. Garcia respectfully requests this Court vary downward and impose a sentence of 3 years of supervised release.

Respectfully submitted,

/s/ *David K. Fletcher*
DAVID K. FLETCHER
Assistant Federal Public Defender
810 Broadway, Suite 200
Nashville, TN  37203
615-736-5047
E-mail:  David_Fletcher@fd.org

Attorney for Josiah Ernesto Garcia

8

## CERTIFICATE OF SERVICE

      I hereby certify that on February 18, 2025, I electronically filed the foregoing *Unopposed Motion to Modify Conditions of Release* with the U.S. District Court Clerk by using the CM/ECF system, which will send a Notice of Electronic Filing to the following: Brooke Schiferle, Assistant United States Attorney, 719 Church Street, Suite 3300, Nashville, Tennessee, 37203.

                                    /s/ *David K. Fletcher*
                                    DAVID K. FLETCHER